UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ROBERT JONES, | : | CIVIL ACTION NO. |
| | : | |
| Plaintiff | : | SECTION |
| | : | |
| v. | : | JUDGE |
| | : | |
| LEON CANNIZZARO, JR., and | : | MAGISTRATE |
| ABC INSURANCE COMPANIES 1-10, | : | |
| | : | |
| Defendants. | : | **JURY TRIAL DEMANDED** |

## <u>COMPLAINT</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

JURISDICTION AND VENUE ......................................................................................... 4

PARTIES ............................................................................................................................. 4

FACTUAL BACKGROUND.............................................................................................. 5

I.      Mr. Jones's Wrongful Convictions for Robbery, Kidnapping and Rape........................... 5

II.     Mr. Jones's Requests for Material, Favorable Information — Which He Was
        Constitutionally Entitled to Receive — and OPDA's Denial of His Requests................ 10

III.    Mr. Jones Uncovers Repeated Violations by OPDA of His Constitutional Right to
        the Disclosure of Material, Favorable Information.......................................................... 15

IV.     OPDA's Longstanding Policy or Custom of Violating the Constitutional Rights of
        Defendants By Not Disclosing Material, Favorable Information to Them ..................... 28

FIRST CAUSE OF ACTION — 42 U.S.C. § 1983   (Defendant Leon Cannizzaro, Jr.)............. 42

SECOND CAUSE OF ACTION — Louisiana Revised Statute § 22:1269   (Defendants
        ABC Insurance Companies 1–10) ................................................................................... 44

PRAYER FOR RELIEF ................................................................................................... 45

DEMAND FOR JURY TRIAL ........................................................................................ 45

## INTRODUCTION

1.        Robert Jones was wrongfully convicted and served over 23 years in prison for crimes he did not commit, as a result of repeated violations of his constitutional rights by the Orleans Parish District Attorney's Office ("OPDA").  From the time of Mr. Jones's arrest in 1992 through at least 2015, OPDA — in violation of its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny — suppressed information that not only demonstrated Mr. Jones's innocence but also pointed convincingly to another man's guilt.

2.        Mr. Jones was arrested in 1992 on suspicion of committing robbery, kidnapping, rape and murder in New Orleans's French Quarter.  OPDA prosecuted Mr. Jones for the robbery, kidnapping and rape while suppressing information establishing that another man — Lester Jones (who is no relation to Robert Jones) — was the sole perpetrator of these crimes.

3.        Specifically, OPDA suppressed information establishing that (1) the robbery, kidnapping and rape were part of a crime spree involving five similar incidents in the French Quarter in April 1992; (2) each of the crime spree crimes was committed by a perpetrator using a car that belonged to Lester Jones; (3) Lester Jones matched the detailed physical description of the perpetrator provided by the victims of each of the crime spree crimes; (4) Lester Jones was found in possession of items — a gun and pieces of jewelry — that were used or taken in connection with each of the crime spree crimes; and (5) the final crime in the spree was committed after Robert Jones was arrested and thus could not possibly have been committed by him.

4.        Because all of the physical evidence from the robbery, kidnapping and rape was linked to Lester Jones — not Robert Jones — OPDA argued at Robert Jones's trial that the two men knew each other, that Robert Jones used Lester Jones's car to commit the robbery, kidnapping and rape, and that in exchange for the use of the car, Robert Jones gave Lester Jones

jewelry from the robbery.  But OPDA also suppressed information establishing that there was no connection between Robert Jones and Lester Jones.  Specifically, OPDA suppressed the fact that (1) prior to Robert Jones's trial, Lester Jones told the Assistant District Attorney prosecuting Robert Jones, Fred Menner, that Lester Jones recanted his earlier statement that he knew Robert Jones, and (2) two New Orleans Police Department ("NOPD") detectives who investigated the crime spree crimes concluded that there was no credible evidence that Lester Jones and Robert Jones knew each other, that all of the evidence from the crimes implicated Lester Jones, and that Robert Jones was innocent — a conclusion that one of the detectives shared with OPDA prior to Mr. Jones's trial.

5.       Having been denied access to this critical exculpatory information, Robert Jones was convicted at trial of robbery, kidnapping and rape.  Following these wrongful convictions, OPDA moved forward with its prosecution of Robert Jones for murder — which occurred as part of the same crime spree as the robbery, kidnapping and rape — despite the overwhelming evidence that Lester Jones was the sole perpetrator of the crime, the NOPD detectives' conclusion that Robert Jones was innocent of the crime, and the fact that ADA Menner knew that there was no evidence linking Robert Jones to the crime.  None of this information was shared with Robert Jones.  Already facing a life sentence following his wrongful convictions for the robbery, kidnapping and rape, and having been persuaded by ADA Menner that a plea would substantially reduce the amount of time he would spend in prison, should his convictions in the robbery, kidnapping and rape case be overturned, Robert Jones pled guilty to manslaughter.

6.       Having secured Robert Jones's convictions based on its suppression of critical exculpatory information, OPDA proceeded for the next 19 years to oppose Mr. Jones's requests

for favorable information, repeatedly and falsely representing to various federal and state courts in the State of Louisiana that no such information existed.  Nevertheless, Mr. Jones ultimately uncovered OPDA's suppression of favorable information, which culminated in a 2014 decision by the State of Louisiana Court of Appeal, Fourth Circuit, vacating Mr. Jones's convictions for the robbery, kidnapping and rape on the ground that the favorable information suppressed by OPDA was material and its omission undermined confidence in the jury's verdict.

7.      Despite this rebuke, OPDA persisted in its efforts to retry Mr. Jones for the robbery, kidnapping and rape.  But in the face of evidence revealing OPDA's suppression of additional favorable information, OPDA agreed, on January 26, 2017, to dismiss the indictment against Mr. Jones for the robbery, kidnapping and rape and to move to vacate Mr. Jones's conviction for manslaughter.  Twenty-five years after Mr. Jones's arrest, OPDA's prosecution of him for crimes he did not commit was finally over.

8.      OPDA's violation of Mr. Jones's constitutional rights was not an isolated incident.  To the contrary: it was a direct and proximate result of OPDA's longstanding policy or custom of violating the constitutional rights of the defendants it prosecuted by not disclosing information favorable to their defense.

9.      Indeed, at the time of Mr. Jones's trial, OPDA's written policy regarding the disclosure of favorable information misrepresented what information prosecutors were constitutionally obligated to disclose to defendants.

10.      In addition, OPDA's history of failing to disclose favorable information to defendants has been documented in dozens of court decisions, including three decisions issued by the United States Supreme Court in *Kyles v. Whitley*, 514 U.S. 419 (1995), *Connick v. Thompson,* 563 U.S. 51 (2011), and *Smith v. Cain*, 565 U.S. 73 (2012).  Notably, the decision in

*Kyles v. Whitley* was issued just months before Mr. Jones's trial and involved the same type of disclosure violation at issue here — OPDA's suppression of prior inconsistent witness statements. OPDA thus had more than fair warning that suppressing such information violated its disclosure obligations under *Brady* and its progeny.

11.     And OPDA prosecutors violated defendants' constitutional right to the disclosure of favorable information with impunity. Harry Connick, the head of OPDA from 1974 to 2003 (including the time of Mr. Jones's trial), has testified that he disciplined only one prosecutor during his 30-year tenure as the head of OPDA for violating OPDA's disclosure obligations — by telling the prosecutor to be more careful the next time.

12.     Mr. Jones now brings this action against OPDA to recover damages under 42 U.S.C. § 1983 for the injuries he suffered and losses he sustained as a result of OPDA's policy or custom of violating the constitutional rights of defendants by not disclosing information favorable to their defense, and to hold OPDA accountable for depriving him of over 23 years of his liberty.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over Mr. Jones's 42 U.S.C. § 1983 claim pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

14.     This Court has subject matter jurisdiction over Mr. Jones's state-law claim pursuant to 28 U.S.C. § 1367.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## PARTIES

16.     Plaintiff Robert Jones ("Robert Jones" or "Mr. Jones") is a 44-year-old Louisiana resident who lives in New Orleans.

17.     Defendant Leon Cannizzaro, Jr. ("Cannizzaro"), whom Mr. Jones sues in his official capacity only, is the Orleans Parish District Attorney and head of the Orleans Parish District Attorney's Office ("OPDA"), a government agency located in Orleans Parish, Louisiana.

18.     Defendants ABC Insurance Companies 1–10 are as-yet unknown insurance companies who may have issued and currently have in effect one or more policies of insurance covering Defendant Cannizzaro and OPDA and/or the actions complained of herein.

## FACTUAL BACKGROUND

### I.     Mr. Jones's Wrongful Convictions for Robbery, Kidnapping and Rape

19.     On April 6, 1992, a group of friends — TP (whose full name is not used herein out of respect for her privacy as a sexual assault victim), her friend HT, and her boyfriend LJ — were spending the evening in New Orleans's French Quarter.  As the group neared Rampart Street, they were approached by a man with a gun who told them to lie down and robbed them.  TP was then forced to enter a car, which the perpetrator drove to the Desire Housing Project, where he took TP into a building and raped her.  (These events shall hereinafter be referred to as the Robbery/Kidnap/Rape.)

20.     On the night of April 14, 1992, Julie Stott and her boyfriend Peter Ellis were walking in the French Quarter, on Chartres Street, when they were approached by a man with a gun.  When Mr. Ellis and Ms. Stott refused the man's demand to lie down, the man shot and killed Ms. Stott.  (This shall hereinafter be referred to as the Stott/Ellis Attempted Robbery/Murder.)

21.     On April 17, 1992, a $10,000 reward was announced for information leading to a conviction in the Stott/Ellis Attempted Robbery/Murder.  Shortly thereafter, an NOPD officer received a Crimestoppers tip (later determined to be false) that Mr. Jones had made

statements implicating himself in the murder of Ms. Stott.  Based on the tip, the police prepared a photo lineup, which included a picture of Mr. Jones.

22.     The next day, NOPD Detective Debra Coffee, who was investigating the Robbery/Kidnap/Rape and interviewed TP, showed the photo lineup to TP.  Following a flawed identification procedure — in which multiple "fillers" in the six-photo lineup were actually known to TP, thus increasing the risk of TP incorrectly identifying Mr. Jones as there were fewer photographs of strangers for TP to select from — TP identified Mr. Jones as the man she believed was her assailant.

23.     Following TP's identification of Mr. Jones, NOPD officers who were with TP at the time were (according to TP) "so excited" that they reacted "like a . . . cheerleading squad" and gave TP the impression that the identification "was all they'd been waiting for — like they had the warrants drawn up and everything and were just waiting on me."  The police then obtained a warrant and arrested Mr. Jones for the Stott/Ellis Attempted Robbery/Murder and Robbery/Kidnap/Rape later that day.

24.     On April 21, 1992, after images of Mr. Jones had been publicized widely in the media as a suspect in the Stott/Ellis Attempted Robbery/Murder and Robbery/Kidnap/Rape, and following NOPD officers' "cheerleading" in response to TP's photo identification, NOPD officers showed a physical lineup, including Mr. Jones, to TP, HT and LJ.  Here again, the identification procedure was flawed.  Contrary to standard practice, TP viewed the lineup in the presence of another eyewitness — LJ — and identified Mr. Jones as the man she believed was her assailant.  LJ, who was thus aware of TP's identification of Mr. Jones, then identified him as the man he believed to be the assailant.

25.     Despite the flaws in the identification procedures described above, OPDA relied heavily on TP's and LJ's identifications of Mr. Jones at Mr. Jones's March 11–12, 1996 trial for charges stemming from the Robbery/Kidnap/Rape.

26.     OPDA also relied heavily at Mr. Jones's trial on TP's physical description of her assailant, even though key aspects of TP's initial description did *not* match Mr. Jones.  For example, when Mr. Jones was arrested in 1992, he had prominent gold "caps" covering all of his upper teeth — a distinctive feature that any witness who came into contact with him would have readily observed.  But TP's initial, detailed description of the assailant contained no mention whatsoever of "gold teeth," much less a mouth full of them.  This statement implicated another man — Lester Jones (who did not have gold-capped teeth) — and not Robert Jones (who did have gold-capped teeth).  The fact that TP's initial description made no mention of gold teeth was not disclosed by OPDA to Mr. Jones.

27.     Yet when TP testified at Mr. Jones's trial four years later, she stated that the assailant's "mouth was full of gold" and, in his closing argument to the jury, one of the OPDA prosecutors handling Mr. Jones's trial — ADA Menner — argued that TP's description of her assailant as having gold teeth proved that Mr. Jones was guilty, because Mr. Jones had gold teeth.

28.     As another example, in TP's initial description of her assailant, she stated that he was 25 to 30 years old.  This statement implicated Lester Jones (who was 30 years old at the time) and not Robert Jones (who was 19 years old at the time).  TP's initial description of her assailant's age was not disclosed by OPDA to Mr. Jones.

29.     Yet when TP testified at Mr. Jones's trial four years later, ADA Menner did not elicit from TP her initial description of the assailant's age.

30.     As yet another example, TP's initial account of the Robbery/Kidnap/Rape included a statement by the perpetrator that he was going to take TP to his "neck of [the] woods." This statement implicated Lester Jones, since the rape occurred one block from where Lester Jones lived. The fact that TP's initial account included this statement was not disclosed by OPDA to Mr. Jones.

31.     Yet when TP testified at Mr. Jones's trial four years later, she made no mention of the fact that the assailant said he was going to take her to his "neck of [the] woods."

32.     OPDA's heavy reliance on TP's and LJ's eyewitness identifications and physical descriptions of the assailant is explained by the fact that, without them, OPDA had no evidence against Mr. Jones at all.

33.     In addition, TP's and LJ's eyewitness identifications were unreliable. Not only were the procedures used to obtain them seriously flawed, a growing body of research and legal authority has established that eyewitnesses — particularly those who, like TP, are asked to identify suspects after undergoing highly traumatic events — are all too often honestly but wholly mistaken in their identifications. A recent analysis of DNA-based exonerations of wrongfully convicted defendants from 1989 to 2014 shows that eyewitness mis-identification was the most common contributing factor to their wrongful convictions, occurring in 72% of these cases. And of those, 83% were cases involving non-fatal sexual assaults and 86% were cases involving mis-identifications by victims.

34.     More disturbingly, in Mr. Jones's case, there was not only a lack of evidence against him, but also a plethora of evidence pointing to Lester Jones as the actual perpetrator. Indeed, by the time of Mr. Jones's trial, Lester Jones had already been convicted of committing the Stott/Ellis Attempted Robbery/Murder as well as another robbery, both of which, then

unbeknownst to Robert Jones, were part of a series of similar crimes committed in April 1992 in the French Quarter that included the Robbery/Kidnap/Rape.  And all of the physical evidence the police recovered relating to the Robbery/Kidnap/Rape — the car that was used, the jewelry that was stolen, and even the round-frame glasses that TP testified the assailant wore — was found in the possession of Lester Jones, not Robert Jones.

35.     The fact that all of the physical evidence was linked to Lester Jones, and not Robert Jones, presented a potentially fatal impediment to OPDA's prosecution of Robert Jones. In order to remove that impediment, ADA Menner needed to convince the jury that Robert Jones and Lester Jones knew one another — and that their association was sufficiently close that it could explain how Mr. Jones could have been the perpetrator, despite the fact that it was Lester Jones who was found with the car used to commit the crimes, the jewelry stolen during the robberies, and the distinctive round-frame glasses that were worn by the perpetrator.  Indeed, ADA Menner has acknowledged that this was an "important" point OPDA needed to establish at Mr. Jones's trial.

36.     But ADA Menner had no evidence establishing such a connection.  Instead, ADA Menner relied exclusively on the following ambiguous and misleading testimony he elicited from NOPD Detective Herman Cade, a detective who participated in the investigation of the Robbery/Kidnap/Rape and who also investigated the other robberies in the crime spree:

> ADA Menner:  "Do you know whether or not through your investigation Lester Jones knows Robert Jones?"
>
> Detective Cade:  "Yes."

37.     OPDA did not ask Detective Cade the obvious and necessary follow-up question: "And, based on your investigation, did Lester Jones know Robert Jones?"   This

omission was significant, since Detective Cade later testified in post-conviction proceedings that, had he been asked this question at Mr. Jones's trial, his answer would have been "no."

38.     Based solely on the above question and answer, ADA Menner made the following statements in his closing argument to the jury:

> "[W]e know the defendant knows Lester Jones.  That's uncontroverted.
> Remember, Detective Cade testified that through the investigation, he discovered
> that Lester Jones and the defendant were friends.  So we know that they knew
> each other.  We know they interacted.  And we can only assume, of course, that
> he borrowed the car from Lester Jones, and he gave him the jewelry in exchange
> for that.   But we know that there's a link between Lester and Robert,
> uncontroverted.  It's never been denied, and we know it to be true."

39.     In addition to OPDA's lack of reliable evidence, Mr. Jones, in his own defense, presented evidence that he did not commit the Robbery/Kidnap/Rape.  Five witnesses, as well as Mr. Jones, all testified that Mr. Jones was at his infant son's birthday party during the evening that the Robbery/Kidnap/Rape occurred.

40.     Nevertheless, on March 12, 1996 Mr. Jones was convicted at trial of the Robbery/Kidnap/Rape.

## II.     Mr. Jones's Requests for Material, Favorable Information — Which He Was Constitutionally Entitled to Receive — and OPDA's Denial of His Requests

41.     For over 23 years, from 1992 to 2015, Mr. Jones, both personally and by his attorneys, repeatedly requested that OPDA disclose to him any information that was favorable to him with regard to the Robbery/Kidnap/Rape.

42.     OPDA was required to disclose such information to Mr. Jones under a series of decisions by the United States Supreme Court, beginning with *Brady v. Maryland*, 373 U.S. 83 (1963), in which the Court held that, under the United States Constitution, the prosecution in a criminal case is required to disclose to the defendant any information that is favorable to the

defendant where such information is material to guilt or innocence.  (This requirement will hereinafter be referred to as OPDA's *Brady* obligations.)

43.     Such favorable information includes (a) information that the defendant was not guilty of the crimes charged; (b) information that another person, and not the defendant, committed the crimes charged; (c) information that could be used to impeach the reliability, credibility or (in any other respect) accuracy of a prosecution witness's testimony; (d) information that is in the possession of not only the prosecution but also the police or other law enforcement agencies that participated in the investigation or prosecution of the defendant; and (e) favorable information — including but not limited to information of the types described in (a) through (d) above — that law enforcement authorities possess but is not documented.

44.     These requirements are fundamental aspects of our country's criminal justice system that all prosecutors are required and expected to be familiar with and follow.  They have been promulgated and reiterated by the United States Supreme Court on several occasions since its decision in *Brady*, including in *Giglio v. United States*, 405 U.S. 150 (1972), *United States v. Agurs*, 427 U.S. 97 (1976), and in *Kyles v. Whitley*, 514 U.S. 419 (1995) — a case involving OPDA and the same *Brady* violation (suppression of prior inconsistent witness statements) as in Mr. Jones's case, and that was decided less than a year before Mr. Jones's trial.

45.     On June 25, 1992, nearly four years before his trial, Mr. Jones requested that OPDA disclose all favorable information to him, whether or not that information was in writing. In its June 23, 1993 response to Mr. Jones's request, the only favorable information that OPDA disclosed to Mr. Jones was the fact that HT identified another person, and not Mr. Jones, as the assailant at the April 21 physical lineup in which Mr. Jones had been included.

46.     At various times between 1996 to 2015, OPDA repeatedly denied that it had any additional favorable information with respect to the charges against Mr. Jones.

47.     For example, from 1998 to 2006, Mr. Jones filed at least seven Public Records Act requests with OPDA seeking information regarding his case.  OPDA responded that the records in his case were missing.

48.     In 2010, Mr. Jones requested a court order requiring OPDA to search its files for favorable information.  In response, OPDA falsely stated to the court that "there is nothing that we [OPDA] have that they [Mr. Jones and his attorneys] have not seen."

49.     From 2006 to 2014, Mr. Jones also filed several challenges to his convictions. In its responses to these challenges, OPDA falsely stated that information Mr. Jones relied upon to establish his innocence was not credible.  For example:

a.  In 2006, Mr. Jones filed a challenge to his convictions in state court, claiming that OPDA had failed to disclose prior statements by TP that could have been used to impeach her testimony at trial.  In response, OPDA stated that Mr. Jones's argument — that TP's pre-trial description of her assailant contradicted her trial testimony — was "completely unsubstantiated, contradicted, and without merit." This statement, as Mr. Jones would later learn, was false.

b.  On December 17, 2007, at a state court hearing in connection with Mr. Jones's challenge to his convictions, Lester Jones testified that he did not know Mr. Jones, did not lend Mr. Jones his car, and did not receive jewelry from Mr. Jones, and that the contrary statement he made to NOPD officers at the time of his 1992 arrest for the Stott/Ellis Attempted Robbery/Murder was false.    Lester Jones also testified that he had been asked by an OPDA prosecutor to testify at Robert

Jones's trial, but that, at or about the time of the trial, he told the prosecutor that he did not know Robert Jones.  OPDA stated to the court that it would endeavor to "substantiate" this testimony.   Yet OPDA not only failed to endeavor to "substantiate" Lester Jones's testimony, but also challenged his testimony in numerous subsequent court filings despite the fact that an undisclosed memorandum in its own files from 1996 directly substantiated Lester Jones's account:

    i.   In an August 8, 2008 filing opposing Mr. Jones's challenge to his convictions, OPDA objected to Mr. Jones's claim that it had failed to disclose any communications it had had with Lester Jones prior to Robert Jones's 1996 trial, falsely describing such communications as "supposed."

    ii.  In a July 31, 2012 filing in federal court opposing Mr. Jones's challenge to his convictions, OPDA falsely stated that Lester Jones's 2007 testimony was not credible because he had waited 15 years before recanting his 1992 statements.   OPDA falsely described Lester Jones's testimony as a "sudden recantation — made some fifteen years after the crime" and falsely stated that his testimony was not credible because he had "waited fifteen years to suddenly recant his initial statement."  OPDA also falsely described Lester Jones's testimony as a "latter-day recantation" that was "simply specious," and even went so far as to falsely state that, in his 2007 testimony, Lester Jones was "fabricating a recantation."

    iii. In a May 15, 2013 filing in state court opposing Mr. Jones's challenge to his convictions, OPDA repeated these same arguments and, in that same

filing, also went so far as to falsely state that Mr. Jones could not "plausibly" "suggest" that information concerning Lester Jones's recantation was in OPDA's possession at the time of Robert Jones's trial.

    iv. In a July 17, 2014 filing opposing Mr. Jones's challenge to his convictions, OPDA falsely described Lester Jones's "recantation" as "sudden" and "made some fifteen years after the crime," and falsely stated that Mr. Jones could not "plausibly" "suggest" that information concerning Lester Jones's recantation was in OPDA's possession at the time of the trial.

    v. In an October 14, 2014 filing opposing Mr. Jones's challenge to his convictions, OPDA falsely stated that the "conclusion" that Robert Jones and Lester Jones knew each other had "never been refuted."

c. In his 2010 state court challenge to his convictions, Mr. Jones also claimed that OPDA had failed to disclose, in connection with his trial, evidence that Lester Jones was responsible for the April 1992 crime spree in the French Quarter, which included the Robbery/Kidnap/Rape, based on distinctive aspects of these crimes and other evidence suggesting both that the same person committed these crimes and that Lester Jones was the perpetrator. In response, OPDA argued that the manner in which the crimes were carried out was "generic" and were "consistent with just about every armed robbery in this city" and therefore did not support the argument either that the crimes had been committed by the same person or that Lester Jones was the perpetrator. At no point did OPDA inform the court that, in its prosecution of Lester Jones for several of these same crimes, it had argued

precisely the opposite — namely, that the crimes had a highly distinctive *modus operandi* and were all committed by Lester Jones.

III. **Mr. Jones Uncovers Repeated Violations by OPDA of His Constitutional Right to the Disclosure of Material, Favorable Information**

50.    From 2002 through 2015, through persistent investigation, Mr. Jones uncovered example after example of favorable information that OPDA was required to disclose to him in connection with his trial, but did not.

51.    This information showed that, for many years, OPDA concealed the existence of favorable information from Mr. Jones, his attorneys, and the various courts that presided over Mr. Jones's case.

52.    This information showed that, in many instances, OPDA had falsely stated to Mr. Jones, his attorneys, and the various courts that presided over Mr. Jones's case that such information did not exist.

53.    This information showed that Mr. Jones was innocent of the Robbery/Kidnap/Rape for which he was wrongly convicted at trial in 1996.

54.    This information also showed that Lester Jones committed the Robbery/Kidnap/Rape.

**TP's Initial Description of Her Assailant**

55.    In 2010, Mr. Jones obtained a copy of Detective Coffee's handwritten notes from the Robbery/Kidnap/Rape investigation, which reflect the contents of her first interview of TP.  Mr. Jones obtained this document in response to a Public Records Act request to NOPD, after several prior requests were unsuccessful.  The notes reflect that TP described her assailant as being 25 to 30 years old and that TP did not mention anything about him having gold teeth. At the time of the Robbery/Kidnap/Rape, Mr. Jones was 19 years old and had gold teeth, while

Lester Jones was 30 years old and did not have gold teeth.  In other words, TP's description of her assailant in Detective Coffee's notes was consistent with Lester Jones and not Robert Jones.

56.     Many years after his trial, Mr. Jones also obtained a copy of Detective Coffee's supplemental report.  The supplemental report contains details of NOPD's investigation of the Robbery/Kidnap/Rape, including the contents of Detective Coffee's first interview of TP.

57.     The supplemental report reflects that TP described her assailant as being 25 to 30 years old and did not mention anything about him having gold teeth.  As noted above, at the time of the Robbery/Kidnap/Rape, Mr. Jones was 19 years old and had gold teeth, while Lester Jones was 30 years old and did not have gold teeth.  In other words, TP's description of her assailant in Detective Coffee's supplemental report was consistent with Lester Jones and not Robert Jones.

58.     At his trial, Mr. Jones requested that OPDA disclose the supplemental report to him.  OPDA objected, and the report was not disclosed.

59.     Notably, ADA Menner has testified that a victim's initial description of the assailant is "very important."  Nevertheless, and despite relying heavily on TP's physical description of her assailant at Mr. Jones's trial, at no time prior to or during the trial did OPDA disclose to Mr. Jones or to the jury that, in her initial statement to the NOPD, TP (i) described the perpetrator as being 25 to 30 years old and (ii) did not state that the perpetrator had gold teeth.

60.     On October 8, 2014, the State of Louisiana Court of Appeal, Fourth Circuit, ruled that Detective Coffee's notes and supplemental report, reflecting TP's initial description of her assailant, were material information that the defense was entitled to receive in connection with Mr. Jones's trial, and that OPDA's failure to disclose this information to Mr. Jones undermined confidence in the jury's verdict.

**The Assailant's "Neck of the Woods" Statement**

61.     As noted above, in 2010, Mr. Jones obtained a copy of Detective Coffee's handwritten notes, which reflect the contents of her initial interview of TP.  The notes reflect that TP said her assailant told her, "I am taking you to my neck of [the] woods."  The assailant then drove TP from the site of the robbery to the Desire Housing Project, parked the car one block from where Lester Jones lived, brought TP to an abandoned building, and sexually assaulted her there.  Two weeks later, Lester Jones's car was found by the NOPD at the Desire Housing Project, across the street from where the perpetrator of the Robbery/Kidnap/Rape had parked the car before assaulting TP.  At that time, Robert Jones lived over two miles away from the Desire Housing Project.  In other words, the "neck of [the] woods" statement in Detective Coffee's notes supported the conclusion that Lester Jones was the assailant.

62.     On October 8, 2014, the State of Louisiana Court of Appeal, Fourth Circuit, ruled that Detective Coffee's notes, reflecting the assailant's "neck of [the] woods" statement, was material information and that OPDA's failure to disclose it to Mr. Jones undermined confidence in the jury's verdict.

**Lester Jones's Crime Spree**

63.     In the two weeks following the April 6, 1992 Robbery/Kidnap/Rape, a series of similar crimes occurred in or around the French Quarter:

a.  On April 14, 1992, at around 11:25 p.m., Bethany Acosta and her boyfriend Patrick Van Hoorebeek were walking on Governor Nicholls Street when they were robbed by a man with a gun.  (This shall hereinafter be referred to as the Acosta/Van Hoorebeek Robbery.)

b. Several minutes later, and one block away, the Stott/Ellis Attempted Robbery/Murder occurred.

c. Around two hours after that, Teresa McKay and Latrice Robinson were robbed by a man with a gun as they exited a sandwich shop on St. Claude Avenue, several blocks from where the Stott/Ellis Attempted Robbery/Murder occurred. (This shall hereinafter be referred to as the McKay/Robinson Robbery.)

d. On April 20, 1992, at around 12:00 a.m., Lorrell Woodfork and his girlfriend Donna Freeman were robbed by a man with a gun as they walked past the corner of North Claiborne Avenue and Dumaine Street. (This shall hereinafter be referred to as the Woodfork/Freeman Robbery.)

64.     In 2010 — 18 years after his arrest and 14 years after his wrongful convictions at trial — Mr. Jones obtained the following exculpatory information regarding the Acosta/Van Hoorebeek Robbery, the Stott/Ellis Attempted Robbery/Murder, the McKay/Robinson Robbery, and the Woodfork/Freeman Robbery:

a. The victims of these crimes all described a single perpetrator acting alone, and their physical descriptions of the perpetrator were consistent with Lester Jones and not Mr. Jones — including the fact that none of the victims described a perpetrator with gold teeth;

b. The victims' descriptions of the car used by the perpetrator were consistent with Lester Jones's car: the victims described it as a 1980s Buick Riviera, Cadillac Eldorado or Oldsmobile Delta 88 with a maroon, burgundy or red body and white vinyl top; Lester Jones owned a 1980 burgundy Oldsmobile Delta 88 with a white landau roof;

c.  Lester Jones was found in possession of physical evidence from each of the crimes, including the gun used in the Stott/Ellis Attempted Robbery/Murder and property stolen from the victims in each of the other crimes;

d.  The victims of three of the crimes (the Robbery/Kidnap/Rape, the Stott/Ellis Attempted Robbery/Murder, and the McKay/Robinson Robbery) described a weapon consistent with the weapon recovered from Lester Jones's mother's apartment;

e.  The perpetrator used a similar *modus operandi* in the crimes, such as forcing victims to lie down and/or kicking them; and

f.  The Woodfork/Freeman Robbery occurred subsequent to Robert Jones's arrest and incarceration and therefore could not possibly have been committed by him.

65.      Mr. Jones obtained this information in response to Public Records Act requests to NOPD and OPDA, and a request to the Orleans Public Defenders (who served as counsel for Lester Jones and had preserved Lester Jones's case files), after several prior requests to NOPD and OPDA were unsuccessful.

66.      All of this information supported the conclusion that the same, lone assailant committed the Robbery/Kidnap/Rape, the Acosta/Van Hoorebeek Robbery, the Stott/Ellis Attempted Robbery/Murder, the McKay/Robinson Robbery, and the Woodfork/Freeman Robbery, and that the assailant was Lester Jones, not Robert Jones.

67.      On September 26, 2013, Detective Cade testified that, after investigation (and well before Mr. Jones's trial), the NOPD concluded that "the same person" committed the Robbery/Kidnap/Rape, the Acosta/Van Hoorebeek Robbery, the Stott/Ellis Attempted Robbery/Murder, the McKay/Robinson Robbery, and the Woodfork/Freeman Robbery, and that

"Lester Jones is the guilty party, not Robert Jones."   Notably, Lester Jones was, in fact, convicted of committing the Stott/Ellis Attempted Robbery/Murder and the McKay/Robinson Robbery.

68.      On October 8, 2014, the State of Louisiana Court of Appeal, Fourth Circuit, ruled that the above information concerning the crime spree was material information and that OPDA's failure to disclose it to Mr. Jones undermined confidence in the jury's verdict.

69.      On October 8, 2014, based on the foregoing findings, the State of Louisiana Court of Appeal, Fourth Circuit, ruled that OPDA had violated its *Brady* obligations by failing to disclose to Mr. Jones (a) TP's initial description of her assailant, (b) the assailant's "neck of [the] woods" statement, (c) information concerning the crime spree, and (d) the NOPD's belief that Lester Jones, and not Robert Jones, committed all of the crimes that constituted the crime spree.

70.      On October 8, 2014, the State of Louisiana Court of Appeal, Fourth Circuit, also ruled that, in light of OPDA's violation of Mr. Jones's constitutional rights, as described in paragraphs 55 through and including 69 above, Mr. Jones's convictions arising out of the Robbery/Kidnap/Rape had to be overturned.

## **Additional Violations of Mr. Jones's Constitutional Right To the Disclosure of Favorable Information**

71.      While the State of Louisiana Court of Appeal, Fourth Circuit, based its ruling on the violations set forth above, OPDA violated Mr. Jones's constitutional right to the disclosure of favorable information in several additional ways.

### ***TP's Inconsistent Account of What Side of the Car She Entered***

72.      At Mr. Jones's trial, TP testified that her assailant forced her to enter his car from the driver's side and identified a photograph of Lester Jones's car as the car that her assailant had forced her to enter.

73.     In his closing argument, ADA Menner argued that TP's testimony was corroborated by the fact that the photograph of the car showed that the passenger side door was damaged, thus purportedly explaining why TP had been forced to enter the car from the driver's side.

74.     In fact, Lester Jones's car was damaged on April 22, 1992 — 16 days <u>after</u> the Robbery/Kidnap/Rape.  Thus, the damage to the car could not possibly explain, let alone support, TP's testimony that she was forced to enter the car from the driver's side.

75.     Also, Detective Coffee's supplemental report, which OPDA failed to disclose to Mr. Jones but which Mr. Jones obtained a copy of 10 or more years after his arrest, reflects that TP initially told the NOPD that her assailant forced her to enter the car from the passenger side.

76.     TP's statement that her assailant forced her to enter the car from the passenger side was thus inconsistent with her testimony at Mr. Jones's trial.

77.     OPDA was required to disclose TP's initial statement to Mr. Jones in connection with his trial.  OPDA's failure to disclose this information to Mr. Jones undermines confidence in the jury's verdict.

### *Detective Stewart's Conclusion that Lester Jones Did Not Know Mr. Jones*

78.     On October 8, 2013, former NOPD Detective James Stewart, who, along with Detective Cade, investigated several crimes in the April 1992 crime spree, testified at a court hearing held in connection with Mr. Jones's challenge to his convictions.  Detective Stewart testified that, after investigation, he could find no credible evidence that Lester Jones and Robert Jones knew each other and that he had informed OPDA of this fact prior to Mr. Jones's trial.

79.     OPDA was required to disclose Detective Stewart's statement to Mr. Jones in connection with his trial.  OPDA's failure to disclose this information to Mr. Jones undermines confidence in the jury's verdict.

### *The Menner Memo, Contemporaneously Documenting that, Prior to Robert Jones's Trial, Lester Jones Recanted His Statement to Police That He Knew Robert Jones*

80.     Even after Mr. Jones's convictions were reversed by the State of Louisiana Court of Appeal, Fourth Circuit, and despite the overwhelming evidence that Mr. Jones had been incarcerated for over 22 years for crimes he did not commit, OPDA continued to oppose Mr. Jones's release from prison.

81.     During that time, the OPDA prosecutor then responsible for Mr. Jones's case stated that he did not think the case was prosecutable.  OPDA and Mr. Jones's counsel also discussed the possible dismissal of the case against Mr. Jones if Mr. Jones waived any right to bring civil claims against OPDA arising out of his prosecution and incarceration.  Ultimately, OPDA informed Mr. Jones that it would not agree to dismiss the case and insisted that Mr. Jones plead guilty to avoid a retrial.  Mr. Jones refused.

82.     During that time, Mr. Jones also uncovered additional, favorable information that OPDA was required to disclose to him in connection with his trial.

83.     Specifically, Mr. Jones uncovered information showing that OPDA's years-long effort to discredit Lester Jones's 2007 testimony — that he did not know Robert Jones, did not lend him his car, and did not receive stolen jewelry from him — was squarely contradicted by information in OPDA's possession since the time of Mr. Jones's 1996 trial.

84.     As described above, the alleged connection between Robert Jones and Lester Jones was an indispensable part of OPDA's case against Mr. Jones in the Robbery/Kidnap/Rape. This alleged connection, in turn, was based solely on an inadmissible post-arrest statement by

Lester Jones to the NOPD in 1992, in which Lester Jones allegedly implicated Mr. Jones in the Stott/Ellis Attempted Robbery/Murder.  In 2007, Lester Jones recanted this statement, testifying that it was false and had been coerced from him by NOPD detectives.  In response, OPDA argued that Lester Jones's testimony was not credible because he had "waited 15 years" before recanting his post-arrest statement.  OPDA made this same argument, over and over again, to Louisiana federal and state courts during the next seven years.

85.     In June 2015, OPDA informed one of Mr. Jones's attorneys that OPDA had uncovered a memorandum prepared in 1996 by ADA Menner concerning ADA Menner's interview of Lester Jones prior to Robert Jones's 1996 trial.  (This memorandum shall hereinafter be referred to as the Menner Memo.)  The OPDA prosecutor responsible for Robert Jones's case in 2015 acknowledged in court that the Menner Memo was in "plain sight" in OPDA's Stott/Ellis Attempted Robbery/Murder file and that he found it "quickly upon looking at the file."

86.     After several requests by Mr. Jones's attorney for a copy of the Menner Memo, OPDA produced a copy to Mr. Jones's attorney nearly three months later, on September 23, 2015.

87.     The Menner Memo revealed that, prior to Mr. Jones's 1996 trial, and just days before ADA Menner argued to the jury that the connection between Lester Jones and Mr. Jones was "uncontroverted" and had "never been denied," Lester Jones told ADA Menner that he (Lester Jones) "recanted [his] entire statement" made to the NOPD regarding Mr. Jones.

88.     The Menner Memo squarely contradicted OPDA's statements at Robert Jones's trial that he and Lester Jones were friends, that Lester Jones lent his car to Robert Jones, and that Robert Jones gave jewelry from the Robbery/Kidnap/Rape to Lester Jones.

89.     The Menner Memo revealed that OPDA's statements to federal and state courts in response to Robert Jones's challenges to his convictions — that Lester Jones's 2007 testimony denying any connection to Robert Jones was not credible because Lester Jones waited 15 years before recanting his post-arrest statement — were all false.

90.     OPDA was required to disclose the information in the Menner Memo to Mr. Jones in connection with his trial.  OPDA's failure to disclose the information in the Menner Memo to Mr. Jones undermines confidence in the jury's verdict.  Indeed, OPDA not only suppressed this critical exculpatory information, but also exploited its own misconduct by arguing to the jury at Mr. Jones's trial that the alleged connection between Robert Jones and Lester Jones was "uncontroverted" and had "never been denied."

91.     Even Defendant Cannizzaro has admitted that the Menner Memo should have been disclosed sooner to Mr. Jones.

92.     Two days after OPDA disclosed the Menner Memo to Mr. Jones's attorney, Mr. Jones filed a motion to dismiss the case against him, based on (among other reasons) OPDA's repeated violations of his constitutional right to the disclosure of favorable information and OPDA's inability to guarantee that there was no additional favorable information that it had failed to disclose to him.

93.     On November 20, 2015 — 23 years, 7 months and 2 days after he was arrested and incarcerated — Mr. Jones was released from prison.

94.     For another 1 year, 2 months and 6 days, Mr. Jones remained on bond, while OPDA continued to pursue charges against him from the Robbery/Kidnap/Rape, despite the overwhelming evidence that Lester Jones was the sole perpetrator.

95.     On January 26, 2017, the day that Defendant Cannizzaro was scheduled to testify at a court hearing in connection with Mr. Jones's motion to dismiss the still-pending Robbery/Kidnap/Rape charges, OPDA dropped the charges against Mr. Jones.

96.     While incarcerated, Mr. Jones suffered numerous injuries and extraordinary damage.  This included, but was not limited to, pain and suffering, mental anguish, emotional distress, lost income, physical illness, inadequate medical care, humiliation, injury to his reputation, psychological damage, and restriction of numerous forms of personal freedom, including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, personal fulfillment, family relations, travel, enjoyment, and expression.

97.     Many of these injuries and harms continued even after Mr. Jones was released from prison, during the more than one year in which OPDA refused to drop the charges against him.

### Mr. Jones's Other Wrongful Convictions

98.     In addition to the Robbery/Kidnap/Rape, OPDA also wrongfully prosecuted Mr. Jones for the Stott/Ellis Attempted Robbery/Murder, the Acosta/Van Hoorebeek Robbery and another robbery.  These prosecutions, too, were deeply flawed.

99.     OPDA's prosecution of Mr. Jones for the Stott/Ellis Attempted Robbery/Murder was based in part on Lester Jones's legally inadmissible post-arrest statement alleging that Robert Jones had committed the Stott/Ellis Attempted Robbery/Murder while Lester Jones and two other men watched — a statement that Lester Jones later testified was coerced by the NOPD.  Moreover, Lester Jones's statement was incredible on its face.  For example, Lester Jones claimed that, after leaving the scene of the Stott/Ellis Attempted Robbery/Murder on his own by bus, he found his abandoned car with the gun used in the murder

inside of it, at which point he was in such a "state of shock" that he committed the McKay/Robinson Robbery that same night, several blocks away from the murder scene.  Lester Jones also referred to Robert Jones as "Larry" even though Robert Jones has never used that name or nickname.

100.    Moreover, neither of the two eyewitnesses to the Stott/Ellis Attempted Robbery/Murder could identify the perpetrator.  Mr. Ellis could not describe the perpetrator's facial features, and the other eyewitness — Thomas Van de Velde — told the NOPD that, after hearing gunshots, he saw a man with a gun but could not identify him because he had only seen the man's "silhouette."  In June 1992, OPDA tried and failed to secure an indictment against Robert Jones for the Stott/Ellis Attempted Robbery/Murder.

101.    After OPDA's failure to indict Mr. Jones was publicized — along with images of Mr. Jones and Lester Jones as suspects in the case — Mr. Van de Velde contacted the authorities because (as he later testified) the case against Mr. Jones was "falling apart."  Mr. Van de Velde now claimed (inexplicably, in light of his prior statement) that there were two perpetrators and that he could identify them both.  After meeting with ADA Roger Jordan (whose misconduct in other OPDA prosecutions is described below), Mr. Van de Velde identified both Robert Jones and Lester Jones from a physical line-up as the perpetrators.  Mr. Van de Velde also gave an account of the crime — that the second assailant (whom he claimed was Robert Jones) rolled Ms. Stott's body over and went through her pockets after she was shot — that was contradicted by Mr. Ellis (who was next to Ms. Stott after she was shot but described no such person and no such conduct).

102.    Thereafter, Mr. Van de Velde passed away and, as noted above, Lester Jones recanted his post-arrest statement.  Thus, by the time Mr. Jones's trial for the

Robbery/Kidnap/Rape was concluded in March 1996, OPDA had no evidence that Robert Jones was involved in any way in the Stott/Ellis Attempted Robbery/Murder.  Moreover, NOPD Detectives Stewart and Cade already had concluded that Lester Jones, not Robert Jones, was guilty of these crimes, with Detective Stewart sharing that conclusion with OPDA.  Indeed, Detective Stewart, who arrested Mr. Jones for the Stott/Ellis Attempted Robbery/Murder, has also stated that this was the only time in his career that he believes he arrested the wrong person.  And by March 1996, OPDA had already prosecuted and convicted Lester Jones for these crimes.

103.     Nonetheless, OPDA inexplicably persisted in its prosecution of Robert Jones for the Stott/Ellis Attempted Robbery/Murder.  In April 1996, OPDA offered Mr. Jones a plea bargain for the Stott/Ellis Attempted Robbery/Murder pursuant to which he would plead guilty to manslaughter and be sentenced to a maximum of 21 years in prison.  By that time, Mr. Jones was facing a mandatory sentence of life without parole for the Robbery/Kidnap/Rape.  During an April 2, 1996 court proceeding, ADA Menner spoke directly to Mr. Jones in effort to convince him to accept the plea bargain, arguing that if his convictions for the Robbery/Kidnap/Rape were subsequently overturned, Mr. Jones would be limiting his sentence for the Stott/Ellis Attempted Robbery/Murder to a maximum of 21 years, rather than the sentence of life without parole he would otherwise receive if convicted of those crimes at trial.  However, ADA Menner never disclosed to Mr. Jones that (1) just several weeks earlier, Lester Jones had recanted his post-arrest statement implicating Robert Jones, (2) Mr. Van de Velde was dead, (3) OPDA had no evidence to prosecute Mr. Jones for the Stott/Ellis Attempted Robbery/Murder, and (4) the NOPD had concluded that Mr. Jones was innocent.

104.     Based on ADA Menner's selective statements and non-disclosures about the murder case, and having just been wrongfully convicted of the Robbery/Kidnap/Rape as a result

of a prosecution rife with *Brady* violations, Mr. Jones accepted the plea offer.  At the same time, Mr. Jones also pleaded guilty to the Acosta/Van Hoorebeek Robbery and another robbery, not knowing that OPDA had already accused Lester Jones of committing the Acosta/Van Hoorebeek Robbery and that the victim of the other robbery had identified an individual without gold teeth as the perpetrator.  Notably, Mr. Jones did not make any factual statement acknowledging any involvement in any of these crimes during his plea.  Mr. Jones challenged each of these convictions in court, but this miscarriage of justice was not rectified for 21 years, when Mr. Jones's convictions for these crimes were vacated and the charges dismissed.

## IV.   OPDA's Longstanding Policy or Custom of Violating the Constitutional Rights of Defendants By Not Disclosing Material, Favorable Information to Them

105.     OPDA's repeated violation of Mr. Jones's constitutional right to the disclosure of favorable information was no isolated incident.  To the contrary: it was part of a longstanding pattern of similar violations by OPDA that started years before Mr. Jones's trial and continued for many years after.

106.     OPDA has maintained and carried out an unconstitutional policy or custom of violating the constitutional rights of defendants charged with crimes by failing to disclose to them information that is favorable to them.

107.     Indeed, in a 2017 opinion referencing OPDA, the State of Louisiana Court of Appeal, Fourth Circuit, wrote that it was "not unmindful of the storied, shameful history of the local prosecuting authorities' noncompliance" with its duty to disclose to defendants information that is favorable to them.

108.     As a result of this unconstitutional policy or custom, OPDA has engaged in the wrongful prosecution of innocent persons and (upon information and belief) has failed in many such instances to prosecute the real perpetrators.

**Unconstitutional Written Policy**

109.     In 1987, Harry Connick — the then-head of OPDA and its official policymaker under Louisiana law — officially adopted or promulgated a "Policy Manual" for OPDA. In a letter included in the manual, Connick stated that "we have developed a policy manual outlining the duties and responsibilities of those who work" at OPDA.

110.     The manual, which, upon information and belief, remained in force during the period of Mr. Jones's trial, included a policy regarding the disclosure of favorable information to defendants that provided in pertinent part: "In most cases, in response to the request of defense attorneys, the Judge orders the State to produce so-called Brady material — that is, information in the possession of the State which is exculpatory regarding the defendant."

111.     This policy was insufficient, inaccurate, and a violation of the constitutional requirements applicable to OPDA, in that it suggested that OPDA prosecutors were obligated to disclose favorable information to a defendant only if the defendant's attorney requested such disclosure when, in truth and in fact, that obligation existed regardless of whether or not the defendant's attorney made such a request.

112.     This policy was insufficient, inaccurate, and a violation of the constitutional requirements applicable to OPDA, in that it suggested that OPDA prosecutors were obligated to disclose favorable information to a defendant only if a judge ordered them to do so, when, in truth and in fact, that obligation existed regardless of whether or not the judge ordered disclosure. Indeed, in an argument before the United States Supreme Court, the head of OPDA's Appeals Section stated that relying upon a judge to determine whether or not OPDA was required to disclose information to a defendant pursuant to *Brady* was a "poor practice."

113.     This policy was insufficient, inaccurate, and a violation of the constitutional requirements applicable to OPDA, in that it required OPDA prosecutors to disclose only "exculpatory" information when, in truth and in fact, OPDA also was required to disclose information that could be used to impeach the trial testimony of OPDA witnesses or was otherwise favorable to the defendant, even if it did not directly exculpate the defendant.

114.     This policy was insufficient, inaccurate, and a violation of the constitutional requirements applicable to OPDA, in that it did not require OPDA prosecutors to disclose information that was not initially in OPDA's possession but was only in the possession of the NOPD when, in truth and in fact, OPDA was required to disclose such information.

115.     This policy was insufficient, inaccurate, and a violation of the constitutional requirements applicable to OPDA, in that it suggested that OPDA's obligation to disclose favorable information to a defendant charged with a crime applied only in most, but not all, cases.

116.     This policy was insufficient, inaccurate, and a violation of the constitutional requirements applicable to OPDA, in that it did not expressly require OPDA prosecutors to disclose information that was favorable to the defendant even if that information was not documented.

117.     Defendant Cannizzaro has testified that the above-described policy was inconsistent with OPDA's constitutional obligation to disclose favorable information to a defendant charged with a crime.

118.     Connick has testified that the above-described policy was "not comprehensive" and "doesn't say anything about favorable" (as opposed to exculpatory) information.

**Unconstitutional Unwritten Policy or Custom**

119.     OPDA has maintained and carried out, for many years, an unwritten policy or custom of not disclosing favorable information to defendants charged with crimes.

***OPDA's Numerous Violations of* Brady**

120.     The existence of this unwritten policy or custom is supported by publicly available information in cases in which a court has determined, or OPDA has acknowledged, that OPDA failed to disclose favorable information to a defendant charged with a crime.   Based solely on that publicly available information, OPDA has failed to make such disclosures in at least 45 cases, not including Mr. Jones's.

121.     Of these 45 cases, 34 occurred prior to Mr. Jones's trial.

122.     Of these 45 cases, at least 27 involved OPDA's failure to disclose a statement that an OPDA witness made prior to trial that was inconsistent with the witness's trial testimony — the same type of constitutional violation that occurred in Mr. Jones's case.   Of these 27 cases, 22 of them occurred prior to Mr. Jones's trial.

123.     Of these 45 cases, at least nine resulted in reversals of convictions by the United States Supreme Court; the United States Court of Appeals for the Fifth Circuit; or the Louisiana Supreme Court, the state's highest court, on the basis of *Brady* violations prior to Mr. Jones's trial.   *See Kyles v. Whitley*, 514 U.S. 419 (1995); *Monroe v. Blackburn*, 607 F. 2d 148 (5th Cir. 1979); *Davis v. Heyd,* 479 F. 2d 446 (5th Cir. 1973); *State v. Knapper*, 579 So. 2d 956 (La. 1991); *State v. Rosiere*, 488 So. 2d 965 (La. 1986); *State v. Perkins*, 423 So. 2d 1103 (La. 1982); *State v. Curtis*, 384 So. 2d 396 (La. 1980); *State v. Falkins*, 356 So. 2d 415 (La. 1978); *State v. Carney*, 334 So. 2d 415 (La. 1976).   Of these nine cases, six involved OPDA's failure to disclose a statement that an OPDA witness made prior to trial that was inconsistent with the

witness's trial testimony — the same type of constitutional violation that occurred in Mr. Jones's case.

124.    The above-described instances in which OPDA failed to disclose favorable information to the defendants it prosecuted significantly understates the actual number of times that OPDA has violated the constitutional rights of defendants in this way.  Unlike other types of constitutional violations, where the defendant is presumably well aware of the potential or actual violation — for example, the use of excessive force or a violation of the defendant's right to a speedy trial — a violation of a defendant's right to the disclosure of favorable information is inherently difficult to detect because, by definition, it involves the suppression of information.

125.    This phenomenon has been widely recognized by leading members of the legal profession.  For example, United States Supreme Court Justice Ruth Bader Ginsberg has stated that *Brady* violations "are not easily detected" and are frequently the result of a "chance discovery."  And former United States Supreme Court Justice Byron White has stated that the "judicial process will by definition be ignorant of" a violation involving suppressing evidence when it occurs, and that "it is reasonable to suspect that most violations never surface."

126.    Another reason why the above-described instances in which OPDA failed to disclose favorable information to the defendants it prosecuted significantly understates the actual number of times that OPDA has violated the constitutional rights of defendants in this way is that (upon information and belief) the vast majority of cases filed by OPDA have resulted in a guilty plea and no trial.  In these cases, it is likely that the pleas occurred prior to the time that the defendants would have received or uncovered any *Brady* material.  In these cases, it also is far less likely that the defendants, having entered a guilty plea and having provided a factual predicate for their pleas, would pursue a post-conviction challenge to their convictions.  Since

post-conviction litigation is the procedural stage at which many *Brady* violations are uncovered, the substantial prevalence of guilty pleas among OPDA cases dramatically reduces the likelihood of *Brady* violations being detected at anything close to the rate at which they actually occur.

127.    Another reason why the above-described instances in which OPDA failed to disclose favorable information to the defendants it prosecuted significantly understates the actual number of times that OPDA has violated the constitutional rights of defendants in this way is that (upon information and belief) there have been cases in which a court determined that OPDA violated *Brady* but the decision was not publicly reported.  Connick has testified that this in fact has occurred.  In such cases, it is difficult if not impossible for persons such as Mr. Jones to identify the cases in which failures to disclose favorable information occurred.

128.    Another reason why the above-described instances in which OPDA failed to disclose favorable information to the defendants it prosecuted significantly understates the actual number of times that OPDA has violated the constitutional rights of defendants in this way is that (upon information and belief) there have been cases with *Brady* violations in which courts granted relief on other grounds.

### *Additional Court Decisions Establishing OPDA's Policy or Custom of Violating* **Brady**

129.    In addition to the cases described above, in at least four cases that were decided prior to Mr. Jones's trial, the Louisiana Supreme Court ruled that a prosecutor from another Louisiana district attorney's office failed to disclose favorable information to a defendant charged with a crime.  These cases provide further support for the conclusion that OPDA was well aware of its constitutional obligation to disclose favorable information to the defendants it prosecuted, and yet repeatedly violated that obligation.

130.     OPDA's persistent failure to honor its *Brady* obligations is remarkable, especially in light of the fact that several of the United States Supreme Court's leading decisions in this area of the law involved OPDA itself.  For example, as noted above, in 1995 — less than one year before Mr. Jones's trial — the United States Supreme Court decided *Kyles v. Whitley*. In that case, the United States Supreme Court held that OPDA violated the defendant's rights under *Brady* by failing to disclose information that the defendant could have used to impeach the credibility of OPDA witnesses who testified at the defendant's trial — the same type of *Brady* violation that occurred in Mr. Jones's case.

131.     The fact that OPDA's violations of defendants' *Brady* rights continued even after the *Kyles* decision supports the conclusion that the continued violations were the result of OPDA's unwritten policy or custom of not complying with its *Brady* obligations.

132.     OPDA's description of, and reaction to, the *Kyles* decision provides further support for that conclusion.  Connick, the head of OPDA at the time of the decision, has testified (incorrectly) that *Kyles* "wasn't a *Brady* case."  He also testified that he did not recall that the United States Supreme Court ruled in *Kyles* that the defendant's claim — that OPDA violated its *Brady* obligations — was valid.  He also testified that he saw no need to change OPDA's *Brady* policy after the *Kyles* decision.  He also testified that compliance with the *Kyles* decision was "not realistic," stating, "insofar as what was in the police file, who the hell knows[.]"  And he also has suggested that he disagreed with the *Kyles* decision, stating that "[j]ust because a guy puts on a black robe doesn't mean he is right."  This testimony, by the longtime Orleans Parish District Attorney, reflects OPDA's disdain for and disregard of the United States Supreme Court's decision in *Kyles* and, in turn, OPDA's obligations under *Brady*.

133.     Connick's disdain for the United States Supreme Court's decision in *Kyles* was not lost on members of his office.  In the re-trial of the defendant in *Kyles*, the OPDA prosecutor stated in court that the Court's decision in *Kyles* was wrong.

134.      Despite OPDA's string of *Brady* violations prior to and including *Kyles*, OPDA failed to take adequate measures to prevent future violations.  It did not revise its written *Brady* policy.  It did not conduct adequate training for OPDA prosecutors on their *Brady* obligations.  And it did not take disciplinary action against OPDA prosecutors who violated *Brady*.

135.     All of these statements, actions, and failures to act in the wake of *Kyles* reflect OPDA's disdain and disregard for its obligations under *Brady*, consistent with its unwritten policy or custom of not complying with those obligations.

### *Statements by OPDA Heads and Prosecutors Establishing OPDA's Policy or Custom of Violating* Brady

136.     OPDA's longstanding policy or custom of disregarding its *Brady* obligations is further evidenced by the sworn testimony and admissions of former OPDA prosecutors, Connick, and heads of OPDA who succeeded Connick.

137.     A former OPDA prosecutor has testified that it was OPDA's policy not to disclose NOPD supplemental reports to a defendant unless ordered to do so by a judge.  This policy was improper because OPDA's *Brady* obligations required it to disclose favorable information to the defendant, including information in a NOPD supplemental report, regardless of whether or not a judge ordered it to do so.

138.     A former OPDA prosecutor has testified that OPDA had no procedure to ensure that NOPD supplemental reports were provided to the OPDA prosecutors responsible for

the cases to which those reports related.  This increased the risk that OPDA would fail to disclose favorable information to the defendants it prosecuted, in violation of OPDA's *Brady* obligations.

139.     Former OPDA prosecutors have testified that OPDA prosecutors did not have an obligation to contact the NOPD to obtain all relevant information regarding a case.  This increased the risk that OPDA would fail to disclose favorable information to the defendants it prosecuted, in violation of OPDA's *Brady* obligations.

140.     Connick, the head of OPDA at the time of Mr. Jones's trial, has testified that he was unaware that OPDA's *Brady* obligations required it to disclose all information favorable to the defendant, and not just information that demonstrates that the defendant is not guilty of the crime with which he is charged.  This testimony reflects both a misunderstanding of OPDA's *Brady* obligations as well as the inadequacy and unconstitutional nature of OPDA's *Brady* policy.  As the United States Supreme Court has stated, a *Brady* violation occurs when the prosecution fails to disclose favorable information to the defendant, regardless of whether the information is directly exculpatory.

141.     Connick also has testified that a prosecutor's failure to disclose favorable information to a defendant due to the prosecutor being under pressure with a large case load would not have constituted a violation of OPDA's *Brady* policy.  This testimony reflects both a misunderstanding of OPDA's *Brady* obligations as well as the inadequacy and unconstitutional nature of OPDA's *Brady* policy.  A *Brady* violation occurs whenever the prosecution fails to disclose material, favorable information to the defendant, regardless of the intent of the prosecutor or the reason for the failure.

142.    Connick also has testified that his "evaluation" of *Brady* was "poor."  This testimony reflects OPDA's disdain and disregard for its obligations under *Brady*, consistent with its unwritten policy or custom of not complying with those obligations.

143.    Eddie Jordan, the former head of OPDA, has stated that "the previous administration [when Connick was the head of OPDA] had a policy of keeping away as much information as possible from the defense attorney."  This statement is consistent with OPDA having an unwritten policy or custom of not complying with its *Brady* obligations.

144.    Defendant Cannizzaro has stated that "[i]n the decades preceding my administration, the District Attorney's office [under Connick] had been in a steady state of decline.  Over the course of that time period, bad policy decisions took root and became institutional."  In an evident reference to OPDA's repeated violations of its *Brady* obligations, Defendant Cannizzaro stated that "some of those policy decisions had collateral consequences in the form of civil liability against the office."  This statement is consistent with OPDA having an unwritten policy or custom of not complying with its *Brady* obligations.

145.    Defendant Cannizzaro also has stated that "[t]he defense attorney has to request" information about cooperation agreements between the prosecution and its witnesses and that if the defendant's attorney did not request that information, "we're not obligated to give it to him."  Defendant Cannizzaro's statements were wrong.  A prosecutor is required to disclose such information to a defendant, even if the defendant does not request it.  This statement is consistent with OPDA having an unwritten policy or custom of not complying with its *Brady* obligations.

146.    OPDA's unwritten policy or custom of not disclosing favorable information to defendants charged with crimes included the post-trial phases of criminal cases.  A former

OPDA prosecutor has testified that, when a defendant asserted a *Brady* claim after the defendant was convicted, there was no policy requiring the prosecutor to obtain and review the trial file or to communicate with the prosecutor who tried the case so that OPDA could determine whether the defendant's claim was valid.  This statement is consistent with OPDA having an unwritten policy or custom of not complying with its *Brady* obligations.

### *Additional Evidence Establishing OPDA's Policy or Custom of Violating* **Brady**

147.    Then-Orleans Parish Criminal District Court Judge Calvin Johnson wrote to Connick in 1998 to advise him that OPDA prosecutors were failing to comply with OPDA's *Brady* obligations.  Connick ignored the warning and maintained OPDA's policy or custom of disregarding its *Brady* obligations.

148.    A 2012 study of OPDA concluded that, despite its lengthy history of repeated violations of its *Brady* obligations, OPDA continued to fail to institute changes to its policies and customs sufficient to encourage consistent compliance with *Brady*.  This study is consistent with OPDA having an unwritten policy or custom of not complying with its *Brady* obligations.

149.    A 2012 study of exonerations in the United States from 1989 to 2012 concluded that New Orleans (Orleans Parish) had the most exonerations per capita of any county with a population over 300,000, at a rate of more than 13 times the national average.  Nearly all of the exonerations in New Orleans involved *Brady* violations committed by OPDA.  This study is consistent with OPDA having an unwritten policy or custom of not complying with its *Brady* obligations.

150.    A 2017 study analyzing state appellate court opinions that were issued from 2010 through 2015 and concern prosecutorial misconduct — including *Brady* violations — found that Orleans Parish had the highest per capita rate of cases involving misconduct as well as

the largest number of reversals of any parish in Louisiana.  In reporting these findings, the study stated that OPDA "has long been a hotbed for prosecutorial misconduct."  This study is consistent with OPDA having an unwritten policy or custom of not complying with its *Brady* obligations.

### Failure to Train and Supervise

151.     OPDA's policy or custom of violating the constitutional rights of defendants charged with crimes by failing to disclose to them information favorable to them is also demonstrated by its failure to properly and adequately train and supervise OPDA prosecutors with respect to their *Brady* obligations.

152.     OPDA's failure to properly and adequately train and supervise OPDA prosecutors with respect to their *Brady* obligations is reflected in many different ways.

153.     As described in paragraphs 109 through and including 118 above, OPDA's written *Brady* policy, as reflected in OPDA's training manual, inaccurately described OPDA's *Brady* obligations in several different ways.

154.     Several former OPDA prosecutors have testified that they did not recall receiving any training on *Brady* at OPDA.

155.     OPDA failed to properly and adequately train and supervise OPDA prosecutors with respect to their obligation to disclose NOPD supplemental reports that contained information favorable to defendants charged with crimes.

156.     Keva Landrum-Johnson, the former head of OPDA, has testified that she did not recall any training for OPDA prosecutors on how to handle post-conviction claims that OPDA violated its *Brady* obligations.

157.    Consistent with former DA Landrum-Johnson's testimony, the former prosecutor assigned to Mr. Jones's first post-conviction petition in 2007 has testified that he received no specific training in how to handle a post-conviction *Brady* claim.  Indeed, he testified that there was no policy requiring him to review OPDA's own file or to speak with the trial prosecutor to see if a *Brady* claim had merit.  Instead, he was trained to address post-conviction cases "as efficiently as possible," which included seeking to have them dismissed on procedural grounds without any investigation, discovery, or hearing.

158.    OPDA also failed to utilize checklists, audits, reviews, or coordinators to ensure that its prosecutors complied with OPDA's *Brady* obligations.

159.    OPDA also failed to discipline OPDA prosecutors who violated OPDA's *Brady* obligations.

160.    For example, Connick has testified that OPDA failed to discipline OPDA prosecutors who violated OPDA's *Brady* obligations because it would make his job more difficult.

161.    Connick has testified that he disciplined only one prosecutor during his 30-year tenure for violating OPDA's *Brady* obligations and that, in that instance, the "discipline" consisted of Connick telling the prosecutor to be more careful the next time.

162.    As a result of OPDA's failure to discipline OPDA prosecutors who violated OPDA's *Brady* obligations, OPDA prosecutors had little or no reason to be concerned about the consequences if they violated those obligations.

163.    OPDA's failure to properly and adequately train and supervise OPDA prosecutors with respect to OPDA's *Brady* obligations is reflected in the conduct of Roger

Jordan, the OPDA prosecutor who was responsible for securing the indictment against Mr. Jones arising out of the Robbery/Kidnap/Rape:

    a.   ADA Jordan was one of the OPDA prosecutors responsible for the capital prosecution of Shareef Cousin. The trial in that case occurred just four months before the trial of Robert Jones. In that case, the Louisiana Supreme Court held that OPDA violated its *Brady* obligations by failing to disclose to the defendant the fact that the sole eyewitness, who identified the defendant at trial as the assailant, told the NOPD prior to trial that she had poor eyesight and would be at a disadvantage in identifying the assailant. The failure to disclose the witness's prior inconsistent statement was the same type of *Brady* violation that occurred in Mr. Jones's case. In 2005, Jordan was charged by the Office of Disciplinary Counsel and sanctioned by the Louisiana Supreme Court for his conduct in the *Cousin* case, with the court finding that Jordan had suppressed "clearly exculpatory" evidence.

    b.   ADA Jordan was one of the OPDA prosecutors responsible for the prosecution of Juan Smith. The trial in that case occurred just five months before the trial of Robert Jones. In that case, the United States Supreme Court held that OPDA violated its *Brady* obligations by failing to disclose to the defendant the fact that OPDA's sole eyewitness told the NOPD prior to trial that he could not identify the perpetrators. The failure to disclose the witness's prior inconsistent statement was the same type of *Brady* violation that occurred in Mr. Jones's case.

    c.   ADA Jordan was one of the prosecutors responsible for the prosecution, by the Jefferson Parish District Attorney's Office, of Corey Miller. In that case, the

Jefferson Parish District Attorney's Office failed to disclose exculpatory information to the defendant — namely, information that could have been used to impeach the testimony of three prosecution witnesses.

164.     OPDA's failure to properly and adequately train and supervise OPDA prosecutors with respect to OPDA's *Brady* obligations is also reflected in the conduct of the OPDA prosecutors responsible for Mr. Jones's post-conviction proceedings.   During those proceedings, and despite Mr. Jones's claims that OPDA had failed to disclose to him all favorable information, OPDA prosecutors repeatedly failed to disclose that OPDA and/or NOPD in fact possessed such information and repeatedly misrepresented to Louisiana federal and state courts that no such information existed.

165.     As described in paragraphs 119 through and including 150 above, OPDA and the heads of OPDA were aware or should have been aware that OPDA prosecutors had repeatedly violated OPDA's *Brady* obligations and that there was a need to train and supervise prosecutors in order to prevent future, similar violations.   OPDA's failure to train or supervise its prosecutors amounted to deliberate indifference to defendants' constitutional rights under *Brady*.

### FIRST CAUSE OF ACTION — 42 U.S.C. § 1983

### (Defendant Leon Cannizzaro, Jr.)

166.     Paragraphs 1 through and including 165 are repeated and re-alleged as if fully set forth herein.

167.     OPDA, acting under color of law, withheld from Mr. Jones favorable information relating to the Robbery/Kidnap/Rape that was material to Mr. Jones's guilt or innocence, in violation of his right under the United States Constitution to the disclosure of such information.

168.     At all times relevant to this action, OPDA maintained an unconstitutional written policy, officially adopted and promulgated by OPDA and the heads of OPDA, with respect to OPDA's obligation to disclose favorable information to the defendants it prosecuted.

169.     At all times relevant to this action, OPDA failed to provide adequate training or supervision of OPDA prosecutors with respect to OPDA's obligation to disclose favorable information to the defendants it prosecuted, despite OPDA's awareness of many prior instances in which it violated *Brady* — including in its prosecution of Curtis Lee Kyles, whose conviction was vacated by the United States Supreme Court in *Kyles v. Whitley* less than one year before Mr. Jones's trial — and despite the fact that it was obvious that such training and supervision was required in order to prevent other *Brady* violations.  This failure to train and supervise was sufficiently common and well-settled that it constituted a custom that fairly represented OPDA's official policy of not complying with its obligation to disclose favorable information to the defendants it prosecuted.

170.     At all times relevant to this action, OPDA's persistent and widespread custom, reflected in numerous cases, of failing to disclose favorable information to the defendants it prosecuted; its failure to adequately train and supervise OPDA prosecutors with respect to OPDA's *Brady* obligations; and other statements, actions, and omissions reflecting OPDA's failure to comply with or otherwise take seriously its *Brady* obligations, were, when taken as a whole, sufficiently common and well-settled that they constituted a custom that fairly represented OPDA's official policy of not complying with its obligation to disclose favorable information to the defendants it prosecuted.

171.     OPDA and the heads of OPDA were on actual or constructive notice that the above-described official policies and customs failed to protect the right of Mr. Jones and other

defendants like him under the Unites States Constitution to the disclosure of favorable information, but were deliberately indifferent to the known and/or obvious consequence that constitutional violations would result from these official policies and customs.

172.     The policies and customs set forth above were the moving force that caused the deprivation of Mr. Jones's right under the United States Constitution to the disclosure of favorable information that was material to Mr. Jones's guilt or innocence.

173.     The conduct set forth above was the cause in fact and proximate cause of Mr. Jones's injuries and damages, as described in paragraphs 96 and 97 above.

174.     Defendant Cannizzaro, as the representative of OPDA, is liable to Mr. Jones pursuant to 42 U.S.C. § 1983.

### SECOND CAUSE OF ACTION — Louisiana Revised Statute § 22:1269

### (Defendants ABC Insurance Companies 1–10)

175.     Paragraphs 1 through and including 165 are repeated and realleged as if fully set forth herein.

176.     Defendants ABC Insurance Companies 1–10 may have issued and currently have in effect one or more policies of insurance covering Defendant Cannizzaro and/or OPDA with regard to the actions complained of herein and obligating Defendants ABC Insurance Companies 1–10, jointly and/or severally, to pay on behalf of Defendant Cannizzaro and/or OPDA any sums the insureds may become obligated to pay Mr. Jones or to indemnify Defendant Cannizzaro and/or OPDA for any sums the insureds may become obligated to pay Mr. Jones.

177.     As described above, Defendant Cannizzaro, as the representative of OPDA, is liable to Mr. Jones for all damages sustained by Mr. Jones, costs and reasonable attorney's fees. Defendants ABC Insurance Companies 1–10 may be contractually obligated to pay all sums on behalf of Defendant Cannizzaro and/or OPDA or to indemnify the insureds for these sums.

178.     Defendants ABC Insurance Companies 1–10 may be liable to Mr. Jones for any and all sums described above up to their policy limits, notwithstanding the fact that Defendant Cannizzaro and/or OPDA may themselves be able to assert claims of privilege or immunity from liability.

179.     Pursuant to Louisiana Revised Statute § 22:1269 (B), Mr. Jones brings a direct action against Defendants ABC Insurance Companies 1–10 to recover any and all sums they are obligated to pay him on behalf of their insureds or for which they are obligated to indemnify their insureds.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Robert Jones requests that this Court enter judgment as follows:

(1)     On the First Cause of Action, against Defendant Leon Cannizzaro, Jr., as the representative of the Orleans Parish District Attorney's Office, compensatory damages in an amount to be determined at trial; costs; and reasonable attorney's fees pursuant to 42 U.S.C. § 1988;

(2)     On the Second Cause of Action, against Defendants ABC Insurance Companies 1–10, an amount equal to any and all sums they are obligated to pay Mr. Jones on behalf of Defendant Leon Cannizzaro, Jr. and/or the Orleans Parish District Attorney's Office or for which they are obligated to indemnify the insureds; and

(3)     On both causes of action, granting Mr. Jones such other and further relief as this Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Mr. Jones demands a trial by jury on both causes of action set forth above.

Dated:  January 16, 2018                              Respectfully submitted,


                                                      */s/ Mark A. Cunningham*
                                                      Mark A. Cunningham (La 24063)
                                                      JONES WALKER LLP
                                                      201 St. Charles Avenue, Ste. 5100
                                                      New Orleans, LA 70170
                                                      Phone:  504.582.8536
                                                      Email: mcunningham@joneswalker.com

                                                      with

                                                      Alan Vinegrad* (T.A.)
                                                      Erin Monju*
                                                      COVINGTON & BURLING LLP
                                                      The New York Times Building
                                                      620 Eighth Avenue
                                                      New York, N.Y. 10018
                                                      Phone:  (212) 841-1000
                                                      Email: avinegrad@cov.com,
                                                              emonju@cov.com

                                                      and

                                                      Nina Morrison*
                                                      INNOCENCE PROJECT
                                                      40 Worth Street
                                                      Suite 701
                                                      New York, N.Y.  10013
                                                      Phone: (212) 364-5340
                                                      Email: nmorrison@innocenceproject.org

                                                      *Application for admission pro hac vice
                                                      to be filed

                                                      *Attorneys for Plaintiff Robert Jones*