UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ROBERT JONES, | : | CIVIL ACTION NO. 2:18-CV-0503-JTM-JCW |
| | : | |
| Plaintiff | : | SECTION H(2) |
| | : | |
| v. | : | JUDGE JANE TRICHE MILAZZO |
| | : | |
| LEON CANNIZZARO, JR., and | : | MAGISTRATE JOSEPH C. WILKINSON, JR. |
| ABC INSURANCE COMPANIES 1-10, | : | |
| | : | |
| Defendants. | : | **JURY TRIAL DEMANDED** |

**<u>PLAINTIFF ROBERT JONES'S BRIEF IN OPPOSITION TO
DEFENDANT LEON CANNIZZARO, JR.'S MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND .................................................................................. 3

    A.    Mr. Jones Is Wrongfully Convicted of Committing the April 6 Crimes and the April 14 Crimes .................................................................................... 3

    B.    Mr. Jones Uncovers Evidence Proving His Innocence of the April 6 Crimes and the April 14 Crimes ............................................................................... 5

    C.    OPDA Continues to Wrongfully Prosecute Mr. Jones Despite the Evidence Proving His Innocence of the April 6 Crimes and the April 14 Crimes ................. 8

LEGAL STANDARD ............................................................................................. 9

LAW AND ARGUMENT ....................................................................................... 9

    A.    Mr. Jones's § 1983 Claim Is Timely .......................................................... 9

        1.    Under *Wallace v. Kato*, Mr. Jones's § 1983 Claim Did Not Accrue Until January 26, 2017, When OPDA Dismissed the Charges for the April 6 Crimes ............................................................................. 10

        2.    Under *Heck v. Humphrey*, Accrual of Mr. Jones's § 1983 Claim Was Deferred Until January 26, 2017, When His Convictions for the April 14 Crimes Were Vacated ......................................................... 17

    B.    Mr. Cannizzaro Is Not Entitled to Immunity .......................................... 21

CONCLUSION ..................................................................................................... 22

## TABLE OF AUTHORITIES

**Cases**

*Aly v. City of Lake Jackson*, 453 Fed. App'x 538 (5th Cir. 2011) ......................................... 10, 12

*Asgeirsson v. Abbott*, 696 F.3d 454 (5th Cir. 2012) ...................................................... 16

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......................................................................... 9

*Babiker v. City of New Orleans*, No. Civ. 08-767, 2010 WL 11541775 (E.D. La. Feb. 26, 2010)..12

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................... 9

*Brady v. Maryland*, 373 U.S. 83 (1963) ............................................................... passim

*Brady v. United States*, 397 U.S. 742 (1970).............................................................. 19

*Brandley v. Keeshan*, 64 F.3d 196 (5th Cir. 1995) .................................................. 12, 16

*Brown v. City of Houston*, --- F. Supp. 3d ---, 2017 WL 8230838 (S.D. Tex. Dec. 26, 2017)11, 13

*Buckley v. Ray*, 848 F.3d 855 (8th Cir. 2017)........................................................ 13, 14

*Burge v. Parish of St. Tammany*, 187 F.3d 452 (5th Cir. 1999) ................................. 21, 22

*Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003).................................................... 12

*Colomb v. Grayson*, No. Civ. A. 07-2171, 2011 WL 335673 (W.D. La. Jan. 31, 2011) ............ 13

*Daigre v. City of Waveland*, 549 Fed. App'x 283 (5th Cir. 2013)................................... 21

*Devbrow v. Kalu*, 705 F.3d 765 (7th Cir. 2013) ......................................................... 15

*EPCO Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank*, 467 F.3d 466 (5th Cir. 2006) .... 9

*Ferrara v. United States*, 456 F.3d 278 (1st Cir. 2006)................................................. 19

*Funk v. Stryker Corp.*, 631 F.3d 777 (5th Cir. 2011)............................................... 18, 19

*Ginter v. Skahill*, 298 Fed. App'x 161 (3d Cir. 2008) ................................................ 12

*Heck v. Humphrey*, 512 U.S. 477 (1994).......................................................... passim

*Hudson v. City of New Orleans*, 174 F.3d 677 (5th Cir. 1999) .................................... 22

*Izen v. Catalina*, 256 F.3d 324 (5th Cir. 2001) ........................................................... 12

*Jackson v. Johnson*, 950 F.2d 263 (5th Cir. 1992) ...................................................... 15

*Jones v. Cain*, 151 So. 3d 781 (La. App. 4 Cir. 2014), *writ denied*, 171 So. 3d 270 (La. 2015).... 8

*Jordan v. Blount County*, 885 F.3d 413 (6th Cir. 2018) ........................................ 11, 13

*Kentucky v. Graham*, 473 U.S. 159 (1985) ................................................................ 21

*King v. Harwood*, 852 F.3d 568 (6th Cir. 2017) ........................................................ 12

*Leal v. McHugh*, 731 F.3d 405 (5th Cir. 2013) ............................................................. 9

*Mairena v. Foti*, 816 F.2d 1061 (5th Cir. 1987) ........................................................ 22

*McLin v. Ard*, 866 F.3d 682 (5th Cir. 2017) .................................................................. 9

*Meyers v. Textron, Inc.*, 540 Fed. App'x 408 (5th Cir. 2013) ...................................... 8

*Morrill v. City of Denton*, 693 Fed. App'x 304 (5th Cir. 2017) ................................ 15

*Norris v. Hearst Trust*, 500 F.3d 454 (5th Cir. 2007) ................................................. 8

*Owens v. Baltimore City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014)..... 11, 12, 13, 14

*Spak v. Phillips*, 857 F.3d 458 (2d Cir. 2017) ........................................................... 12

*State v. Johnson*, 544 So. 2d 767 (La. Ct. App. 1989) ............................................... 19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ........................ 8, 19

*Thompson v. Connick*, No. Civ. A. 03-2045, 2005 WL 3541035 (E.D. La. Nov. 15, 2005), *aff'd*, 553 F.3d 836 (5th Cir. 2008), *on reh'g en banc*, 578 F.3d 293 (5th Cir. 2009), *rev'd on other grounds*, 563 U.S. 51 (2011) ...................................................... 16, 20

*Uboh v. Reno*, 141 F.3d 1000 (11th Cir. 1998) .......................................................... 12

*United States v. Nelson*, 59 F. Supp. 3d 15 (D.D.C. 2014) ....................................... 19

*Wallace v. Kato*, 549 U.S. 384 (2007) .............................................................. passim

*Whatley v. Coffin*, 496 Fed. App'x 414 (5th Cir. 2012) ........................................... 21

*Winfrey v. Rogers*, 882 F.3d 187 (5th Cir. 2018) ......................................... 10, 12, 15

*Wright v. City of Philadelphia*, 229 F. Supp. 3d 322 (E.D. Pa. 2017)................................... 11, 13

**Statutes**

42 U.S.C. § 1983.................................................................................... passim

La. Civ. Code. Ann. art. 3492 ................................................................. 11

**Treatises**

Dan B. Dobbs, *et al.*, *The Law of Torts* (2d ed. 2011) .................................................. 12

Fowler V. Harper, *et al.*, *Harper, James, and Gray on Torts* (3d ed. rev. 2006) ........................ 12

W. Page Keeton, *et al.*, *Prosser & Keeton on Torts* (5th ed. 1984)........................................ 12, 16

Stuart M. Speiser, *et al.*, *The American Law of Torts* (2011) ...................................... 12

**Other**

Fed. R. Civ. P. 12(b)(6)…………………………………………………………8, 9, 18, 19

## INTRODUCTION

In April 1992, Lester Jones (no relation to Plaintiff, who is referred to herein as "Mr. Jones") perpetrated a two-week crime spree in and around New Orleans's French Quarter, consisting of several robberies, a kidnapping, a rape, and a murder.  Dkt. No. 1 ("Compl.") ¶¶ 2–5, 63.  In the midst of this crime spree, Mr. Jones was arrested and subsequently charged by the Orleans Parish District Attorney's Office ("OPDA") for committing several of these crimes— specifically, three robberies, a kidnapping, and a rape, committed on April 6, 1992 (the "April 6 Crimes"), and a murder and two robberies, committed on April 14, 1992 (the "April 14 Crimes"). *Id.* ¶¶ 19–23, 98.

In March 1996, Mr. Jones was wrongfully convicted of committing the April 6 Crimes, as a direct result of OPDA's violation of his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), a United States Supreme Court case that, with its progeny, requires prosecutors to disclose all favorable information in the government's possession to defendants.  Compl. ¶¶ 40–42, 50–90. Specifically, at the time of Mr. Jones's trial, OPDA suppressed evidence that not only established Mr. Jones's innocence, but also Lester Jones's guilt.  *Id.*  Shortly thereafter, OPDA leveraged its wrongful conviction of Mr. Jones for the April 6 Crimes to extract a guilty plea from him to the April 14 Crimes.  *Id.* ¶¶ 98–104.  At the time, OPDA was aware, but did not disclose to Mr. Jones, that it had evidence that Lester Jones—not Mr. Jones—committed the robberies on April 14, and it had no evidence that could be used to convict Mr. Jones of the murder.  *Id.* ¶¶ 63–64, 102–04.

Following his wrongful convictions, Mr. Jones fought for over two decades to clear his name, repeatedly requesting that OPDA disclose any favorable information to him.  *Id.* ¶¶ 6, 41–49.  During that time, OPDA continued to suppress the evidence of Mr. Jones's innocence, falsely stating that all favorable information had been disclosed to him.  *Id.* ¶¶ 6, 46–49.  Nevertheless,

Mr. Jones persisted, eventually uncovering abundant evidence of his innocence and Lester Jones's guilt. *Id.* ¶¶ 50–54. Citing much of this evidence, the Louisiana Fourth Circuit Court of Appeal vacated Mr. Jones's convictions for the April 6 Crimes on October 8, 2014, on the ground that OPDA had violated its obligations under *Brady v. Maryland*. *Id.* ¶¶ 69–70. Yet, despite the vacatur and the evidence of Mr. Jones's innocence, OPDA continued to prosecute Mr. Jones for the April 6 Crimes for another 28 months, while also opposing Mr. Jones's challenges to his illegally obtained plea to the April 14 Crimes. *Id.* ¶¶ 94–95, 104. Finally, on January 26, 2017—the day Defendant Leon Cannizzaro, Jr., the Orleans Parish District Attorney, was scheduled to testify in Mr. Jones's criminal case—OPDA agreed to the vacatur of Mr. Jones's convictions for the April 14 Crimes and dismissed all charges against him. *Id.* ¶¶ 95, 104. Mr. Jones filed his Complaint less than one year later, on January 16, 2018, seeking relief under 42 U.S.C. § 1983 for the injuries he suffered as a result of his wrongful convictions and imprisonment.

Mr. Cannizzaro now seeks to dismiss Mr. Jones's § 1983 claim on prescription and immunity grounds, prior to discovery. *See* Dkt. No. 14. The motion is meritless.

First, Mr. Cannizzaro argues that Mr. Jones should have filed his claim within one year of the October 8, 2014 vacatur of his convictions for the April 6 Crimes. *See* Dkt. No. 14-2 at pp. 10–11. But that argument ignores binding United States Supreme Court and Fifth Circuit precedent dictating that § 1983 claims based on wrongful prosecution—including claims seeking to remedy harms caused by violations of *Brady v. Maryland*—do not accrue until the underlying prosecution has finally, favorably terminated in the plaintiff's favor. *See, e.g.*, *Wallace v. Kato*, 549 U.S. 384 (2007). That occurred here on January 26, 2017, when OPDA dismissed the charges against Mr. Jones for the April 6 Crimes. The argument also ignores that Mr. Jones could not have brought his § 1983 claim—and it therefore did not accrue—until his convictions for the April 14

2

Crimes had been vacated, given that Mr. Jones's claim necessarily implies the invalidity of those convictions. *See, e.g.*, *Heck v. Humphrey*, 512 U.S. 477 (1994). That, too, occurred on January 26, 2017. Because Mr. Jones filed the Complaint less than one year later, within the relevant one-year limitations period, his § 1983 claim is timely.

Second, Mr. Cannizzaro asserts that he is entitled to absolute and qualified immunity from Mr. Jones's claim. *See* Dkt. No. 14-2 at pp. 11–13. But Mr. Cannizzaro was sued in his official capacity only, as a proxy for OPDA. *See* Compl. ¶ 17. This argument, again, ignores binding United States Supreme Court and Fifth Circuit precedent holding that absolute and qualified immunity are not available defenses to prosecutors sued in their official capacities.

For these reasons, Mr. Cannizzaro's arguments fail and his motion must be denied.

## FACTUAL BACKGROUND

A.  ***Mr. Jones Is Wrongfully Convicted of Committing the April 6 Crimes and the April 14 Crimes***

On April 6, 1992, TP (whose name is not used to protect her privacy), her boyfriend, and a friend were approached in the French Quarter by a man with a gun who told them to lie down and robbed them. *Id.* ¶ 19. The perpetrator then forced TP into a car, drove her to the Desire Housing Project, and raped her. *Id.* These crimes are referred to herein as the April 6 Crimes.

On April 14, 1992, Bethany Acosta and her boyfriend, Patrick Van Hoorebeek, were walking in the French Quarter when they were robbed by a man with a gun. *Id.* ¶ 63. Several minutes later, and one block away, Julie Stott and her boyfriend, Peter Ellis, were approached by a man with a gun who attempted to rob them. *Id.* ¶ 20. When Ms. Stott refused the man's demands to lie down, he shot and killed her. *Id.* These crimes—the two robberies and the murder—are referred to herein as the April 14 Crimes.

On April 17, 1992, a $10,000 reward was announced for information leading to a conviction in the murder of Ms. Stott.  *Id.* ¶ 21.  Shortly thereafter, the New Orleans Police Department ("NOPD") received a tip, later determined to be false, that Mr. Jones had implicated himself in the murder.  *Id.*  Following a brief, deeply flawed police investigation, Mr. Jones was arrested on April 18, 1992 for committing the April 6 Crimes and the April 14 Crimes.  *Id.* ¶¶ 21–23, 98.  He was only 19 years old at the time.  *Id.* ¶ 28.

After four years of pre-trial detention, OPDA tried Mr. Jones for the April 6 Crimes.  *See id.* ¶¶ 23, 25, 93.  During the trial, OPDA Assistant District Attorney Fred Menner relied heavily on TP's description of her assailant to argue Mr. Jones's guilt.  *Id.* ¶¶ 25–27.  Specifically, Mr. Menner elicited testimony from TP that her assailant's "mouth was full of gold"—like Mr. Jones, who had gold caps on his teeth.  *Id.*  Mr. Menner also elicited testimony from TP that her assailant had forced her to enter his car through the driver side door when he kidnapped her; Mr. Menner then bolstered TP's credibility by introducing a photograph of the car showing damage to the car's passenger side door, which ostensibly prevented its use.  *Id.* ¶¶ 72–73.  And Mr. Menner explained away a critical weakness in the case—the fact that all of the physical evidence from the April 6 Crimes, including the car that was used, the jewelry that was stolen, and the glasses the perpetrator wore, was found in the possession of another man, Lester Jones—by arguing to the jury that Mr. Jones and Lester Jones were "friends" and that Mr. Jones had given Lester Jones the jewelry "in exchange" for use of Lester Jones's car.  *Id.* ¶¶ 35–38.  Despite the fact that Mr. Jones and five other witnesses all testified that Mr. Jones was at his infant son's birthday party at the time of the crimes, Mr. Jones was convicted of the April 6 Crimes on March 12, 1996, after a two-day trial.  *Id.* ¶¶ 39–40.  He received a mandatory minimum sentence of life without parole.  *Id.* ¶ 103.

4

Shortly after Mr. Jones was convicted of committing the April 6 Crimes, Mr. Menner offered Mr. Jones a plea bargain for the murder of Ms. Stott, under which Mr. Jones would plead guilty to a reduced charge of manslaughter. *Id.* To convince Mr. Jones to accept the bargain, Mr. Menner argued that, if Mr. Jones were able to overturn his convictions for the April 6 Crimes, Mr. Jones would spend—at most—21 years in prison for manslaughter. *Id.* Conversely, Mr. Menner asserted, if Mr. Jones were convicted of murder at trial, he would face a second life sentence without parole. *Id.* Having just been wrongfully convicted of several crimes he did not commit, and facing the threat of a second life sentence, Mr. Jones accepted the offer, pleading guilty to manslaughter and the related robbery counts. *Id.* ¶ 104. Notably, Mr. Jones did not make any factual statements acknowledging his involvement in the April 14 Crimes during his plea. *Id.*

**B.    *Mr. Jones Uncovers Evidence Proving His Innocence of the April 6 Crimes and the April 14 Crimes***

Following his convictions, Mr. Jones fought to prove his innocence for the next two decades. *Id.* ¶ 41. During this period, Mr. Jones made numerous requests to OPDA to disclose all favorable information it had regarding the crimes he had been convicted of committing; in response, OPDA repeatedly, falsely denied that it had any favorable information, *id.* ¶ 46, claimed that the records in Mr. Jones's case were missing, *id.* ¶ 47, and falsely stated that it did not have any favorable information that Mr. Jones and his attorneys had not already seen, *id.* ¶ 48. Nevertheless, through his persistent efforts and those of his attorneys, Mr. Jones discovered a wealth of evidence that OPDA was required, but failed, to disclose under *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny. The evidence Mr. Jones uncovered not only proved his innocence of these crimes, but also established Lester Jones's guilt. *Id.* ¶¶ 41, 46–90, 102–04.

For example, Mr. Jones obtained police records establishing that TP's initial descriptions of her assailant matched Lester Jones and not Mr. Jones. *Id.* ¶¶ 55–59. Notably, TP never told the

5

NOPD that her assailant had gold teeth, despite testifying at trial that he had a mouth "full of gold." *Id.* At the time of the crimes, Lester Jones did not have gold teeth; Mr. Jones did. *Id.* In addition, TP told the NOPD that her assailant was 25 to 30 years old, a description that was never elicited at trial. *Id.* At the time of the crimes, Lester Jones was 30; Mr. Jones was 19. *Id.* The police records also disclosed that TP stated that her assailant told her he was taking her to his "neck of [the] woods." *Id.* ¶ 61. At the time of the crimes, Lester Jones lived in the Desire Housing Project, where the rape occurred; Mr. Jones lived over two miles away. *Id.* The police records also revealed that TP told the NOPD that she entered her assailant's car from the *passenger* side, contradicting her trial testimony and diminishing its credibility. *Id.* ¶¶ 72–76. In addition, the police records showed that Lester Jones's car—which TP identified as being her assailant's car— did not sustain damage to its passenger side door until two weeks *after* the April 6 Crimes, refuting Mr. Menner's assertion that the damage to the door explained (much less bolstered) TP's testimony. *Id.* ¶ 74.

Mr. Jones also obtained evidence establishing that the April 6 Crimes and the April 14 Crimes were part of a crime spree, spanning April 6 through April 20, 1992, that had been committed by Lester Jones, not Mr. Jones. *Id.* ¶¶ 63–67. Specifically, the police records Mr. Jones obtained established that the victims of the crimes in the spree all described a single perpetrator, acting alone, who looked like Lester Jones, *id.* ¶ 64; the victims all described a car used by the perpetrator that looked like Lester Jones's car, *id.*; Lester Jones was found with physical evidence from all of the crimes, *id.*; and the final crime in the spree was committed two days after Mr. Jones had been arrested on April 18, 1992—meaning he could not have committed it. *Id.* ¶¶ 23, 63–64. In addition, Mr. Jones discovered that an NOPD detective investigating the spree had concluded that "the same person" committed all of the crimes and that "the guilty party" was Lester Jones,

6

not Mr. Jones. *Id.* ¶ 67. And Mr. Jones discovered that a second NOPD detective who investigated several of the crimes also concluded that Lester Jones, not Mr. Jones, was the perpetrator—a conclusion the detective shared with OPDA prior to Mr. Jones's trial. *Id.* ¶¶ 78, 102.

Finally, Mr. Jones obtained evidence that OPDA's theory underlying his convictions for the April 6 Crimes—that Mr. Jones and Lester Jones were "friends" and that Mr. Jones had given Lester Jones the jewelry from the crimes "in exchange" for use of Lester Jones's car—was false. *Id.* ¶¶ 78–88. OPDA's sole basis for believing there was a connection between Mr. Jones and Lester Jones was a statement Lester Jones made to the NOPD while in custody in 1992 implicating Mr. Jones in Ms. Stott's murder. *Id.* ¶ 84. But OPDA had ample reason to doubt the statement. Beyond blatant inaccuracies in the statement itself, the NOPD detectives referenced above found no credible evidence that there *was* a connection between Mr. Jones and Lester Jones, a fact one of the detectives shared with OPDA prior to Mr. Jones's trial. *Id.* ¶¶ 37, 78, 99, 102. In addition, in 2007, Lester Jones testified that, prior to Mr. Jones's trial, he made clear to an OPDA prosecutor that he did not know Mr. Jones and that his post-arrest statement had been coerced. *Id.* ¶¶ 49, 84. Incredibly, OPDA argued for years during post-conviction proceedings that Lester Jones's testimony was not credible because he had supposedly waited until 2007 to "suddenly" recant. *Id.* ¶ 49. Yet in 2015, OPDA disclosed to Mr. Jones—for the first time—a 1996 memorandum by Mr. Menner (referred to herein as the "Menner Memo") memorializing the fact that Lester Jones *had recanted his entire statement to Mr. Menner prior to Mr. Jones's trial. Id.* ¶¶ 49, 85–88. As such, OPDA had no basis to argue at Mr. Jones's trial that he and Lester Jones were "friends." Indeed, OPDA's theory of Mr. Jones's involvement in the April 6 Crimes was a fiction—a fiction directly contradicted by information in OPDA's possession that it had withheld from Mr. Jones for nearly 20 years.

7

**C.**   ***OPDA Continues to Wrongfully Prosecute Mr. Jones Despite the Evidence Proving His Innocence of the April 6 Crimes and the April 14 Crimes***

On October 8, 2014, the Louisiana Fourth Circuit Court of Appeal vacated Mr. Jones's convictions for the April 6 Crimes and remanded for a new trial on the ground that OPDA had violated its obligations under *Brady v. Maryland*, by failing to disclose much of the evidence cited above. *Id.* ¶¶ 68–70; *Jones v. Cain*, 151 So. 3d 781 (La. App. 4 Cir. 2014), *writ denied*, 171 So. 3d 270 (La. 2015). Despite this rebuke and the abundant evidence of Mr. Jones's innocence, OPDA continued its efforts to re-convict Mr. Jones of the April 6 Crimes for another 28 months. Compl. ¶ 94. Finally, on January 26, 2017, the day Mr. Cannizzaro was scheduled to testify at a hearing in connection with Mr. Jones's motion to quash the indictment for the April 6 Crimes, OPDA dismissed the charges. *Id.* ¶ 95. That same day, OPDA consented to the vacatur of Mr. Jones's convictions for the April 14 Crimes and dismissed those charges as well. *Id.* ¶ 104; Crim. Dist. Ct., Orleans Parish, No. 357–917, Dkt. at 01/26/2017 (reflecting vacatur and dismissal).[1]

Mr. Jones filed the instant Complaint less than one year later, on January 16, 2018, seeking damages under 42 U.S.C. § 1983 for the injuries he suffered as a result of OPDA's violations of *Brady v. Maryland*, including his wrongful convictions, over 23 years of wrongful imprisonment, and over 25 years of wrongful prosecution by OPDA. Compl. ¶¶ 12, 96–97.

---

[1] The Court may take judicial notice of the fact that Mr. Jones's convictions for the April 14 Crimes were vacated, and the charges dismissed, on January 26, 2017. *See, e.g.*, *Meyers v. Textron, Inc.*, 540 Fed. App'x 408, 409–10 (5th Cir. 2013) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007), to find that a court may take into account "court proceedings" in deciding a 12(b)(6) motion); *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) ("[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record.").

8

## LEGAL STANDARD

To withstand a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint need only allege sufficient facts to "'state a claim to relief that is plausible on its face'"—that is, sufficient facts to support "the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  In deciding a motion to dismiss, a court must accept all factual allegations in the complaint as true and "view all facts and inferences in the light most favorable to the nonmoving party."  *McLin v. Ard*, 866 F.3d 682, 688 (5th Cir. 2017).  Moreover, dismissal based on an affirmative defense is inappropriate unless the defense appears "on the face of the complaint."  *EPCO Carbon Dioxide Prods., Inc. v. JP Morgan Chase Bank*, 467 F.3d 466, 470 (5th Cir. 2006)  In light of these standards, a motion to dismiss under Rule 12(b)(6) "is viewed with disfavor and is rarely granted."  *E.g.*, *Leal v. McHugh*, 731 F.3d 405, 410 (5th Cir. 2013).

## LAW AND ARGUMENT

Mr. Cannizzaro moves to dismiss Mr. Jones's § 1983 claim on the grounds that the claim is time-barred and he is immune from suit.  *See* Dkt. No. 14-2 at pp. 10–13.  Mr. Cannizzaro is mistaken.  Because Mr. Jones filed the Complaint on January 16, 2018—less than one year after his claim accrued on January 26, 2017—his § 1983 claim is timely.  In addition, because Mr. Cannizzaro was sued in his official capacity only, as a proxy for OPDA, he is not entitled to immunity.  As such, Mr. Cannizzaro's motion to dismiss must be denied.

### A.    *Mr. Jones's § 1983 Claim Is Timely*

Mr. Cannizzaro asserts that Mr. Jones's § 1983 claim is time-barred because it was not filed within one year of the date on which his convictions for the April 6 Crimes were vacated and his case remanded for a new trial.  *See* Dkt. No. 14-2 at pp. 10–11.  Nowhere, however, does Mr.

Cannizzaro cite the Supreme Court case that controls when a § 1983 claim accrues for statute-of-limitations purposes. *See Wallace v. Kato*, 549 U.S. 384 (2007). Instead, he relies on—and misapplies—a Supreme Court case that controls only when accrual of a § 1983 claim must be *deferred* to prevent collateral attack on an extant conviction. *See* Dkt. No. 14-2 at pp. 10–11 (citing *Heck v. Humphrey*, 512 U.S. 477 (1994)). Contrary to Mr. Cannizzaro's argument, under a proper application of both *Wallace* and *Heck*, Mr. Jones's § 1983 claim did not accrue until January 26, 2017—when OPDA abandoned its wrongful prosecution of Mr. Jones for the April 6 Crimes and agreed to the vacatur of his convictions for the April 14 Crimes. Thus, Mr. Jones's Complaint—which was filed within the relevant one-year limitations period, on January 16, 2018—is timely.

1. **Under *Wallace v. Kato*, Mr. Jones's § 1983 Claim Did Not Accrue Until January 26, 2017, When OPDA Dismissed the Charges for the April 6 Crimes**

In *Wallace v. Kato*, the Supreme Court articulated the framework for determining when a § 1983 claim accrues for statute-of-limitations purposes. 549 U.S. 384; *see Winfrey v. Rogers*, 882 F.3d 187, 196–97 (5th Cir. 2018) (applying the *Wallace* framework to determine when a § 1983 claim accrued); *Aly v. City of Lake Jackson*, 453 Fed. App'x 538, 539 (5th Cir. 2011) (same). Specifically, the Court stated, the timeliness of a § 1983 claim is assessed by reference to both state and federal law. *Id.* at 387. Courts look to state law to determine the *length* of the limitations period applicable to a § 1983 claim—by applying the state's limitations period for personal injury torts. *Id.* But courts look to federal law to determine when that limitations period *begins to run*—by applying accrual rules derived from federal "common-law tort principles." *Id.* at 388. These "common-law tort principles" direct that, generally, a § 1983 claim accrues "when the plaintiff has a complete and present cause of action." *Id.* However, the Court cautioned, this "standard rule" does not govern the accrual of *all* § 1983 claims. *Id.* Instead, to determine when a § 1983 claim accrues, courts must decide what common law tort is most analogous to the § 1983 claim, and—

10

if a "distinctive" rule governs the accrual of that tort—courts must "consider[]" that "refinement" in determining when the limitations period for the § 1983 claim began to run.  *Id.*

Assessed under this framework, the limitations period applicable to Mr. Jones's § 1983 claim is determined by reference to state law.  Here, the relevant limitations period is one year, the prescriptive period applicable to delictual actions in Louisiana.  *See* La. C.C. art. 3492.  The question of *when* that limitations period began to run is decided by reference to "common-law tort principles"—first, by determining which common law tort is most analogous to Mr. Jones's § 1983 claim and, second, by applying that tort's "distinctive" accrual rule, if any, to Mr. Jones's claim.

First, the case law is settled that Mr. Jones's *Brady*-based § 1983 claim—which seeks to remedy his wrongful conviction and imprisonment—is most analogous to the common law tort of malicious prosecution.  *See Jordan v. Blount County*, 885 F.3d 413, 415 (6th Cir. 2018) (concluding *Brady*-like § 1983 claim was most analogous to the tort of malicious prosecution); *Owens v. Baltimore City State's Attorney's Office*, 767 F.3d 379, 390 (4th Cir. 2014) (same); *Brown v. City of Houston*, --- F. Supp. 3d ---, 2017 WL 8230838, at *6 (S.D. Tex. Dec. 26, 2017) (same); *Wright v. City of Philadelphia*, 229 F. Supp. 3d 322, 331–32 (E.D. Pa. 2017) (same).  That is because, when selecting a common law tort analogue, the Supreme Court asks whether a § 1983 claim seeks to remedy detention that occurred *with* or *without* legal process, and has concluded that claims seeking to remedy detention *with* legal process are most analogous to the tort of malicious prosecution.  *Compare Heck*, 512 U.S. at 484 (finding malicious prosecution to be the most analogous tort to a § 1983 claim for wrongful conviction and imprisonment, because both the tort and claim concerned "confinement imposed pursuant to legal process"); *with Wallace*, 549 U.S. at 389 (finding false imprisonment to be the most analogous tort to a § 1983 claim for a warrantless arrest, because both the tort and claim concerned detention "*without legal process*");

*see also Winfrey*, 882 F.3d at 197 (analogizing a § 1983 claim to the tort of malicious prosecution because both concerned violations that occurred pursuant to legal process); *Babiker v. City of New Orleans*, No. Civ. 08-767, 2010 WL 11541775, at *5 (E.D. La. Feb. 26, 2010) (same).  As such, the accrual rule relevant to the tort of malicious prosecution applies here.

Second, the case law is also settled that a malicious prosecution claim does not accrue until "'the prosecution ends in the plaintiff's favor,'" *Winfrey*, 882 F.3d at 197 (quoting *Castellano v. Fragozo*, 352 F.3d 939, 953 (5th Cir. 2003))—that is, when the prosecution terminates "in such manner that it cannot be revived."  W. Page Keeton, *et al.*, *Prosser & Keeton on Torts* 874 (5th ed. 1984); *see Wallace*, 549 U.S. at 388–90 (relying on treatises to derive common law tort principles).  According to the Fifth Circuit, such a termination occurs with "[a]n acquittal, an order of dismissal based on the running of the statute of limitations on the crime or an order of dismissal reflecting an affirmative decision not to prosecute."  *Brandley v. Keeshan*, 64 F.3d 196, 199 (5th Cir. 1995), *abrogated on other grounds by Wallace*, 549 U.S. 384; *accord Izen v. Catalina*, 256 F.3d 324, 328 (5th Cir. 2001).  Of particular relevance here, the Fifth Circuit has explicitly held that "[t]he reversal of a conviction and remand for new trial is not, in and of itself, a termination" sufficient to satisfy this requirement.  *Brandley*, 64 F.3d at 199; *see, e.g.*, *Aly*, 453 Fed. App'x at 539 ("[A] malicious prosecution claim only accrues once the criminal charges are dismissed.").  While this definition of favorable termination is binding here, it is also not unique.  Numerous circuit courts[2] and treatises[3] agree that a malicious prosecution claim does not accrue until the

---

[2] *See, e.g.*, *Spak v. Phillips*, 857 F.3d 458, 462–64 (2d Cir. 2017); *King v. Harwood*, 852 F.3d 568, 579 (6th Cir. 2017); *Owens*, 767 F.3d at 390 (4th Cir.); *Ginter v. Skahill*, 298 Fed. App'x 161, 163 (3d Cir. 2008); *Uboh v. Reno*, 141 F.3d 1000, 1004–06 (11th Cir. 1998).

[3] *See, e.g.*, *Prosser & Keeton on Torts* 874; Dan B. Dobbs, *et al.*, *The Law of Torts* § 590 (2d ed. 2011); Stuart M. Speiser, *et al.*, *The American Law of Torts* § 28.5 (2011); Fowler V. Harper, *et al.*, *Harper, James, and Gray on Torts* § 4.4 (3d ed. rev. 2006).

underlying proceeding has finally terminated in the plaintiff's favor.  As such, Mr. Jones's § 1983

claim did not accrue until a claim for malicious prosecution would have accrued—that is, when

the proceeding against him for the April 6 Crimes was terminated in such a manner that it could

not be "revived."  That occurred on January 26, 2017, when OPDA dismissed the charges.

This conclusion has ample support: numerous courts have found that, under *Wallace*,

*Brady* and *Brady*-like § 1983 claims do not accrue until the underlying criminal proceeding has

finally terminated in the plaintiff's favor.  *See Jordan*, 885 F.3d at 415 (holding that, because the

plaintiff's "criminal proceeding . . . continued after the vacatur," his *Brady*-based § 1983 claim did

not accrue until "acquittal"); *Owens*, 767 F.3d at 390 ("Because the grant of a new trial does not

trigger the limitations period for a malicious prosecution claim, the statute of limitations on [the

plaintiff's *Brady*-like] § 1983 claims did not begin to run on the date he was granted a new trial,"

but instead on "the date on which the *nolle prosequi* was entered."); *Brown*, 2017 WL 8230838,

at *7 (finding that a *Brady*-based § 1983 claim "accrued when the underlying state criminal case

terminated in [the plaintiff's] favor, which was when the State elected not to reprosecute him and

the trial court dismissed the charges"); *see also Wright*, 229 F. Supp. 3d at 332 and n.5 (finding

that a *Brady*-like § 1983 claim did not accrue "until [the plaintiff's] criminal proceeding terminated

in his favor," which occurs when "there [is] no longer a threat of prosecution"); *Colomb v.

Grayson*, No. Civ. A. 07-2171, 2011 WL 335673, at *4 (W.D. La. Jan. 31, 2011) (comparing trial-

based *Bivens* claims to the tort of malicious prosecution to find that the plaintiff's claims did not

accrue upon the grant of a new trial, but instead when charges were dismissed).

Only one, out-of-circuit court has reached a contrary conclusion, and it clearly misapplied

*Wallace*.  *See Buckley v. Ray*, 848 F.3d 855 (8th Cir. 2017).  In *Wallace*, the Supreme Court

discussed accrual of § 1983 claims in two respects: the Court first articulated the framework for

13

determining when a § 1983 claim accrues for limitations purposes, *Wallace*, 549 U.S. at 387–92, and then found that the *Heck* bar—which only *defers* the accrual of a § 1983 claim that would impugn an extant conviction—does not apply to claims that may impugn "*an anticipated future conviction*," *id.* at 392–95. The court in *Buckley* relied on the second holding in *Wallace* to find that a *Brady*-based § 1983 claim could accrue upon vacatur, because "the *Heck* rule applies only when there exists a conviction or sentence that has *not* been invalidated." *Buckley*, 848 F.3d at 867. But that confuses the questions of when accrual occurs under *Wallace* with whether accrual must be *deferred* under *Heck*. *Cf. Owens*, 767 F.3d at 391 (noting that the *Heck* bar on a *Brady*-like § 1983 claim lifted upon vacatur, but finding, under *Wallace*, that the claim did not accrue until charges were dismissed). As a result of this confusion, the *Buckley* court did not conduct the accrual analysis required by *Wallace*. In addition, *Buckley* is factually inapposite. In *Buckley*, the plaintiff's § 1983 claim would have been untimely whether it accrued upon vacatur or the dismissal of charges. *Buckley*, 848 F.3d at 866. Here, Mr. Jones timely filed his claim within one year of the dismissal of charges. Thus, because the *Buckley* court did not conduct an accrual analysis under *Wallace*, and because the facts in *Buckley* are distinguishable, the ruling is of no help to Mr. Cannizzaro here.

Finally, that a *Brady*-based § 1983 claim would accrue upon a final, favorable termination makes sense as a practical matter. *Cf. Wallace*, 549 U.S. at 389 (noting that a "distinctive" accrual rule may apply to false imprisonment claims for the practical reason that "the victim may not be able to sue while he is still imprisoned"). If a plaintiff were required to bring a *Brady*-based § 1983 claim upon vacatur, and prior to final termination, the plaintiff would be forced to choose between suing the prosecutor who is *at that time* considering continued prosecution (increasing the risk that the prosecutor might decide to seek a conviction in order to avoid a civil judgment) or abandoning

14

the claim altogether (preventing vindication of the plaintiff's civil rights). Indeed, Mr. Jones faced

that very risk—following vacatur of his convictions for the April 6 Crimes, Mr. Jones and his

attorneys tried mightily, for over two years, to convince OPDA to dismiss the charges against him.

*See* Compl. ¶¶ 80–81.  If Mr. Jones's § 1983 claim had accrued upon vacatur, he would have been

forced to choose between suing OPDA (which was, at that time, deciding whether to re-prosecute

him) or abandoning his claim altogether.  Such an accrual rule would be tantamount to denying

Mr. Jones a remedy for the *Brady* violations that deprived him of over 23 years of his liberty.

Thus, *Wallace*, *Brandley*, the weight of precedent, and practical considerations all support

one conclusion: Mr. Jones's § 1983 claim is timely.  Mr. Cannizzaro does not cite—much less

grapple with—any of this precedent.  *See* Dkt. No. 14-2 at p. 10–11.  Instead, he cites precedent

pre-dating *Wallace* to assert that a § 1983 claim accrues when a plaintiff knows or has reason to

know of his injury.  *Id.* at 10 (citing *Jackson v. Johnson*, 950 F.2d 263, 265 (5th Cir. 1992)).  While

that is the "standard rule," *see, e.g.*, *Morrill v. City of Denton*, 693 Fed. App'x 304, 306 (5th Cir.

2017) (characterizing the standard accrual rule as being "when a plaintiff is aware, or should be

aware, of the existence of the injury"), Mr. Cannizzaro's argument ignores *Wallace*'s instruction

that courts apply the "distinctive" accrual rule of the most analogous common law tort.  *See, e.g.*,

*Devbrow v. Kalu*, 705 F.3d 765, 767 (7th Cir. 2013) (noting that, under *Wallace*, there is "no single

accrual rule for all § 1983 claims"); *Winfrey*, 882 F.3d at 197 (applying the distinctive accrual rule

for malicious prosecution to a § 1983 claim under *Wallace*).  As such, his argument must fail.

In addition, in his reply brief in a related case in this Court, Mr. Cannizzaro raises two

arguments responding to the cases cited above, neither of which is availing.  *See Morgan v.*

*Cannizzaro*, No. 17 Civ. 5319, Dkt. No. 56-1 at pp. 3–6.  First, Mr. Cannizzaro asserts that the

Fifth Circuit panel opinion in *Thompson v. Connick* requires a finding that accrual occurs upon

vacatur. *See id.* (citing *Thompson v. Connick*, 553 F.3d 836 (5th Cir. 2008), *on reh'g en banc*, 578 F.3d 293 (5th Cir. 2009), *rev'd*, 563 U.S. 51 (2011)). His reliance on *Thompson* is misplaced. In *Thompson*, a Fifth Circuit panel stated in dicta that the plaintiff, John Thompson, "could have" brought his *Brady*-based § 1983 claim "as soon as . . . [his] conviction was vacated." *Id.* at 849. But this opinion has no precedential effect: it was vacated by the Fifth Circuit sitting *en banc*. *See Thompson*, 578 F.3d at 293 (*en banc*) ("The panel opinion was vacated by the grant of rehearing en banc."); *see also Asgeirsson v. Abbott*, 696 F.3d 454, 459 (5th Cir. 2012) ("[T]his court has consistently held that vacated opinions are not precedent . . . ."). In any event, the court's finding is in accord with *Brandley* and the other cases cited above: "vacatur," in Mr. Thompson's case, was in fact a final, favorable termination, given that OPDA itself moved for vacatur and did not re-prosecute on the ground that Mr. Thompson had been exonerated by previously undisclosed blood evidence. *See Thompson*, 553 F.3d at 845. Thus, *Thompson* also supports the conclusion that accrual of a *Brady*-based § 1983 claim occurs upon a final, favorable termination.

Second, Mr. Cannizzaro impliedly argues against the accrual rule in the Fifth Circuit's decision in *Brandley*—that "reversal of a conviction and remand for new trial is not, in and of itself, a [final, favorable] termination," *Brandley*, 64 F.3d at 199—by asserting that such a rule would permanently delay accrual when there is no statute of limitations for the underlying crime, such that charges could be re-filed against the plaintiff indefinitely. *See Morgan v. Cannizzaro*, Dkt. No. 56-1 at p. 5 n.16. But the Fifth Circuit foreclosed this argument in *Brandley*, ruling that "an order of dismissal reflecting an affirmative decision not to prosecute" is a final, favorable termination and that "[e]ven a prosecutor's failure to act on remand will at some point entitle a defendant to an order of dismissal" satisfying this requirement. *Brandley*, 64 F.3d at 199; *see Prosser & Keeton on Torts* 874 (noting that "abandonment of the prosecution by the prosecuting

attorney" is a final, favorable termination).  Therefore, to the extent Mr. Cannizzaro asserts his

two arguments from *Morgan v. Cannizzaro* here, they should be rejected.

In short, under *Wallace*, the distinct accrual rule governing the tort of malicious prosecution

governs the accrual of Mr. Jones's *Brady*-based § 1983 claim.  Because that rule directs that Mr.

Jones's § 1983 claim did not accrue until January 26, 2017, when OPDA dismissed the April 6

Crimes charges against him, the Complaint—filed less than one year later—is timely.

### 2.      Under *Heck v. Humphrey*, Accrual of Mr. Jones's § 1983 Claim Was Deferred Until January 26, 2017, When His Convictions for the April 14 Crimes Were Vacated

Mr. Jones's § 1983 claim is timely for a separate and independent reason.  In *Heck v.

Humphrey*, the Supreme Court held that a § 1983 claim that would "necessarily imply the

invalidity" of an extant conviction is barred unless and until the conviction "has been reversed on

direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make

such a determination, or called into question by a federal court's issuance of a writ of habeas

corpus."  512 U.S. at 486–87.  Thus, *Heck* imposes a rule of "*deferred* accrual"—"[i]t delays what

would otherwise be the accrual date of a tort action until the setting aside of an extant conviction

which success in that tort action would impugn."  *Wallace*, 549 U.S. at 393.  Mr. Cannizzaro

asserts that the *Heck* bar on Mr. Jones's § 1983 claim lifted when his convictions for the April 6

Crimes were vacated and that his claim therefore accrued at that time.  *See* Dkt. No. 14-2 at pp.

11–13.  But this argument ignores Mr. Jones's allegations concerning the April 14 Crimes.

Specifically, Mr. Jones alleges that OPDA improperly relied on his wrongful convictions for the

April 6 Crimes to extract a guilty plea from him to the April 14 Crimes and that he is innocent of

the April 14 Crimes, *see, e.g.*, Compl. ¶¶ 98–104—allegations that "necessarily imply the

invalidity" of his convictions for the April 14 Crimes.  As such, Mr. Jones could not have brought

his § 1983 claim, and it did not accrue, until the convictions for the April 14 Crimes were vacated.

First, the Complaint alleges that OPDA improperly leveraged Mr. Jones's wrongful

convictions for the April 6 Crimes to extract a guilty plea from him to the April 14 Crimes.  *See*

Compl. ¶¶ 98–104.  Specifically, the Complaint alleges that Mr. Menner explicitly relied on the

wrongful conviction of Mr. Jones for the April 6 Crimes to argue to Mr. Jones that he should accept

a plea bargain for the April 14 Crimes because, if Mr. Jones were able to overturn his convictions

for the April 6 Crimes, he would, with the plea bargain, face no more than 21 years in prison,

whereas if he were convicted at trial, he would face a second life sentence without parole.  *Id.*

¶ 103.  Faced with this grim prospect, Mr. Jones pled guilty to crimes he did not commit.  But the

Complaint alleges that, had OPDA not first secured a wrongful conviction against him that carried

a mandatory life sentence, Mr. Jones would not have waived his right to a trial for the April 14

Crimes.  *Id.* ¶ 104.

Moreover, the Complaint alleges facts supporting that Mr. Jones's waiver of his right to a

trial was invalid.  Mr. Menner not only relied on wrongful convictions to secure Mr. Jones's plea,

but also affirmatively misled Mr. Jones concerning the strength of the evidence against him.  As

Mr. Menner recently testified in Mr. Jones's criminal proceeding, when arguing to Mr. Jones that

he should accept the plea bargain for the April 14 Crimes, Mr. Menner told Mr. Jones that he

"could be found guilty of the murder" and "you could lose and then you have another life

sentence."[4]  *See* Ex. A at 122.  But, as the Complaint alleges, these statements were demonstrably

---

[4] The Court may take judicial notice of Mr. Menner's testimony when deciding the motion, because
it is a matter of public record.  *See, e.g.*, *supra* note 1; *Funk v. Stryker Corp.*, 631 F.3d 777, 783
(5th Cir. 2011) (permitting notice of "publicly-available . . . transcripts" in deciding a 12(b)(6)

false.  As Mr. Menner contemporaneously documented in the Menner Memo, "the only evidence" OPDA had implicating Mr. Jones in the murder was Lester Jones's statement.[5]  Yet, as Mr. Menner wrote at that time, Lester Jones had recanted that statement and, in light of the recantation, this lone piece of evidence "would not survive appellate review in the event of a conviction."  *See* Ex. B; Compl. ¶¶ 80–92.  Thus, Mr. Menner was well aware that, contrary to what he told Mr. Jones, Mr. Jones could *not* "lose and . . . have another life sentence"—even if Mr. Jones had been convicted at trial (which, based on Mr. Menner's own assessment, was unlikely), the conviction would not have survived appellate review.  Compounding this misconduct, Mr. Menner also did not inform Mr. Jones or his attorney that Lester Jones had recanted the statement—the "only evidence" against Mr. Jones—before extracting his plea.  As such, the Complaint alleges facts that, read in the light most favorable to Mr. Jones, render his waiver of his right to a trial—and his resulting convictions for the April 14 Crimes—constitutionally infirm.  *See Brady v. United States*, 397 U.S. 742, 748, 751 n.8, 755, 757 (1970) (stating that, as a waiver of the constitutional right to trial, a guilty plea must be knowing and voluntary, and that government "misrepresentation[s]" and "other impermissible conduct" may render a plea involuntary); *Ferrara v. United States*, 456 F.3d 278, 290–93 (1st Cir. 2006) (finding that government misconduct rendered a plea involuntary); *United States v. Nelson*, 59 F. Supp. 3d 15, 27 (D.D.C. 2014) (same); *see also State v. Johnson*, 544 So. 2d 767, 772–73 (La. Ct. App. 1989) (vacating guilty plea where undisclosed

---

motion).  A copy of the transcript of Mr. Menner's testimony is attached as Exhibit A to the declaration of Erin Monju.

[5] The Court may rely on the Menner Memo when deciding the motion, because it is incorporated by reference in the Complaint.  *See* Compl. ¶¶ 80–92; *Funk*, 631 F.3d at 783 (citing *Tellabs*, 551 U.S. 308, to note that courts may rely on documents incorporated by reference in the complaint when deciding a 12(b)(6) motion).  A copy of the Menner Memo is attached as Exhibit B to the declaration of Erin Monju.

evidence proved the defendant's innocence).  Therefore, Mr. Jones could not have brought his § 1983 claim, and it did not accrue, until these convictions were vacated.

In this respect, Mr. Jones's case resembles that of John Thompson.  Mr. Thompson filed a § 1983 claim against OPDA for *Brady* violations that led to his wrongful conviction for robbery. *See Thompson v. Connick*, No. Civ. A. 03-2045, 2005 WL 3541035, at *3 (E.D. La. Nov. 15, 2005), *aff'd*, 553 F.3d 836 (5th Cir. 2008), *on reh'g en banc*, 578 F.3d 293 (5th Cir. 2009), *rev'd on other grounds*, 563 U.S. 51 (2011).  Mr. Thompson alleged that OPDA's *Brady* violations infected both his initial robbery conviction and his subsequent conviction for murder, because the wrongful robbery conviction caused him to waive his right to testify in his subsequent murder trial. *Thompson*, 2005 WL 3541035, at *3.  The district court, reviewing the claim for timeliness under *Heck*, concluded that Mr. Thompson could not have brought his § 1983 claim until his murder conviction had been vacated, because the "alleged improper conduct . . . in the armed robbery case is related to the murder conviction" and, thus, Mr. Thompson's claim "was not ripe under *Heck* until . . . the appellate court reversed his murder conviction."  *Id.*  Like Mr. Thompson, OPDA's *Brady* violations caused both Mr. Jones's initial, wrongful conviction at trial and his waiver of rights preceding his subsequent, constitutionally infirm conviction by plea.  As such, Mr. Jones could not have brought his § 1983 claim—and it did not accrue—until his convictions for the April 14 Crimes were vacated on January 26, 2017.

Second, to succeed in his § 1983 claim, Mr. Jones will have to prove that OPDA withheld evidence that was material to his guilt or innocence under *Brady v. Maryland*.  As alleged in the Complaint, the evidence OPDA withheld in Mr. Jones's criminal proceedings was material to his guilt or innocence because it provided powerful evidence that another man, Lester Jones, committed *all* of the crimes in the April 1992 crime spree.  *See, e.g.*, Compl. ¶¶ 2–5.  Because any

20

evidence material to Mr. Jones's innocence of the April 6 Crimes would therefore *necessarily* imply his innocence of the April 14 Crimes, and because Mr. Jones in fact pleads his innocence of the April 14 Crimes in the Complaint, *see e.g.*, *id.*, Mr. Jones could not have brought his § 1983 claim—and it did not accrue—until his convictions for the April 14 Crimes were vacated. *See, e.g.*, *Daigre v. City of Waveland*, 549 Fed. App'x 283, 287 (5th Cir. 2013) (finding that "broad claims of innocence" in a complaint triggered the *Heck* bar); *Whatley v. Coffin*, 496 Fed. App'x 414, 417 (5th Cir. 2012) (finding that *Heck* bars complaints containing allegations that are "inherently inconsistent" with extant convictions).

Because Mr. Jones's § 1983 claim therefore "necessarily impl[ies] the invalidity" of his convictions for the April 14 Crimes, under *Heck*, he could not have filed his § 1983 claim, and it did not accrue, until his convictions for the April 14 Crimes were vacated on January 26, 2017. Thus, his Complaint—filed less than one year later, on January 16, 2018—is timely.

**B.      *Mr. Cannizzaro Is Not Entitled to Immunity***

Mr. Cannizzaro asserts that he is entitled to absolute and qualified immunity from Mr. Jones's § 1983 claim. *See* Dkt. No. 14-2 at pp. 11–13.  But the defenses of absolute and qualified immunity are available to prosecutors only if they are sued in their individual capacities. *See, e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 165–67 (1985) (stating that absolute and qualified immunity are available to defendants sued in their individual, not official, capacities).  Here, Mr. Cannizzaro was sued in his official capacity only—in effect, as a proxy for OPDA.  *See* Compl. ¶ 17 (stating that Mr. Cannizzaro is "sue[d] in his official capacity only"); *Burge v. Parish of St. Tammany*, 187 F.3d 452, 466–67 (5th Cir. 1999) (noting that "[o]fficial capacity suits generally represent another way of pleading an action against an entity of which an officer is an agent").  Indeed, a suit against Mr. Cannizzaro in his official capacity is the only way a suit may be brought against OPDA,

because the office itself cannot be sued.  *See, e.g.*, *Hudson v. City of New Orleans*, 174 F.3d 677, 680 (5th Cir. 1999) ("Louisiana law does not permit a district attorney's office to be sued in its own name" and instead "requires that the claim be brought against the district attorney in his official capacity.").  Because Mr. Cannizzaro is sued in his official capacity only, the defenses of absolute and qualified immunity are not available to him.  *See, e.g.*, *Mairena v. Foti*, 816 F.2d 1061, 1063 n.1 (5th Cir. 1987) ("[P]rosecutorial immunity is a personal defense, and is not applicable in this case since the district attorney is being sued in his official capacity only.").  Moreover, Mr. Cannizzaro does not—and could not—assert that OPDA is entitled to these defenses.  *See, e.g.*, *Burge*, 187 F.3d at 466–67 ("Unlike government officials sued in their individual capacities, municipal entities and local governing bodies do not enjoy immunity from suit, either absolute or qualified, under § 1983.").  As such, Mr. Cannizzaro's motion to dismiss on immunity grounds must be denied.

## CONCLUSION

For the foregoing reasons, Mr. Cannizzaro's motion to dismiss must be denied.

Respectfully submitted,


*/s/ Erin Monju*_____
Erin Monju* (N.Y. 5160908)
Alan Vinegrad* (T.A.) (N.Y. 1967140)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, N.Y. 10018
Phone:  (212) 841-1000
Email: avinegrad@cov.com,
          emonju@cov.com

with

Mark A. Cunningham (La 24063)
JONES WALKER LLP
201 St. Charles Avenue, Ste. 5100
New Orleans, LA 70170
Phone:  504.582.8536
Email: mcunningham@joneswalker.com

and

Nina Morrison* (N.Y. 3048691)
INNOCENCE PROJECT
40 Worth Street
Suite 701
New York, N.Y.  10013
Phone: (212) 364-5340
Email: nmorrison@innocenceproject.org

*Admitted pro hac vice*

*Attorneys for Plaintiff Robert Jones*

23

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing document has been served upon all counsel of record by using the CM/ECF system, this 22nd day of May, 2018.

*/s/ Erin Monju*

24