# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ROBERT JONES, | |
| *Plaintiff*, | Civil Action No. 18-503 |
| v. | Section H |
| | Judge Jane Triche Milazzo |
| LEON CANNIZZARO, JR., in his official capacity; ABC INSURANCE COMPANIES 1–10, | Division 2 |
| | Magistrate Judge Joseph Wilkinson, Jr. |
| *Defendants*. | |

## OPPOSITION TO MOTION TO COMPEL DISCOVERY

Leon Cannizzaro, Jr. (in his official capacity as Orleans Parish District Attorney), through undersigned counsel, respectfully submits this memorandum in opposition to the Motion to Compel Discovery filed by Robert Jones, Doc No. 52.

## INTRODUCTION

Pursuant to his official-capacity claim against the Orleans Parish District Attorney's Office ("OPDA") alleging a violation of his rights under *Brady v. Maryland*, 373 U.S. 83 (1963), Mr. Jones has propounded overbroad and burdensome discovery requests that extend far beyond any conceivable grounds of relevance. Mr. Jones broadly seeks documents and information about OPDA policies, practices, and training concerning *Brady*, and *Brady* violations in other cases, over a period of 44 years—or even longer, in some instances. Mr. Jones also seeks documents and information that he contends are relevant to showing *Brady* violations in his case by OPDA during the 20-year period *after* his conviction in 1996.

However, it is clearly established that the *Brady* duty to disclose favorable, material evidence ends upon conviction and therefore does not apply in post-conviction matters. Thus, any

*Brady* violation in Mr. Jones's case would have occurred by 1996 at the latest, and there is no legitimate need for him to conduct discovery into whether OPDA subsequently disclosed materials that he contends are favorable to him. Moreover, although Mr. Jones's official-capacity claim certainly requires him to show that his alleged constitutional violation was caused by OPDA's official policy, the only relevant OPDA policies in this case are those that existed at the time of the alleged violation—not policies that may have existed at some other time. Accordingly, Mr. Jones's discovery concerning OPDA policies should be restricted to evidence and events near in time to his alleged constitutional violation, and in no event extending beyond Harry Connick's tenure as District Attorney.[1]

## BACKGROUND

Mr. Jones was convicted by a jury of robbing, kidnapping, and raping a young woman, T.P., and robbing her friend and her fiancé, on the night of April 6, 1992. Mr. Jones contends that he was convicted because OPDA withheld material, favorable evidence from him, but this is incorrect. The jury heard the convincing and unequivocal testimony of T.P. identifying Mr. Jones as the man who had violated her in almost every conceivable way in a degrading ordeal lasting several hours. Only 11 days after she was raped, T.P. positively identified Mr. Jones in a photographic line-up. Three days later, she positively identified him in a physical line-up, becoming so upset upon seeing him in person that she started crying and shaking. And despite the efforts of Mr. Jones and his lawyers to discredit her testimony, T.P. remains convinced that Mr. Jones is the man who raped her.

---

[1] Mr. Connick was District Attorney of Orleans Parish from 1973 until 2003 and was therefore OPDA's policymaker at all times relevant to Mr. Jones's alleged *Brady* claim.

OPDA did not violate Mr. Jones's *Brady* rights in connection with his prosecution and conviction because the evidence that was allegedly "withheld" either (1) was not favorable to Mr. Jones; (2) was not material because there is no reasonable probability that it would have altered the jury's verdict; or (3) was already known to Mr. Jones and his counsel. More specifically:

**No mention of gold teeth:** Mr. Jones argues that OPDA should have disclosed a supplemental police report and the notes of a police detective showing that the initial description of the assailant given by T.P. and the other two victims included no mention of gold teeth. *See* Doc. No. 1 at ¶¶ 55–57. Mr. Jones contends that this fact was exculpatory and important because he had gold teeth at the time. But it was established at trial that none of the initial descriptions mentioned gold teeth, and Mr. Jones's counsel emphasized this point at great length in his closing argument. Because the supplemental report and the notes would have added nothing but cumulative evidence on the same point, they were not material.

**Estimated age of the perpetrator:** Mr. Jones argues that the same notes and supplemental police report also show that T.P. and the other two victims had initially estimated the assailant's age as 25 to 30 years, older than Mr. Jones (who was 19 at the time). *See* Doc. No. 1 at ¶¶ 55–57. But this evidence was in fact disclosed to Mr. Jones. Specifically, the incident report prepared by Detective Debra Coffee on April 7, 1992, following her interview with the victims, describes the perpetrator's age as "25–30." Mr. Jones previously admitted in his state post-conviction briefing that he received Detective Coffee's incident report. The fact that his trial counsel chose not to use this evidence for impeachment at trial is not attributable to any failure to disclose by OPDA.

**"Neck of the woods":** Mr. Jones argues that the same notes show that T.P. told Detective Coffee that the assailant told her he was taking her to his "neck of [the] woods." *See* Doc. No. 1 at

¶ 61. He contends that this evidence is exculpatory because Lester Jones[2]—who, according to Mr. Jones, actually committed the April 6 crimes—lived in the Desire Housing Project, where T.P. was raped, whereas Mr. Jones lived about two miles away. But Mr. Jones grew up in the Desire Housing Project, and, at the time of the rape, he and his friends were known to frequently use and occupy a bedroom in an apartment in the Desire Housing Project. Because the statement is fully consistent with Mr. Jones being the rapist, it can hardly be considered exculpatory. And even assuming it could be considered exculpatory in some sense, it is of minimal importance and is not material.

**Alleged "crime spree":** Mr. Jones's central contention is that the April 6 crimes were committed not by him, but by Lester. Pursuant to this theory, he argues that OPDA should have disclosed evidence relating to four separate incidents, involving crimes committed on April 14 and April 20, 1992,[3] that he could have used to make the following argument: (1) the April 14 and April 20 crimes share certain common characteristics with each other and with the April 6 crimes; (2) therefore, all of the crimes must have been committed by the same person; (3) Lester committed the April 14 and April 20 crimes; (4) therefore, Lester must have committed the April 6 crimes. *See* Doc. No. 1 at ¶¶ 63–66. However, Mr. Jones greatly overstates the similarities among the crimes.

- First, it is simply not true that "[t]he perpetrator used a similar *modus operandi* in the crimes." *Id.* at ¶ 64. The April 14 and 20 crimes were quick, straightforward armed robberies lasting seconds or minutes, whereas the April 6 assailant led his victims on a bizarre, extended trek through the French Quarter at gunpoint, before kidnapping one of his victims and raping

[2] To avoid confusion, Lester Jones is referred to herein by his first name and Robert Jones is referred to as "Mr. Jones."

[3] Specifically, these incidents are: (1) the armed robbery of Bethany Acosta and Patrick van Hoorebeek on April 14; (2) the murder of Julie Stott and armed robbery of Peter Ellis on April 14; (3) the armed robbery of Theresa McKay and Latrice Robinson on April 14; and (4) the armed robbery of Donna Freeman and Lorrell Woodfork on April 20.

her in an abandoned apartment building in the Desire Housing Project for hours.

- Second, it not true that "[t]he victims of these crimes all described a single perpetrator acting alone." *Id.* The incident report for the April 20 robbery states that the assailant "got into a waiting maroon and white Olds with an unknown driver." And one of the April 14 victims (Bethany Acosta) testified at Lester's 1994 trial that she could not see into the vehicle in which her assailant escaped and thus could not see how many people were in the vehicle or who was driving.

- Third, Mr. Jones does not even suggest that the same gun was used in all five crimes, arguing only that "victims of *three* of the crimes . . . described a weapon consistent with the weapon recovered from Lester Jones's mother's apartment." *Id.* (emphasis added). But even the witnesses to those three crimes were not consistent in describing the gun used. Peter Ellis, who witnessed the murder of Julie Stott on the night of April 14, described the murder weapon as "a small revolver" with "a very thin barrel." But at Mr. Jones's trial, Lionel Johnson—the husband of T.P., who was also robbed on April 6—described "a large gun . . . like a .357 or maybe something on that order."[4] Furthermore, contrary to Mr. Johnson's description, the gun that was recovered from Lester's home and identified as the weapon used to murder Julie Stott is a .22, the smallest-caliber handgun in common use.

- Fourth, Mr. Jones argues that the victims of all the crimes gave descriptions of the perpetrator that "were consistent with Lester Jones and not Mr. Jones," Doc. No. 1 at ¶ 64, but this is misleading at best. On April 22, 1992, three victims from three separate incidents (Bethany Acosta, Patrick van Hoorebeek, and Lorrell Woodfork) viewed a physical line-up that included Lester but did not identify Lester as the perpetrator. Moreover, one of these victims (Bethany Acosta) had previously identified ***Robert*** Jones in a photographic line-up.

Ultimately, the only facts suggesting a connection between the five incidents are (1) that Lester's car, or a very similar vehicle, appears to have been used in each incident; and (2) that Lester was found in possession of property stolen in four of the five incidents. But it was already clearly established at Mr. Jones's trial that the crimes at issue in that trial were committed using

---

[4] Mr. Johnson further testified that he was familiar with firearms because he used to work in law enforcement. Additionally, Detective Coffee's notes suggest that at least one of the April 6 victims initially described the gun as a .45, an even larger-caliber handgun.

Lester's car, and that Lester—and not Mr. Jones—was actually wearing jewelry stolen from one of the victims when he was arrested. It was also established that Lester had been convicted of murder and armed robbery; that he lived only one block from the rape scene; that he did not have gold teeth; and that he was found with round wire-rim glasses matching the description given by the victims.

Thus, based on evidence that was known to Mr. Jones and introduced at trial, his counsel was able to argue in closing that a convicted murder and armed-robber with no gold teeth owned the car used to kidnap T.P., lived one block from the rape scene, and was caught with jewelry stolen from one of the victims and glasses exactly matching the description given by the victims. Because Mr. Jones already had more than enough evidence to substantiate his argument that Lester had committed the April 6 crimes, it is entirely implausible that any competent defense counsel would have chosen to introduce evidence about *four separate criminal incidents* into the trial and take on the burden of proving that they were all committed by the same person, acting alone, and that that person was Lester.[5] And even if Mr. Jones's counsel had attempted such a thing, and even if the trial judge had allowed him to present this evidence,[6] there is no reasonable probability that it would have changed the jury's verdict because it would not have meaningfully strengthened Mr. Jones's case against Lester.

**NOPD's alleged "conclusion" concerning Lester:** Pursuant to the same "crime spree" theory discussed above, Mr. Jones argues that OPDA should have disclosed NOPD's conclusion

---

[5] This strategy would have been particularly reckless because Mr. Jones himself was, at the time, charged with crimes arising from two of the incidents.

[6] In light of the many dissimilarities among these other crimes, as discussed above, any attempt to present such evidence would likely have been rejected under Code of Evidence article 403 because the probative value of such evidence is outweighed by the danger of confusing the issues and wasting time.

that the person committed the April 6 rape, kidnapping, and armed robberies was the same person who committed the four other incidents (a murder and various armed robberies) on April 14 and April 20—specifically, Lester Jones. *See* Doc. No. 1 at ¶ 67. As an initial matter, it is doubtful that a "conclusion" or opinion of a police officer could constitute *Brady* material. More importantly, no one at NOPD, or OPDA for that matter, ever formed such a conclusion during the investigation and prosecution of the April 6 crimes. Although Lester was indeed a suspect in the April 14 and April 20 crimes, none of the April 6 victims identified him as their assailant, and he was never arrested or charged for the April 6 crimes. OPDA is unaware of any contemporaneous evidence suggesting that any NOPD officer believed that Lester had committed the April 6 rape, kidnapping, and armed robberies.

**The "Menner Memo" and Lester's alleged recantation:** Mr. Jones argues that OPDA should have disclosed the fact that, in a 1996 conversation with ADA Fred Menner, Lester recanted his initial statement to the police implicating Mr. Jones in the April 14 murder and armed robberies. *See* Doc. No. 1 at ¶¶ 83–87.[7] Mr. Jones argues that this evidence was exculpatory because it undermined OPDA's argument at trial that Mr. Jones knew Lester and was associated with him, which was important in explaining the fact that Lester's car was used in the April 6 crimes and that Lester was found in possession of jewelry taken from one of the victims. However, for multiple reasons, this evidence does not support a *Brady* claim.

- First, Mr. Menner has testified that, notwithstanding his use of the word "recanted" in a hastily drafted internal memorandum, Lester did not actually say that his prior statements to the police were untrue. *See* Doc. No. 22-2 at 110–11. Instead, when Mr. Menner met with Lester to prepare for Mr. Jones's trial, Lester refused to cooperate and testify unless OPDA would offer him a deal to reduce the life sentence he was then serving, which

---

[7] This information is contained in an April 4, 1996 internal memo written by Fred Menner, which Mr. Jones refers to as the "Menner Memo," and dramatically describes as a "bombshell." Doc. No. 52-2 at 8.

demand was refused. *See id.* When Mr. Menner pointed out that Lester had already given a statement implicating Mr. Jones, Lester said that he would simply deny ever having made the statement. *See id.*[8] However, Lester did not actually make any factual statement concerning Mr. Jones that was inconsistent with his earlier statements to the police.

- Second, even if Lester had given a statement to Mr. Menner that was inconsistent with his prior statements to the police, this could not have been used as impeachment evidence because Lester's statements to the police implicating Mr. Jones were not introduced, or even referred to, at Mr. Jones's trial. In fact, Lester did not testify at all.

- Third, once again assuming that Lester told Mr. Menner that he did not know Mr. Jones or have any involvement with him, that cannot be *Brady* material for the simple reason that it was already known to Mr. Jones and his counsel. Mr. Jones's counsel, Curklin Atkins, testified in 2013 that he met with Lester before trial and Lester told him that he did not know Mr. Jones. Yet Mr. Atkins declined to call Lester as a witness at trial to rebut the State's argument that he was associated with Mr. Jones. Additionally, if it was in fact true that Mr. Jones did not know Lester and had no involvement with him, obviously this information would be known to Mr. Jones himself. However, even though Mr. Jones testified at trial in his defense, he did not say a word about Lester or deny knowing him.

\* \* \* \* \*

Finally, even assuming that Mr. Jones's rights under *Brady* were violated in connection with his trial and conviction for the April 6 crimes (which is expressly denied), this is plainly not the actual or proximate cause of the 23 years he spent in prison. Apart from the April 6 crimes, Mr. Jones pled guilty to four separate crimes and was sentenced to 25 years of imprisonment without benefit of probation, parole or suspension.[9] Mr. Jones does not challenge these convictions and sentences on *Brady* grounds. Nor could he, in light of clear Fifth Circuit authority holding that the Constitution does not require *Brady* material to be disclosed in connection with a guilty plea.

---

[8] Mr. Menner's testimony that Lester's "recantation" was a refusal to cooperate rather than a factual retraction is corroborated by the wording of his memo, which states: "If Lester keeps his promise and recants his statement, the only evidence [connecting Mr. Jones to the murder of Julie Stott] will be the impeached testimony of a co-defendant." Doc. No. 22-3 at 2.

[9] Mr. Jones was given one 25-year sentence and three 21-year sentences, to be served concurrently.

*See Alvarez v. City of Brownsville*, _ F.3d _, 2018 WL 4441619, at *8 (5th Cir. 2018) (en banc). Mr. Jones contends that OPDA somehow "leveraged" his convictions for the April 6 crimes "to extract a false guilty plea" to several other crimes, Doc. No. 52-2 at 1, but he has never been able to explain how his convictions for the April 6 crimes might have served as "leverage" to compel him to plead guilty to other crimes that he claims he did not commit. Indeed, in his *pro se* post-conviction briefing submitted to the Louisiana Supreme Court, the Louisiana Fourth Circuit, and the Orleans Parish Criminal District Court in 2007, 2008, and 2009, Mr. Jones explained that he pled guilty on the advice of his trial counsel, who believed that he would probably be found guilty if he went to trial. Additionally, Mr. Jones's convictions for the crimes for which he pled guilty were vacated specifically on the ground that they were not knowing, intelligent, and voluntary because his counsel rendered ineffective assistance. Thus, because Mr. Jones would have served 25 years in prison pursuant to the guilty pleas—which were caused by his counsel's advice and by his own decision to plead guilty—his imprisonment could not have been caused by OPDA in any sense.

## LAW AND ARGUMENT

I.   **Evidence is relevant in this case only if it relates to the existence of a *Brady* violation in Mr. Jones's case; the existence of an OPDA policy of withholding *Brady* evidence at the time that caused the alleged violation; or OPDA's deliberate indifference in the face of prior notice that its training on *Brady* issues was constitutionally inadequate.**

As Mr. Jones correctly recognizes, the scope of discovery allowed under Federal Rule of Civil Procedure 26 turns on relevance to his claim and proportionality to the needs of the case. *See* Doc. No. 52-2 at 5. Aside from claims against unnamed insurance companies that are not at issue here, this action concerns a single *Brady* claim against Mr. Cannizzaro, in his official capacity, alleging that OPDA "withheld from Mr. Jones favorable information relating to the [April 6, 1992] Robbery/Kidnap/Rape that was material to Mr. Jones's guilt or innocence." Doc. No. 1 at ¶ 167.

To prove his claim, Mr. Jones must establish that, in connection with his prosecution and conviction for the April 6 crimes, OPDA withheld "evidence that is favorable to the defense and material to [his] guilt or punishment." *Smith v. Cain*, 565 U.S. 73, 75 (2012). Mr. Jones must also "demonstrate by a preponderance of the evidence a causal link between the *Brady* violation and his conviction"—in other words, "that he would not have been convicted but for the withholding of evidence."[10] *Drumgold v. Callahan*, 707 F.3d 28, 48–49 (1st Cir. 2013).

Even if Mr. Jones is able to prove, under civil tort-law standards, a *Brady* violation that caused his alleged damages, he cannot recover damages from OPDA unless he can prove that his injury was directly caused by "action pursuant to official municipal policy." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell v. N.Y. City Dept. of Social Svcs.*, 436 U.S. 658, 691 (1978)). This can be proven in one of two ways: First, Mr. Jones may "go beyond [his] specific case and demonstrate that a pattern or policy of purposefully withholding exculpatory evidence from criminal defendants existed within the DA office during the relevant time period." *Truvia v. Connick*, 577 F. App'x 317, 322 (5th Cir. 2014). Such a pattern or policy may consist of either an officially adopted "policy statement, ordinance, regulation, or decision," or a "persistent, widespread practice of [OPDA] officials or employees" that "is so common and well settled as to constitute a custom that fairly represents municipal policy." *Burge v. St. Tammany Parish*, 336 F.3d 363, 369 (5th Cir. 2003) ("*Burge II*"). Second, Mr. Jones may assert a "failure-to-train theory" by showing "both (1) that Connick, the policymaker for the district attorney's office, was deliberately indifferent to the need to train the prosecutors about their *Brady* disclosure obligation . . . and (2) that the lack of training actually caused the *Brady* violation in this case." *Truvia*, 577

---

[10] Additionally, as in any claim under 42 U.S.C. § 1983, Mr. Jones must prove that the alleged *Brady* violation was the proximate cause of his injuries. *See, e.g.*, *Murray v. Earle*, 405 F.3d 278, 290 (5th Cir. 2005).

App'x at 323 (quoting *Thompson*, 563 U.S. at 59). "Deliberate indifference is a stringent standard of fault," and "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 61–62 (quotations omitted).[11]

Thus, information and evidence may be relevant to Mr. Jones's claim in three possible ways: (1) it may be relevant in showing whether a *Brady* violation occurred, and what caused it; (2) it may be relevant in showing whether "a pattern or policy of purposefully withholding exculpatory evidence from criminal defendants existed within the DA office during the relevant time period," *Truvia*, 577 F. App'x at 322; or (3) it may be relevant in showing whether OPDA's policymaker was deliberately indifferent in failing to train his employees even after being put "on notice that the office's *Brady* training was inadequate with respect to the sort of *Brady* violation at issue here," *Thompson*, 563 U.S. at 62.

    A.    **Because Mr. Jones was convicted in 1996, and the *Brady* duty of disclosure does not continue after conviction, information pertaining to OPDA's alleged failure to disclose evidence to Mr. Jones after 1996 is irrelevant.**

With respect to the first basis for relevance (whether a *Brady* violation occurred), it is of critical importance that *Brady* "does not apply in the post-conviction context." *In re Bolin*, 811 F.3d 403, 408–09 (11th Cir. 2016) (citing *District Attorney's Office for Third Judicial District v. Osborne*, 557 U.S. 52 (2009)); *see also, e.g.*, *Gavitt v. Born*, 835 F.3d 623, 648 (6th Cir. 2016) ("In *Osborne*, the Supreme Court noted that 'nothing in our precedents' suggests that the prosecutor's obligation to disclose *Brady* material to the defendant before trial continued after the

---

[11] Mr. Jones may also establish municipal liability by showing that the municipal policymaker, here Mr. Connick, personally and directly violated his constitutional rights. *See, e.g.*, *Burge v. Parish of St. Tammany*, 187 F.3d 452, 471 (5th Cir. 1999) ("*Burge I*"). However, it does not appear that Mr. Jones has advanced this theory.

defendant is convicted and the case is closed."); *Jones v. Ryan*, 733 F.3d 825, 837 (9th Cir. 2013) ("[T]he *Brady* right of pretrial disclosure available to defendants at trial does not extend to habeas corpus petitioners seeking post-conviction relief."); *Tevlin v. Spencer*, 621 F.3d 59, 70 (1st Cir. 2010) ("[T]he Supreme Court has explicitly rejected *Brady's* applicability to postconviction proceedings."). Because Mr. Jones was convicted in 1996, nothing that happened after that time could constitute a new, additional, or continuing *Brady* violation.

Mr. Jones cites no legal authority supporting the argument that his *Brady* claim may be based on events occurring after his conviction. *See* Doc. No. 52-2 at 13 (arguing that "OPDA continued to violate [Mr. Jones's] *Brady* rights through at least September 2015"). Instead, Mr. Jones argues that "Mr. Cannizzaro has admitted that OPDA's obligation to disclose *Brady* material . . . to Mr. Jones was not extinguished upon his convictions." *Id.* at 9. But as Mr. Jones and his counsel surely understand, OPDA's constitutional disclosure obligations are defined by the Constitution itself and by binding judicial precedent interpreting it, not by Mr. Cannizzaro's "own understanding of *Brady*." *Id.* at 13. The statements cited by Mr. Jones merely illustrate Mr. Cannizzaro's practice of disclosing evidence to defendants beyond what is strictly required by the Constitution—they do not establish additional, extra-constitutional grounds for imposing civil liability on his office under § 1983.

**B.**     ***Brady* violations in other cases are relevant in showing an official policy or custom only if they are similar and very close in time to the violations alleged in this case.**

With respect to the second basis for relevance (official policy of withholding *Brady* evidence), Mr. Cannizzaro does not dispute that *Brady* violations occurring after Mr. Jones's convictions that are similar to the violations alleged in this case may be relevant in demonstrating a "persistent, widespread practice of [OPDA] officials or employees" *Burge II*, 336 F.3d at 369. However, because the claim against ODPA turns on its official policy ***at the time of the alleged***

**constitutional violation** (and not at any other time), evidence of subsequent events is relevant only "if, and to the extent that, [it provides] reliable insight into the policy in force at the time of the incident." *Foley v. City of Lowell*, 948 F.2d 10, 14 (1st Cir. 1991). Thus, the relevance of subsequent events rapidly diminishes as the time from the underlying alleged violation increases.

Notably, most of the caselaw that Mr. Jones cites to argue that "information post-dating an alleged constitutional violation may be relevant to proving a policy, practice, or custom" involves similar incidents occurring soon after the alleged violation, not years later. *See Beck v. City of Pittsburgh*, 89 F.3d 966, 970, 972 (3rd Cir. 1996) (allowing consideration of one similar incident that occurred less than three months after the plaintiff's alleged constitutional violation and was committed by the same police officer involved in the plaintiff's incident); *Foley*, 948 F.2d at 14–15 (finding no abuse of discretion where the district court allowed testimony about one similar incident that occurred six months after the plaintiff's alleged constitutional violation); *Henry v. County of Shasta*, 132 F.3d 512, (9th Cir. 1997) (holding that two similar incidents that occurred less than one year after the plaintiff's alleged constitutional violation were probative of official policy); *see also Sherrod v. Berry*, 827 F.2d 195, 204–05 (7th Cir. 1987) (finding no error where the district court allowed evidence of a similar incident that occurred one month after the plaintiff's alleged constitutional violation). On the other hand, in *Chepilko v. City of New York*, No. 06-cv-5491, 2012 WL 398700, at *15 (E.D.N.Y. Feb. 6, 2012), also cited by Mr. Jones, the district court held that five incidents in 2008 and 2009 could not establish the existence of a municipal custom or policy in July 2005 because they "significantly post-date the incident and are only minimally, if at all, probative of the existence of a municipal policy of unlawful enforcement in effect in July 2005."

In a case involving alleged *Brady* violations by the Jefferson Parish DA's Office, Magistrate Judge Knowles, while recognizing that "a plaintiff must demonstrate a pattern of similar *Brady* violations" to establish municipal liability, nevertheless restricted discovery to "documents that relate to *Brady* violations similar to those alleged [in that case]," during "a ten-year period surrounding the incident alleged [in that case], from five years before the incident to five years after it." *Williams v. Connick*, No. 12-cv-1274, 2014 WL 1246771, at *3 (E.D. La. Mar. 25, 2014). Because events occurring five years after an alleged constitutional violation have essentially no probative value in demonstrating what the policy was at the time of the alleged violation, the relevant period adopted by Judge Knowles for discovery purposes should represent the maximum outer limit of what Mr. Jones could reasonably be entitled to seek through discovery. And because policies adopted by subsequent district attorneys after Mr. Connick left office in 2003 have no relevance whatsoever in showing the policies in effect under Mr. Connick from 1992–1996, there is no legitimate reason for Mr. Jones to inquire into the policies of these subsequent district attorneys.

### C.   Events occurring after the underlying *Brady* violations alleged in this case cannot be relevant in showing deliberate indifference and failure to train.

With respect to the third basis for relevance (failure to train), the theory by its very nature permits consideration only of events occurring *before* the alleged *Brady* violation. To show deliberate indifference, Mr. Jones must show events that would have put OPDA's policymaker "on notice that the office's *Brady* training was inadequate with respect to the sort of *Brady* violation at issue here," *Thompson*, 563 U.S. at 62. Obviously, events occurring *after* Mr. Jones's conviction (such as findings of *Brady* violations in other cases) could not have provided notice to anyone *before* the conviction. *See Thompson*, 563 U.S. at 63 n.7 ("[C]ontemporaneous or subsequent conduct cannot establish a pattern of violations that would provide notice . . . and the

opportunity to conform to constitutional dictates.") (quotation omitted); *Truvia*, 577 F. App'x at 324 ("None of this evidence shows that Connick's office was deliberately indifferent to a need for *Brady* training before Appellants' criminal trial in 1976. . . . Appellants' citation to over a dozen federal and state cases to show a 'continuum' of *Brady* violations are not probative because the vast majority of them occurred after Appellants were convicted in July 1976.").

**II.     The specific discovery that Mr. Jones seeks to compel is irrelevant to the claims and defenses in this case.**

> **A.     Post-conviction documents and information concerning Mr. Jones's case (Request for Production Nos. 3, 7 and Interrogatory No. 1)**

Mr. Jones seeks various documents and information post-dating his conviction that relate to his criminal cases, including (1) information about every OPDA employee who has worked on his criminal cases (including post-conviction proceedings and his post-2014 re-prosecution for the April 6 crimes); and (2) files, documents, and communications relating to his post-conviction proceedings, and to OPDA's 2017 decision to dismiss the pending charges against him for the April 6 crimes and to agree to the vacatur of his convictions for manslaughter and armed robbery that were based on guilty pleas.[12] Mr. Jones suggests that even OPDA personnel who worked only on post-conviction matters in his cases and had no involvement whatsoever in his prosecution and trial (including personnel who did not even work for OPDA at the time of the prosecution and trial) may nonetheless know "when and how OPDA became aware of *Brady* material in Mr. Jones's case"; "why *Brady* material was not turned over prior to Mr. Jones's trial"; and "who at OPDA was aware of the existence of undisclosed *Brady* material in Mr. Jones's case and when." Doc. No. 52-2 at 9–10. But there is no logical reason why prosecutors working on post-conviction

---

[12] *See* Interrogatory No. 1 (Doc. No. 52-15 at 2–3) and Request for Production Nos. 3, 7 (Doc. No. 52-10 at 3–6).

matters more than a decade after a conviction would know (other than by reviewing file materials, which have been produced to Mr. Jones to the extent that they still exist) when, how, or whether the trial prosecutors became aware of specific evidence or turned it over to Mr. Jones.[13]

Mr. Jones also contends that documents created after his conviction in the course of post-conviction proceedings may contain answers to these same questions about OPDA's receipt, awareness, and disclosure of *Brady* material before and during his 1996 trial. *See* Doc. No. 52-2 at 10. Here again, there is no good reason to believe that this is true. Moreover, the specific types of post-conviction documents that Mr. Jones has requested—"recommendations, instructions, directions, orders, approvals, and decision-making concerning OPDA's decision to oppose [his] applications for post-conviction relief"—plainly are not directed toward discovering what happened before and during his trial. *See* Doc. No. 52-10 at 3–6. Rather, they appear to be directed toward the mental processes and decision-making of the attorneys involved in the post-conviction proceedings, which would be privileged in any event. The only example Mr. Jones provides of how post-conviction materials could be "relevant to *Brady* violations committed *prior to* and *during* [his] trial" is the "Menner Memo," which was drafted a mere two days after his sentencing by the lead prosecutor at his trial. Doc. No. 52-2 at 10. By contrast, documents drafted years later by OPDA personnel who had no involvement in Mr. Jones's trial obviously would not contain the same sort of information.

Specifically with respect to the "Menner Memo," Mr. Jones also argues that the discovery he seeks may identify OPDA personnel who became aware of this memo during his post-

---

[13] Fred Menner, the lead trial prosecutor, testified that he left ODPA shortly after Mr. Jones's sentencing to accept a job with the U.S. Attorney. *See* Doc. No. 22-2 at 122, 125. Additionally, the other trial prosecutor, Trina Wilson (formerly Trina Thomas), previously submitted an affidavit stating that she left OPDA in 1997. Thus, the prosecutors who tried the case clearly did not work on the subsequent post-conviction proceedings.

conviction proceedings and show when it was discovered and why it was not disclosed sooner in the post-conviction proceedings.[14] *See* Doc. No. 52-2 at 11 (arguing that "[s]uch information would be relevant not only to why Mr. Jones was wrongfully convicted in the first place, but also to why he remained in prison for nearly 20 years while the memorandum went undisclosed."). But as explained above, the *Brady* duty of disclosure does not extend to post-conviction proceedings. Thus, even assuming that Mr. Jones could show that OPDA lawyers working on his post-conviction proceedings discovered favorable evidence and failed to disclosed it (and he cannot), this would be irrelevant to his *Brady* claim because it would not be a *Brady* violation.

### B. Post-conviction documents and information concerning Lester Jones's case (Requests for Production No. 11 and Interrogatory No. 2)

Mr. Jones also seeks documents and information relating to Lester Jones's post-conviction proceedings.[15] Again, to the extent that Mr. Jones seeks to discover documents and information that did not exist at the time of his conviction, such materials are not relevant to his claim. Mr. Jones contends that such materials may show that OPDA "made conflicting statements in filings in both Lester Jones's and Mr. Jones's cases concerning the men's culpability in these crimes," or "that OPDA had no procedure for assuring that *Brady* information in one case was shared with defendants in other related cases." Doc. No. 52-2 at 11–12. But whether ODPA made "conflicting statements" in post-conviction filings, or had procedures for sharing information between one post-conviction matter and another, is irrelevant to Mr. Jones's claim. Even if Mr. Jones could show that OPDA made "misleading statements" in post-conviction filings with the intent "to conceal its

---

[14] Interrogatory No. 3 seeks information about "each OPDA attorney, investigator, supervisor, and staff person who had knowledge of the information contained in the [memo] prior to October 5, 2015." Doc. No. 52-15 at 4.

[15] *See* Interrogatory No. 2 (Doc. No. 52-15 at 3–4) and Request for Production No. 11 (Doc. No. 52-10 at 8).

*Brady* violations," *id.* at 12 (and he certainly cannot), this would not support his claim in this case. Finally, Mr. Jones's hope that post-conviction materials may "lead to the discovery of *Brady* material that OPDA has not yet disclosed to [him]," *id.*, is simply unfounded, because the underlying case files pertaining to the Lester Jones prosecution have already been produced.

### C.    Post-conviction public-records requests relating to Mr. Jones's case (Request for Production No. 13)

Mr. Jones argues that public-records requests made to OPDA following his conviction, and OPDA's responses, are relevant in this case because they may show "that OPDA had no reliable system for filing or locating information in its cases, or that OPDA's records custodian denied requests for favorable information on privilege grounds, even if the files contained *Brady* material."[16] Doc. No. 52-2 at 12. But whether OPDA had a "reliable system for filing or locating information" in the years after Mr. Jones's conviction has no relevance whatsoever to whether Mr. Jones's *Brady* rights were violated or whether OPDA had an official policy of refusing to disclose *Brady* material at the time of his conviction. Moreover, even if Mr. Jones could show that OPDA failed to produce "favorable" information in response to public-records requests after his conviction, this would not constitute a *Brady* violation because the *Brady* duty to disclose ends upon conviction. Thus, such evidence would not show that Mr. Jones's *Brady* rights were violated, or that OPDA had an official policy of refusing to disclose *Brady* material.[17]

---

[16] *See* Request for Production No. 13 (Doc. No. 52-10 at 9).

[17] Mr. Jones also argues that the public-records requests and responses may show "that OPDA failed to reveal *Brady* material or falsely informed him that no favorable material existed," Doc. No. 52-2 at 12, but this is mistaken. All materials in OPDA's possession, custody, or control that existed at the time of his prosecution (1992–1996) and that relate to his crimes, or the alleged "crime spree" crimes, have been produced. To the extent he is alleging that OPDA failed to disclose materials after his conviction, this is irrelevant to his claims, as discussed above.

**D.      OPDA policies, training, and other *Brady* violations after Mr. Jones's conviction and after Mr. Connick's tenure as District Attorney (Request for Production Nos. 17–27, 30–33 and Interrogatory Nos. 11–13, 15, 17)**

Mr. Jones argues that information about OPDA's "*Brady* policy, practice, or custom" after his conviction is relevant for two reasons. First, he contends that such information is relevant "because OPDA *continued to violate his* Brady *rights through at least September 2015*." Doc. No. 52-2 at 13. For the reasons explained above, this is incorrect. *Brady* simply does not apply in post-conviction proceedings, so it would not be possible for OPDA to "violate his *Brady* rights" after his conviction. Second, Mr. Jones argues that information "post-dating an alleged constitutional violation may be relevant to proving a policy, practice, or custom, and deliberate indifference under *Monell*." *Id.* at 13. As to deliberate indifference, Mr. Jones is mistaken—consistent with logic, the Supreme Court has explained that "contemporaneous or subsequent conduct cannot establish a pattern of violations that would provide notice . . . and the opportunity to conform to constitutional dictates." *Thompson*, 563 U.S. at 63 n.7 (quotation omitted). As to the existence of a policy or custom, it is true that subsequent constitutional violations may serve as circumstantial evidence of a policy or custom at the time of the underlying alleged violation, but only to a very limited extent, as discussed above in Section I.B. A period of five years after Mr. Jones's conviction, as previously approved by Judge Knowles in another municipal-liability *Brady* case, is more than reasonable (and is in fact significantly over-inclusive) as an outer limit for discovery of subsequent *Brady* violations.

Notably, in *Adams v. City of New Orleans*, EDLA Case No. 15-cv-1543, a case also involving *Brady* claims against OPDA, the plaintiff properly limited the scope of his requests concerning OPDA policies to a period going from one year before the events of his case (1978) through one year after the Louisiana Supreme Court denied writs on the direct appeal of his

conviction (1995).[18] That case involved a murder that occurred in 1979, for which Mr. Adams was

indicted in 1980 and convicted in 1983. *See Adams v. City of New Orleans*, 2016 WL 4272711, at

*1 (E.D. La. Aug. 15, 2016). His conviction was reversed in 1989; he was retried and convicted

again in 1990; this second conviction was affirmed on appeal in 1992; and the Louisiana Supreme

Court denied writs in 1994. *See id.* at *1–2. By comparison, the crimes for which Mr. Jones was

convicted occurred in 1992; he was convicted in 1996; his conviction was affirmed on appeal in

1997; and the Louisiana Supreme Court denied writs in 1998. Mr. Jones's requests concerning

OPDA policies should be limited, as were the requests in *Adams*, to a period going from shortly

before the underlying crime to shortly after the Louisiana Supreme Court's denial of writs.

Moreover, the general irrelevance of evidence and events after Mr. Jones's conviction (or,

at the latest, after Mr. Connick's tenure as District Attorney) is confirmed upon consideration of

Mr. Jones's specific requests:

- Request for Production No. 17 seeks documents reflecting statements by Mr. Cannizzaro and his predecessors relating to their understanding of *Brady*'s requirements. Doc. No. 52-10 at 10. However, because Mr. Connick was the District Attorney at all times relevant to Mr. Jones's *Brady* claim, the statements and understandings of subsequent DAs are irrelevant.

- Request for Production Nos. 18–21 seek documents relating to "formal or informal practices, customs, procedures, or rules" concerning *Brady*. *See* Doc. No. 52-10 at 11–13; *see also* Interrogatory No. 13 (seeking information about *Brady* policies) and Interrogatory No. 11 (seeking information about OPDA personnel responsible for "drafting, approving, amending, implementing, enforcing, or revising" such rules or policies), Doc. No. 52-15 at 8–10. But policies that were adopted ***after*** Mr. Jones's conviction are not probative in establishing the policy ***before*** his conviction (*i.e.*, before they were adopted).

- Request for Production No. 23 seeks "training materials, agenda, attendance lists, assessments, and evaluations" concerning *Brady*. Doc. No. 52-10 at

---

[18] *See* First Set of Interrogatories to Defendant Leon Cannizzaro, Jr., by Reginald Adams (attached as Exhibit 1), at 5 & 9–10; *see also* First Set of Requests for Production of Documents to Defendant Leon Cannizzaro, Jr., by Reginald Adams (attached as Exhibit 2), at 8–9.

14; *see also* Interrogatory No. 12 (seeking information about "dates, instructors, training materials, and the names and titles or positions of attendees of each instance in which OPDA provided training to its employees related to their *Brady* Obligations"), Doc. No. 52-15 at 9. As explained above, training conducted ***after*** Mr. Jones's conviction obviously is not relevant to the adequacy of training ***before*** his conviction.

- Requests for Production No. 24–27 seek documents concerning instances where OPDA attorneys failed to comply with *Brady* and remedial steps taken by OPDA. *See* Doc. No. 52-10 at 14–16; *see also* Request for Production No. 22 (seeking studies, reports, etc., about "the adequacy of OPDA's training, supervision, and discipline of its attorneys and other law enforcement officers and personnel concerning their *Brady* Obligations"), *id.* at 13, and Interrogatory No. 15 (seeking information about discipline of OPDA employees for non-compliance with *Brady* obligations), Doc. No. 52-15 at 11. But *Brady* violations occurring more than a few years after Mr. Jones's conviction, or after Mr. Connick left office, have no probative value in showing OPDA policy at the time of Mr. Jones's trial and conviction. Similarly, remedial actions taken (or not taken) years after Mr. Jones's conviction are irrelevant.

- Interrogatory No. 17 specifically seeks information about "policies, procedures, and practices implemented by ***Mr. Cannizzaro***." Doc. No. 52-15 at 12 (emphasis added). But Mr. Cannizzaro did not become District Attorney until 2008, 12 years after Mr. Jones's convictions. And policies implemented by Mr. Cannizzaro have no relevance whatsoever in showing the policies that were implemented by Mr. Connick in the mid-1990s.

## III.  Mr. Cannizzaro's interrogatory answers have been properly answered under oath by an agent of OPDA based on the information available to OPDA.

Contrary to Mr. Jones's suggestion, Mr. Cannizzaro has not "declined to verify his answers" to Mr. Jones's interrogatories. Doc. No. 52-2 at 18. Because Mr. Cannizzaro has been sued in his official capacity, the claims are against OPDA, a municipal entity, rather than Mr. Cannizzaro personally. *See, e.g.*, *Burge I*, 187 F.3d at 466–67. Accordingly, as "a governmental agency," OPDA's interrogatories may be answered by "any officer or agent, who must furnish the information available to the party." FED. R. CIV. P. 33(b)(1)(B). That officer or agent must answer the interrogatories under oath and sign them. FED. R. CIV. P. 33(b)(3), (5). Mr. Cannizzaro has fully complied with these requirements. He has designated the undersigned counsel as OPDA's

agent to answer Mr. Jones's interrogatories based on the information available to OPDA. Undersigned counsel has diligently sought out and reviewed the information available to OPDA and has answered the interrogatories under oath. *See* Doc. No. 52-15 at 13.

Nothing in Rule 33 prevents a governmental party from designating its lawyer to answer interrogatories under oath on its behalf. The rule plainly allows the answers to be provided by "*any* officer or agent," FED. R. CIV. P. 33(b)(1)(B) (emphasis added), and a lawyer is of course an agent. Where a particular type of agent is intended, the Federal Rules of Civil Procedure specify such. *See, e.g.*, FED. R. CIV. P. 4(h)(1)(B) (specifying that service must be made on "a managing or general agent"); FED. R. CIV. P. 30(b)(6) (specifying "managing agents" as potential organizational deponents). Accordingly, courts and other authorities that have considered the issue have concluded that interrogatories may be answered by an entity's lawyer. *See, e.g.*, 8B Wright & Miller, FED. PRACTICE & PROCEDURE 2172 ("Because the rule authorizes either an officer or an agent to answer, it clearly allows answers by an attorney."); *Wilson v. Volkswagen of America, Inc.*, 561 F.2d 494, 508 (4th Cir. 1977); *Gluck v. Ansett Australia Ltd.*, 204 F.R.D. 217, 221 (D.D.C. 2001); *Chatman v. Nat'l R.R. Passenger Corp.*, 246 F.R.D. 695, 700 (M.D. Fla. 2007); *Wood v. Credit One Bank*, 277 F. Supp. 3d 821, 831 (E.D. Va. 2017).

Mr. Jones cites a host of decisions, mostly from this Court, finding that certain interrogatory answers "do not contain the verification, signed under oath by an authorized representative of defendant, not its counsel of record." *Wallace v. Chevron USA, Inc.*, No. 09-cv-4202, 2010 WL 11549578, at *1 (E.D. La. Dec. 1, 2010). Although Mr. Jones reads these decisions as holding that a party's counsel is for some reason barred from being the "agent" allowed under Rule 33(b)(1)(B), none of Mr. Jones's cited authorities actually address that question. Instead,

these decisions appear to address the common (but different) situation in which interrogatories are signed by counsel pursuant to Rule 26(g) but contain no verification under oath whatsoever:

> Defendants are incorrect in their assertion that the Rule 26(g)(2) signature of counsel somehow supplants the separate verification requirement of Rule 33(b)(1) and (2). *See generally* C. Wright, A. Miller, R. Marcus, 8A *Federal Practice and Procedure* §§ 2172 and 2177 (West 1994). Defendants must provide the Rule 33(b) verification answers, signed under oath by authorized representatives of each defendant, not by its counsel.

*Entergy La., Inc. v. Nat'l Union Fire Ins. Co.*, No. 98-cv-219, 1999 WL 239511, at *2 (E.D. La. Apr. 21, 1999). Although it is true that counsel's mere signature *as counsel* does not satisfy the Rule 33(b)(3) requirement that interrogatories must be answered under oath, this does not mean that a lawyer, designated as the party's "agent" under Rule 33(b)(1)(B), cannot be the one to answer under oath on behalf of the party.

When it is a party's lawyer who has actually compiled and reviewed the "information available to the party" for the purpose of answering interrogatories, FED. R. CIV. P. 33(b)(1)(B), it is eminently reasonable for that lawyer to serve as the party's agent or representative to verify the answers under oath. Neither the Federal Rules of Civil Procedure nor the caselaw interpreting them would prohibit such a thing.

## CONCLUSION

For the reasons explained above, the Motion to Compel Discovery by Robert Jones should be denied.

|  | */s/ Matthew J. Paul* |
|---|---|

Robert L. Freeman, Jr., 21596
Donna R. Andrieu, 26441
Office of the District Attorney,
Parish of Orleans
619 South White Street
New Orleans, Louisiana 70119
Telephone:  (504) 822-2414, ext. 2877
Facsimile:  (504) 827-6393

Thomas J. Barbera, 18719
4645 Carthage Street
Metairie, Louisiana 70002
Telephone:  (504) 931-0662

*/s/ Matthew J. Paul*
Richard C. Stanley, 8487
W. Raley Alford, III, 27354
Matthew J. Paul, 37004
STANLEY, REUTER, ROSS, THORNTON
  & ALFORD, LLC
909 Poydras Street, Suite 2500
New Orleans, Louisiana 70112
Telephone: (504) 523-1580
Facsimile:  (504) 524-0069
rcs@stanleyreuter.com
wra@stanleyreuter.com
mjp@stanleyreuter.com

*Counsel for Leon Cannizzaro (in his official capacity
as Orleans Parish District Attorney)*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 6th day of November, 2018, a copy of the foregoing was filed

electronically with the Clerk of Court using the CM/ECF system, and that service will be provided

through the CM/ECF system, as well as by U.S. Mail for any non-CM/ECF participant.

*/s/ Matthew J. Paul*