UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ROBERT JONES, | : | CIVIL ACTION NO. 2:18-CV-0503-JTM-JCW |
| | : | |
| Plaintiff | : | SECTION H(2) |
| | : | |
| v. | : | JUDGE JANE TRICHE MILAZZO |
| | : | |
| LEON CANNIZZARO, JR., and | : | MAGISTRATE JOSEPH C. WILKINSON, JR. |
| ABC INSURANCE COMPANIES 1-10, | : | |
| | : | |
| Defendants. | : | **JURY TRIAL DEMANDED** |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S SECOND MOTION TO COMPEL DISCOVERY FROM DEFENDANT LEON CANNIZZARO, JR. AND PLAINTIFF'S MOTION FOR LEAVE TO DEPOSE KYLE DALY**

By this motion, Plaintiff Robert Jones respectfully seeks an order compelling Defendant Leon Cannizzaro, Jr. to provide a full and complete response to the Requests for Production identified below, pursuant to Federal Rule of Civil Procedure 37, and granting leave for Mr. Jones to take an additional deposition, pursuant to Federal Rule of Civil Procedure 26(b)(2)(A).

**LEGAL STANDARD**

Federal Rule of Civil Procedure 26 authorizes "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). This standard is "to be accorded broad and liberal treatment to effect [the] purpose of adequately informing the litigants in civil trials." *Fairley v. Wal-Mart Stores, Inc.*, No. 15-CV-462, 2016 WL 9582711, at *4 (E.D. La. Oct. 26, 2016) (quoting *Herbert v. Lando*, 441 U.S. 153, 177 (1979)). Thus, while "[r]elevance focuses on the claims and defenses in the case, not its general subject matter," *e.g.*, *Sines v. Kessler*, 325 F.R.D. 563, 566 (E.D. La. 2018), relevance is "to be construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on any party's claim or defense," *see, e.g.*, *Dotson v. Edmonson*, No.

16-CV-15371, 2017 WL 4619739, at *3 (E.D. La. Oct. 16, 2017) (internal quotation marks omitted); *Greater New Orleans Fair Hous. Action Ctr., Inc. v. Dorian Apartments, LLC*, No. 15-CV-6406, 2016 WL 6157534, at *10 (E.D. La. Oct. 24, 2016) (same).  In addition, "[w]hen the discovery sought appears relevant, the party resisting the discovery has the burden to establish the lack of relevance."  *Fairley*, 2016 WL 9582711, at *4 (internal quotation marks omitted).  Further, proportionality turns on "various factors, including the importance of the issues at stake, the amount in controversy, the parties' relative access to information, the parties' resources, the importance of the discovery in resolving the issue, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  *Sines*, 325 F.R.D. at 566.

Courts may, in accordance with these standards, compel responses to discovery requests if a party fails to respond fully and completely to the requests, *see* Fed. R. Civ. P. 37(a)(3)(B), 37(a)(4), and grant leave to take additional depositions beyond the ten-deposition limit imposed by Federal Rule of Civil Procedure 30, *see* Fed. R. Civ. P. 26(b)(2)(A), 26(b)(2)(C).

## ARGUMENT[1]

I.      **Mr. Cannizzaro Must Be Compelled to Produce the Personnel File of Former Assistant District Attorney Michael Bollman (*Request for Production No. 36*)**

On February 13, 2019, Mr. Jones served a document request seeking personnel files for 12 current or former employees of the Orleans Parish District Attorney's office ("OPDA").  *See* Ex. 1 (Plaintiff's Second Set of Requests for Production) to Monju Decl. at 5–6.  Mr. Jones limited his request to portions of files that did not "encompass information of a strictly personal nature, such as information related to health or family" and expressly stated that the files could be marked

---

[1] Much of the relevant background information concerning this motion is provided in Mr. Jones's first motion to compel, which Mr. Jones hereby incorporates by reference.  *See* Doc. No. 52-2 at 1–4.  Additionally, the parties' unsuccessful efforts to resolve these disputes are outlined in the Declaration of Erin Monju, submitted in support of this motion.

confidential under the parties' protective order.  *See id.*  On March 15, 2019, Mr. Cannizzaro declined to produce any responsive documents, objecting on relevance grounds and asserting that disclosure would cause "annoyance, embarrassment, and oppression."  *See* Ex. 2 (Defendant's Responses to Second Set of Requests for Production) to Monju Decl. at 2–3.   Mr. Jones subsequently limited his request to the file of one former assistant district attorney, Michael Bollman—who played an integral role in Mr. Jones's case, and has since passed away and is unavailable for discovery—but Mr. Cannizzaro again declined to produce any responsive documents.  *See* Monju Decl. at ¶ 5.

Personnel files enjoy no special privilege or blanket protection from discovery and, like other materials, must be produced if relevant and reasonably calculated to lead to the discovery of admissible evidence.  *See Champagne v. Chet Morrison Contractors, Inc.*, No. 10-CV-2778, 2012 WL 5830552, at *2 (E.D. La. Nov. 16, 2012) (stating that "[t]he Fifth Circuit has stated that it is aware of no privilege that would support the nondisclosure of personnel files" and compelling production of personnel files); *Ardoin v. Louisiana*, No. 08-CV-593, 2012 WL 12986190, at *2 (M.D. La. Apr. 23, 2012) (similar).   Law enforcement personnel files in particular are also the proper subject of discovery, as demonstrated by *Coughlin v. Lee*, the Fifth Circuit's "leading case . . . regarding discovery of personnel files."  *George v. Entergy Servs., Inc.*, No. 09-CV-3676, 2010 WL 3802452, at *3 (E.D. La. Sept. 17, 2010) (citing *Coughlin v. Lee*, 946 F.2d 1152, 1159–60 (5th Cir. 1991)).  In *Coughlin*, the plaintiffs asserted a wrongful termination claim against the Jefferson Parish Sheriff's Department.  *Coughlin*, 946 F.2d at 1156.  The Fifth Circuit reversed the trial court's ruling barring discovery of police officers' personnel files relevant to proving patterns of wrongful conduct at the department, because "[e]vidence of repeated disparity in the punishment meted out to [the sheriff's] supporters and non-supporters [would] clearly [be] relevant in

considering pretext." *Id.* at 1159.  Recognizing that the requested files "[did] not appear to concern ongoing criminal investigations" and that plaintiffs "[did] not seek material identifying confidential sources," the court remanded with instructions for the trial court to weigh "the government's interest in confidentiality against the litigant's need for the documents." *Id.* at 1159–60.

Mr. Bollman's personnel file clearly satisfies this standard.  First, the contents of Mr. Bollman's personnel file may be highly relevant to Mr. Jones's case.  Mr. Bollman is a key figure in the events of this case:  Mr. Bollman served as OPDA's Chief of Trials from 1994 until 2003—covering the period of Mr. Jones's trial and wrongful convictions and the filing of his first two applications for post-conviction relief.  *See* Ex. 3 (Mr. Bollman's Obituary) to Monju Decl.  Mr. Bollman therefore supervised the line attorneys who committed *Brady* violations in Mr. Jones's case and likely participated in pre-trial preparations for his case.  *See* Ex. 4 (Dep. of Frederick Menner, Feb. 19, 2019) to Monju Decl. at 68:14–69:3.  In addition, Mr. Bollman served as the lead trial attorney in OPDA's prosecution of *Lester* Jones for one of the Crime Spree Crimes—a series of crimes for which OPDA prosecuted both Lester Jones and Mr. Jones, despite significant *Brady* information that indicated that Lester Jones was the sole perpetrator of the crimes.  *See* Ex. 5 (*State v. Jones*, No. 356-872, Trial Tr. (Orleans Crim. Dist. Ct. Aug. 31, 1994)[2]) to Monju Decl.  As a result, Mr. Bollman was aware of a substantial amount of the *Brady* information that was suppressed in Mr. Jones's case.  Finally, Mr. Bollman signed the "Menner Memo," a memorandum concerning Mr. Jones's case that revealed that Lester Jones had "recanted [his] entire statement" implicating Mr. Jones—information that was fatal to OPDA's theory of Mr. Jones's guilt—and that OPDA had no evidence to convict Mr. Jones of the murder of Julie Stott, one of the Crime Spree Crimes.  *See* Ex. 6 (Mem. from Frederick Menner, Apr. 4, 1996) to Monju Decl.  By signing the Menner Memo,

---

[2] The trial transcript erroneously says "Bowman" instead of Bollman.

4

Mr. Bollman authorized OPDA's offer of a manslaughter plea to Mr. Jones for the murder of Ms. Stott, despite his awareness of evidence that Lester Jones alone committed the murder and of Mr. Menner's acknowledgement that OPDA lacked evidence to convict Mr. Jones of the crime.

Accordingly, any information in Mr. Bollman's file bearing on *Brady*—including OPDA's policies, practices, and customs, as well as Mr. Bollman's own conduct with respect to *Brady*— could be relevant to proving both that OPDA "failed to discipline OPDA prosecutors who violated OPDA's *Brady* obligations" such that OPDA prosecutors "had little or no reason to be concerned about the consequences if they violated those obligations," *see* Doc. No. 1 ("Compl.") at ¶¶ 159, 162, and that this failure to discipline, at least in part, caused Mr. Jones's injuries.  Moreover, it is not merely theoretical that such information may be in Mr. Bollman's file.  Mr. Cannizzaro has already produced the personnel file ███████████████████████████████████ ██████ The personnel file for ████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████ Thus, Mr. Bollman's file may be a rich source of highly relevant evidence.

Second, Mr. Jones's need for Mr. Bollman's file outweighs the unspecified concerns Mr. Cannizzaro has asserted.  Because Mr. Bollman is deceased, *see* Ex. 3 (Mr. Bollman's Obituary) to Monju Decl., and because his tenure either preceded or only briefly overlapped with the advent of email at OPDA, Mr. Bollman's file is the best remaining source of information with respect to his

performance, salary, promotions, and discipline at OPDA, as well as any of his communications with Mr. Connick.  Mr. Jones has also proposed reasonable measures to mitigate the effects of this discovery on Mr. Bollman's privacy interests, including by limiting his request to portions of the file that do not "encompass information of a strictly personal nature" and by stipulating that the file may be marked as confidential.  *See* Ex. 1 (Plaintiff's Second Set of Requests for Production) to Monju Decl. at 5–6.  Accordingly, Mr. Cannizzaro should be compelled to produce the portions of Mr. Bollman's personnel file that do not "encompass information of a strictly personal nature."

## II.    Mr. Cannizzaro Must Be Compelled to Produce Files for Cases Where OPDA is Known or Suspected to Have Violated *Brady* (*Request for Production No. 41*)

On June 19, 2019, Mr. Jones served a discovery request seeking OPDA's case files for 61 cases in which courts have found that OPDA violated *Brady*, OPDA admitted a *Brady* violation, OPDA acted in a manner that substantiated that a *Brady* violation had occurred (for example, by entering into a plea agreement in the face of a credible *Brady* claim), or evidence supports that a *Brady* violation occurred.  *See* Ex. 8 (Plaintiff's Third Set of Requests for Production) to Monju Decl. at 8–9.  Mr. Jones endeavored to limit the burden of responding to the request from the outset by offering that files for any cases in which OPDA admitted a *Brady* violation in response to Mr. Jones's Requests for Admission need not be produced.  *Id.* at 7.  Further, Mr. Jones offered to forgo production of 21 of the files, which OPDA produced in prior litigation, if Mr. Cannizzaro stipulated that the files are authentic.  *Id.* at 6.[3]  Finally, Mr. Jones did not request files for the 11 cases with *Brady* violations that Mr. Cannizzaro is precluded from re-litigating at trial, by virtue of the district court's May 28, 2019 order granting Mr. Jones's motion *in limine* to preclude re-litigation of

---

[3] These files were produced by OPDA in *Adams v. City of New Orleans*, No. 15-CV-1543 (E.D. La.) ("*Adams*"), a case to which Mr. Cannizzaro, in his official capacity, was a party.  Of note, since serving his Third Set of Requests for Production, Mr. Jones has identified an additional case that OPDA produced in *Adams*, potentially obviating the need to produce 22 case files.

findings by federal courts that OPDA violated *Brady*. *See* Doc. No. 118 at 10–15, 18.

Subsequent to serving the Requests, Mr. Jones amended his offer to Mr. Cannizzaro regarding the stipulation to authenticity, requesting only that Mr. Cannizzaro stipulate that the files that OPDA produced in *Adams* were in fact produced by OPDA and came from OPDA's own files, on the understanding that such a stipulation would be acceptable to Mr. Cannizzaro. Ex. 9 (Email from Matthew Paul, Sept. 26, 2019) to Monju Decl. at 1–2. In addition, to alleviate the burden of seeking out and producing the oldest case files requested, Mr. Jones's offered to forgo production of files for cases in which *Brady* allegations were resolved prior to 1987.[4] *Compare* Ex. 8 (Plaintiff's Third Set of Requests for Production) to Monju Decl. at 3–4, *with* Ex. 10 (Email from Matthew Paul, Sept. 20, 2019) to Monju Decl. at 2.

Despite Mr. Jones's efforts to limit the burden of this Request, Mr. Cannizzaro refused to admit that OPDA committed a *Brady* violation in *any* of the cases cited by Mr. Jones in his Requests for Admission. *See* Ex. 11 (Defendant's Responses to Requests for Admission) to Monju Decl. at 4–6. In addition, despite having had over three months to review the relevant files, and despite being represented by two of the same counsel in this case that oversaw the production of the 22 files in *Adams*, Mr. Cannizzaro has declined to stipulate that the files he produced in *Adams* were in fact produced by him from OPDA's own files. *Compare Jones v. Cannizzaro, et al.*, No. 18-503, Docket (E.D. La.) (reflecting Thomas Barbera and Robert Freeman serve as counsel of record for Mr. Cannizzaro in this case), *with* Ex. 12 (*Adams v. City of New Orleans*, No. 15-CV-1543, Docket (E.D. La.)) to Monju Decl. (reflecting Mr. Barbera and Mr. Freeman served as counsel of record for Mr. Cannizzaro in *Adams*); Ex. 9 (Email from Matthew Paul, Sept. 26, 2019) to Monju

---

[4] Mr. Jones's decision to forgo production of these case files reflects a good faith effort to minimize Mr. Cannizzaro's burden, but does not represent a concession that cases tried and resolved prior to 1987 are irrelevant to Mr. Jones's claims.

Decl.  Mr. Cannizzaro has also refused to produce *any* responsive documents, objecting to the burden of production and asserting that cases predating 1989 are irrelevant.  *See* Ex. 13 (Defendant's Responses to Third Set of Requests for Production) to Monju Decl. at 4–5; Ex. 10 (Email from Matthew Paul, Sept. 20, 2019) to Monju Decl.

It bears noting that Mr. Cannizzaro has propounded similar requests to Mr. Jones—and Mr. Jones has complied with them.  For example, Mr. Cannizzaro has sought production of "all documents" in Mr. Jones's possession, custody, and control relating to the cases with *Brady* violations that Mr. Jones has identified.  *See* Ex. 14 (Defendant's First Requests for Production) to Monju Decl. at 3.  Mr. Jones's counsel has expended substantial effort gathering these documents from the public domain, including hundreds of hours of research identifying, retrieving, and reviewing these documents.  *See* Monju Decl. at ¶ 18.  Mr. Jones has, to date, produced over 30,000 pages of documents to Mr. Cannizzaro in response to this request.  *See id.* at ¶ 19.  Mr. Cannizzaro should not be permitted to benefit from the fruits of Mr. Jones's counsel's labor without undertaking commensurate discovery efforts of his own.  Further, Mr. Cannizzaro recently moved for and obtained a nearly three-month extension of the discovery deadline and a three-month trial continuance, based in part on the potential that he may be compelled to comply with this discovery request.  *See* Doc. No. 140 at 4.  Now that Mr. Cannizzaro has secured additional time to respond to this request, he should not be heard to complain about the burden of doing so.

As a result, Mr. Jones now moves for an order compelling production of 56 of the 61 files addressed in Request No. 41.[5]  Specifically, Mr. Jones seeks an order compelling Mr. Cannizzaro

---

[5] Mr. Jones does not seek an order compelling the production of the 5 files that have not been previously produced and that concern cases in which *Brady* allegations were resolved prior to 1987, in a continued good faith effort to minimize burden, due to the potential incremental difficulty of locating older case files that have not yet been produced in a prior litigation.

to produce the 34 case files that have not been previously produced in which a *Brady* violation was committed, found by a court, and/or otherwise substantiated between 1987 and 2017,[6] and the 22 case files previously produced by OPDA in *Adams*.[7]  For the reasons below, each of these files is highly relevant to, and their production would be proportional to the needs of, this case.

### A.      The Files Mr. Jones Seeks Are Highly Relevant to the Case

To prevail in his claim, Mr. Jones must prove, in part, that OPDA had an unconstitutional policy, practice, or custom of withholding *Brady* information, based on, *inter alia*, a pattern of *Brady* violations at OPDA, and that this pattern of *Brady* violations put OPDA on notice of its unconstitutional policy, practice, or custom with respect to *Brady*.  *See* Doc. No. 52-2 at 5–6 (collecting cases).  To prove such a pattern, Mr. Jones will seek to introduce evidence that OPDA routinely violated *Brady*—including through the admission of dozens of court opinions finding *Brady* violations and other documents substantiating that *Brady* violations occurred.  *See* Doc. No. 118 at 16–18 (granting Mr. Jones's motion *in limine* and holding that state court opinions that include a finding that OPDA violated *Brady* are admissible as exceptions to the hearsay rule).

In response, Mr. Cannizzaro has made explicit that he may seek to litigate *each* of these

---

[6] These 34 case files pertain to the prosecutions of Michael Anderson, Henry Bruer, Jeremy Burse, Charles Conway, Shareef Cousin, Calvin Duncan, John Duncan, Trenedad East, Arthur Grandprix, Marquette Grandprix, Norris Henderson, Alvin Jeanmarie, Bobbie Jean Johnson, Dwight Labran, Betty Lawrence, Alvin Lawrence, George Lee, Darnell Lewis, Anthony Martin, William Moore, Frank Oliver, Salvador Perez, Daniel Rideau, Julio Ruano, Anthony Scire, Clarence Smith, Jamaal Tucker, James Walker, Ronald Warner, Bobby Washington, Christopher Wells, Calvin Williams, Michael Williams, and Albert Wolfe.  Ex. 10 (Email from Matthew Paul, Sept. 20, 2019) to Monju Decl. at 2.

[7] These 22 case files pertain to the prosecutions of Reginald Adams, Errol Bernard, Dan Bright, Gregory Bright, James Carney, Larry Curtis, Roland Gibson, Larry Hudson, Erin Hunter, Leonard Johnson, Isaac Knapper, Eugene Lindsey, Jerome Morgan, Alfred Oliver, William Perkins, Stephen Rosiere, Tyronne Smith, John Thompson, Earl Truvia, Darryl Washington, Troy Wilkerson, and Hayes Williams.  *See* Ex. 8 (Plaintiff's Third Set of Requests for Production) to Monju Decl. at 6; *supra* note 3.  Mr. Jones reiterates that he is willing to waive production of these files—nearly 40% of the requested files—if Mr. Cannizzaro enters the requested stipulation.

*Brady* violations—even *Brady* violations that have been found by a court, after extensive, prior

litigation by OPDA.   For example, in response to Mr. Jones's Requests for Admission, Mr.

Cannizzaro denied that OPDA violated *Brady* in *any* of the 61 cases cited by Mr. Jones—including

in both cases in which the United States Supreme Court found that OPDA violated *Brady*, *Kyles v.*

*Whitley*, 514 U.S. 419 (1995) and *Smith v. Cain*, 565 U.S. 73 (2012).   *See* Ex. 11 (Defendant's

Responses to Requests for Admission) to Monju Decl. at 4–6.   Despite this reservation of right, Mr.

Cannizzaro seeks to unilaterally disarm Mr. Jones by refusing to produce the very case files that

may be required to counter Mr. Cannizzaro's position on the cases.   Mr. Cannizzaro's position is

untenable:   these files are plainly relevant both to Mr. Jones's ability to counter Mr. Cannizzaro's

litigation and re-litigation of these cases, and also to potentially substantiating additional *Brady*

violations or uncovering further evidence of OPDA's *Brady* policies, practices, and customs.

In addition, Mr. Cannizzaro's assertion that case files predating 1989 are minimally relevant

also fails.   As an initial matter, Mr. Cannizzaro is right to effectively concede the relevance of files

for cases created in or after 1989, based on the Court's prior ruling which rejected Mr. Cannizzaro's

argument that discovery from that period was irrelevant to the claims and defenses in this case.   *See*

Doc. No. 60 at 1–3.[8]   However, his objection to pre-1989 discovery is misplaced.   With respect to

this motion, OPDA's conduct concerning *Brady* in 1987 and 1988 is highly relevant to Mr. Jones's

case.   As has been universally acknowledged in discovery, OPDA promulgated its first written

*Brady* policy in 1987.   *See, e.g.*, Ex. 15 (Dep. of Harry Connick, Sr., Feb. 11, 2019) to Monju Decl.

---

[8] While Mr. Cannizzaro has since asserted additional relevance objections, *see* Ex. 10 (Email from Matthew Paul, Sept. 20, 2019) to Monju Decl., these belated objections were not included in Mr. Cannizzaro's written responses and objections to the Request, *see* Ex. 13 (Defendant's Responses to Third Requests for Production) to Monju Decl. at 3–5, and are therefore waived.   *See, e.g.*, *First Am. Bankcard, Inc. v. Smart Bus. Tech., Inc.*, No. 15-CV-638, 2017 WL 2267149, at *2 (E.D. La. May 24, 2017).   Regardless, Mr. Cannizzaro's belated objections do not identify the allegedly irrelevant cases, and are therefore too generalized and conclusory to permit response.

at 11:12–19, 14:20–22; Ex. 16 (Dep. of Timothy McElroy, Feb. 15, 2019) to Monju Decl. at 25:1–

27:16. This policy—which was materially inaccurate with respect to OPDA's *Brady* obligations—

was the same policy in place at the time of Mr. Jones's wrongful convictions, and remained in place

through the end of Mr. Connick's tenure in 2003. *See, e.g.*, Ex. 16 (Dep. of Timothy McElroy, Feb.

15, 2019) to Monju Decl. at 39:7–10. Accordingly, OPDA's pattern of violating *Brady* when this

written policy was in effect bears a direct connection to its compliance with *Brady* at the time of

Mr. Jones's wrongful convictions. Further, *Brady* violations that were either uncovered or

committed in 1987 and 1988 share a close temporal nexus with Mr. Jones's arrest in 1992 and

wrongful convictions in 1996, and are therefore highly relevant to proving OPDA's pattern of

misconduct as it relates to Mr. Jones's case. *See* Doc. No. 52-2 at 5–6 (collecting cases in which

courts rejected strict time limits for discovery where plaintiffs were required to prove a pattern of

misconduct).

**B.     Mr. Jones's Request for the Files is Proportionate to the Needs of the Case and Does Not Place an Undue Burden on Mr. Cannizzaro**

Each factor for evaluating proportionality set forth in Rule 26(b)(1) weighs in favor of

granting Mr. Jones's motion to compel. As this Court has previously held, "the issues at stake [in

this action] are important, both to the parties involved and as a public matter," *see* Doc. No. 60 at

2. Indeed, Mr. Jones seeks to remedy the decades of wrongful imprisonment he suffered as a result

of OPDA's longstanding unconstitutional *Brady* policy, practice, or custom, a policy that Mr. Jones

intends to prove also impacted dozens of other defendants prosecuted by OPDA. *See* Compl.

¶¶ 105–108. In addition, as this Court has previously observed, "[t]he amount in controversy

arising from [Mr. Jones's] imprisonment for 23 years is large." *See* Doc. No. 60 at 2.

Each of the other factors in Rule 26(b)(1) also support the proportionality of Mr. Jones's

request. OPDA's access to the relevant materials—*OPDA's own case files*—is far superior to Mr.

Jones's, given that Mr. Jones has no independent access to the files.  Mr. Jones's personal resources are minimal; he has received no compensation from the state for his injuries.  *See* Monju Decl. at ¶ 22.  And the requested discovery will be central to Mr. Jones's proof at trial and will enable Mr. Jones to effectively rebut OPDA's potential litigation of *Brady* violations in each of the cases included in this request—including OPDA's re-litigation of state court decisions finding that *Brady* violations occurred.  Thus, any burden on OPDA associated with producing its own case files is clearly outweighed by the importance of this evidence in proving OPDA's long history of *Brady* violations.

To the extent that Mr. Cannizzaro objects that the number of requested case files renders the request unduly burdensome, the number of requested files—all of which relate to cases with proven or likely *Brady* violations—is a problem of OPDA's own making and cannot be held against Mr. Jones.  As an initial matter, OPDA committed dozens of *Brady* violations; it is thus entirely logical—and appropriate—that Mr. Cannizzaro may be required to produce documents concerning each of those violations in a case concerning OPDA's pattern of *Brady* violations.  More to the point, Mr. Cannizzaro himself has inflated the number of files to be produced, first, by refusing to make the obvious stipulation that the 22 files produced in *Adams* were produced by OPDA from its own files, and second, by his continued insistence on re-litigating OPDA's dozens of court-found *Brady* violations.  Mr. Jones has made clear that he will not insist on the production of files for any cases in which OPDA concedes that it violated *Brady*—something that, to date, Mr. Cannizzaro has been unwilling to do for any of the 45 cases, affecting 46 defendants, in which courts have previously found *Brady* violations by OPDA.  Mr. Cannizzaro cannot be permitted to pursue this re-litigation strategy while preventing Mr. Jones from preparing to respond to it.

Moreover, Mr. Cannizzaro's assertion of undue burden is conclusory and insufficient to

avoid his discovery obligations.  He has offered no estimate of the burden associated with producing the case files Mr. Jones has requested.  *See* Ex. 13 (Defendant's Responses to Third Requests for Production) to Monju Decl. at 4–5.  Mr. Cannizzaro suggests that the allegedly "substantial" burden of producing Mr. Jones's own case files is instructive, *see id.*, but this argument ignores that OPDA has already identified and produced numerous files in prior *Brady* litigations.  For example, OPDA produced at least 70,000 pages of case files in connection with *Adams* alone, *see* Monju Decl. at ¶ 23, a case in which Mr. Cannizzaro, in his official capacity, was represented by just two outside counsel and one in-house attorney, *see* Ex. 12 (*Adams v. City of New Orleans*, No. 15-CV-1543, Docket (E.D. La.)) to Monju Decl.  By contrast, Mr. Cannizzaro is represented in this case by, and may rely on the services of, at least six attorneys in this case—facts that belie his objection to the feasibility of identifying and producing a similar number of files here.[9]

For all these reasons, Mr. Cannizzaro should be compelled to produce the 56 requested files from OPDA cases with known or likely *Brady* violations.

## III.    Mr. Jones Should Be Permitted to Depose Assistant District Attorney Kyle Daly

Several months ago, Mr. Jones sought leave from Mr. Cannizzaro to depose Kyle Daly, a current assistant district attorney in OPDA's appeals division, with respect to OPDA's policies, practices, and customs concerning post-conviction *Brady* claims.  *See* Monju Decl. at ¶ 24.  On June 21, 2019, Mr. Jones supplemented his request by disclosing to OPDA the precise topics on which Mr. Jones sought to depose Mr. Daly—including citing three specific cases on which Mr. Daly has worked that are directly relevant to the number of *Brady* violations committed by OPDA—

---

[9] While Mr. Cannizzaro offered additional burden objections by email as well, *see* Ex. 10 (Email from Matthew Paul, Sept. 20, 2019) to Monju Decl., these belated objections are also waived and insufficiently particularized to permit response.  *See, e.g.*, *First Am. Bankcard, Inc.*, 2017 WL 2267149, at *2.

and offered to limit Mr. Daly's deposition to 2.5 hours. *See id.* at ¶ 25. Mr. Cannizzaro rejected Mr. Jones's request. Accordingly, Mr. Jones now seeks leave under Rule 26(b)(2)(A) to depose Mr. Daly, as Mr. Jones has previously taken 13 depositions in this case. *See id.* at ¶ 26.

Under Rule 26(b)(2)(A), the Court has the discretion to enlarge the number of permitted depositions, when the requested depositions are both relevant and proportional to the needs of the case and would not be unreasonably cumulative, duplicative, burdensome, or expensive. *See* Fed. R. Civ. P. 26(b)(1), (b)(2); *Quest Diagnostics Inc. v. Factory Mut. Ins. Co.*, No. 07-CV-03877, 2008 WL 11355072, at *6 (E.D. La. Aug. 21, 2008) (permitting four additional depositions of individuals with relevant knowledge beyond the fifteen depositions already taken). Because Mr. Daly's deposition will likely provide significant, unique testimony relating to the frequency of *Brady* violations at OPDA, and because such a brief deposition would impose a relatively minimal burden on OPDA, the Court should grant Mr. Jones leave to depose Mr. Daly.

### A. Mr. Daly's Expected Testimony Concerns a Significant Issue

In reviewing numerous cases in which credible allegations of *Brady* violations have been made against OPDA in post-conviction proceedings, Mr. Jones detected several cases in which OPDA, under Mr. Cannizzaro, offered plea agreements to petitioners and/or requested that district court judges vacate prior convictions on unspecified grounds when credible *Brady* claims were pending. This practice has the effect of limiting—and is potentially intended to limit—OPDA's total number of court-found *Brady* violations. Mr. Daly acted as OPDA's representative in at least three of the cases in which Mr. Jones detected such conduct. Ex. 17 (*State v. Wells*, No. 480-153 (Orleans Crim. Dist. Ct. Jan. 25, 2019)) to Monju Decl.; Ex. 18 (C. Conway Docket) to Monju Decl.; Ex. 19 (T. East Docket) to Monju Decl. In addition, Mr. Jones has identified at least one case in which the petitioner asserted a credible *Brady* claim and—directly after an *ex parte* meeting with Mr. Cannizzaro—the judge granted relief on the petitioner's pleadings on a non-*Brady* ground.

14

*See* Ex. 20 (Decl. of Paul Barker, Aug. 9, 2019) to Monju Decl. at ¶¶ 6–9.  Mr. Daly also acted as OPDA's representative in that proceeding.  *See id.* at ¶ 2.

Each of these cases provides fertile ground for questioning of Mr. Daly.  Two of the cases involve convictions that occurred close in time to Mr. Jones's wrongful convictions and vacaturs that similarly occurred close in time to the vacatur of Mr. Jones's convictions.  *See* Ex. 18 (C. Conway Docket) to Monju Decl. at 2, 4–5 (reflecting January 1996 conviction and March 2014 plea agreement); Ex. 19 (T. East Docket) to Monju Decl. at 2, 4 (reflecting August 1997 conviction and June 2017 plea agreement).  In addition, the third case provides the most explicit use of these practices.  In that case, Mr. Daly asked the district court judge—on the record—to vacate the petitioner's conviction without stating a ground for the vacatur.  *See* Ex. 17 (*State v. Wells*, No. 480-153 (Orleans Crim. Dist. Ct. Jan. 25, 2019)) to Monju Decl. at 3:14–4:28.  Despite the court's apparent misgivings, it acceded to OPDA's request.  *See id.* at 20:1–30.  Notably, the trial court had expressly concluded that "the *Brady* violation [was] there," but the appellate court deferred resolution of the *Brady* claim until it could be more fully addressed in post-conviction proceedings. *See State v. Wells*, 191 So.3d 1127, 1134, 1137 (La. Ct. App. 2016).  Mr. Daly's conduct plainly preempted a potential *Brady* finding.  Finally, in the fourth case, Mr. Cannizzaro's visit may well have prompted the court's decision on non-*Brady* grounds, a suspicion harbored at least by the petitioner's attorney.  *See* Ex. 20 (Decl. of Paul Barker, Aug. 9, 2019) to Monju Decl. at ¶¶ 6–9. Mr. Daly, of course, may also shed light on whether OPDA engaged in this practice in any other cases.  Substantiating the *Brady* violations in these cases, and the intent behind Mr. Daly's conduct in potentially suppressing these *Brady* violations, would both bolster Mr. Jones's proof of a pattern of misconduct and rebut OPDA's likely defense that the dozens of *Brady* violations identified by Mr. Jones are insufficient to prove a pattern, by establishing that OPDA actively sought to reduce

the number of proven violations.

**B.      Mr. Jones's Request to Depose Mr. Daly is Proportionate to the Needs of the Case and Does Not Place an Undue Burden on Mr. Cannizzaro**

For similar reasons to those stated above, each factor for evaluating proportionality under Rule 26(b)(1) weighs in favor of granting Mr. Jones's motion for leave to depose Mr. Daly, including the importance of the issues at stake; the amount in controversy; Mr. Cannizzaro's access to the relevant information—specifically, his own employee; Mr. Jones's minimal personal resources; and the significance of the requested discovery to Mr. Jones's claim.

Moreover, the requested discovery would not be unreasonably cumulative, duplicative, burdensome, or expensive.  First, OPDA's practice and custom of offering plea agreements in the face of credible *Brady* claims—a practice and custom that has proliferated during Mr. Cannizzaro's tenure as District Attorney—has not yet been addressed in this case.  That is because Mr. Cannizzaro's counsel sought, and Mr. Jones's counsel acceded to, an agreement that Mr. Cannizzaro and OPDA's deponents under Federal Rule of Civil Procedure 30(b)(6) would not be questioned regarding OPDA's *Brady* policies, practices, and customs under Mr. Cannizzaro. Monju Decl. at ¶ 31.  However, Mr. Jones's counsel has since uncovered substantial evidence of the recurrence of this practice and custom.  This, in turn, is directly relevant to the magnitude of OPDA's *Brady* violations over the years.  Second, Mr. Daly's deposition will not be overly burdensome or expensive.  Mr. Jones has identified in detail the precise topics for the deposition, limiting required preparation time with counsel.  Further, Mr. Jones has offered to limit Mr. Daly's deposition to 2.5 hours, less than half a day's work.

Finally, each of the 13 depositions Mr. Jones has taken to date was necessary to the development of proof for his claims and responses to Mr. Cannizzaro's defenses, as set forth below:

1. **Bridget Bane (April 18, 2019):**  Ms. Bane joined OPDA in 1975 and held a variety of supervisory positions before serving as First Assistant to Mr. Connick from 1987 until

1989.  Ex. 21 (Dep. of Bridget Bane, Apr. 18, 2019) to Monju Decl. at 10:10–21.  Ms. Bane helped draft OPDA's first policy manual in 1987, which included the written *Brady* policy in effect when Mr. Jones was arrested and tried for the rape of T.P. and related robberies and kidnapping (the "April 6 Crimes"), *see, e.g.*, *id.* at 68:9–16, and in her deposition, testified regarding the development and implementation of the policy, *see, e.g.*, *id.* at 67:13–68:21.  Ms. Bane also testified about overseeing OPDA's day-to-day operations as First Assistant.  *See, e.g.*, *id.* at 19:22–25, 20:16–23, 35:15–37:16.

2. **Raymond Bigelow (March 21, 2019):**  Judge Bigelow joined OPDA in 1983 and held a variety of supervisory positions before serving as First Assistant to Mr. Connick from 1989 to November 1993,[10] a period that included Mr. Jones's arrest for the April 6 Crimes.  Ex. 22 (Dep. of Raymond Bigelow, Mar. 21, 2019) to Monju Decl. at 7:19–10:18.  In his deposition, Judge Bigelow testified regarding his responsibility during the period for promulgating Mr. Connick's policies and overseeing OPDA's day-to-day operations.  *See, e.g.*, *id.* at 31:2–20.

3. **Camille Buras (March 26, 2019):**  Judge Buras joined OPDA in 1986 and held a variety of supervisory positions before serving as First Assistant to Mr. Connick from November 1993 to 1998,[11] a period that included Mr. Jones's trial for the April 6 Crimes.  Ex. 23 (Dep. of Camille Buras, Mar. 26, 2019) to Monju Decl. at 7:7–9:17.  In her deposition, Judge Buras testified regarding her responsibility for promulgating Mr. Connick's policies and overseeing OPDA's day-to-day operations.  *See, e.g.*, *id.* at 24:4–19.  Moreover, Judge Buras reviewed and signed the "Menner Memo"—a document with significant *Brady* information that OPDA failed to disclose for over 19 years—in the course of granting her approval for OPDA to offer Mr. Jones a plea bargain to crimes for which OPDA had no prosecutable case.  *See, e.g.*, *id.* at 302:16–304:25.

4. **Leon Cannizzaro, Jr. (April 16, 2019):**  Mr. Cannizzaro, the named defendant in this case, has served as District Attorney for Orleans Parish since 2008, a period that included the filing and litigation of Mr. Jones's successful application for post-conviction relief.  Ex. 24 (Dep. of Leon Cannizzaro, Jr., Apr. 16, 2019) to Monju Decl. at 27:25–28:1.  In his deposition, Mr. Cannizzaro testified regarding his knowledge of the Menner Memo and OPDA's decision to not re-prosecute Mr. Jones for the April 6 Crimes.  *See, e.g.*, *id.* at 173:12–174:13, 176:19–180:22.  Mr. Cannizzaro was also an assistant district attorney at OPDA from 1978 to 1983, and provided

---

[10] In his deposition, Judge Bigelow testified that he left OPDA in 1992.  Ex. 22 (Dep. of Raymond Bigelow, Mar. 21, 2019) to Monju Decl. at 7:19–10:18.  Mr. Jones believes Judge Bigelow misspoke and that his tenure as First Assistant ended in 1993.  *See* Metro, *Connick Names His 1st Assistant*, TIMES-PICAYUNE (Nov. 23, 1993) (stating that Camille Buras was named "Tuesday" by Mr. Connick to be First Assistant and she "was picked for the spot being relinquished by Ray Bigelow who was elected Criminal Court judge this month.").

[11] In her deposition, Judge Buras testified that she was appointed First Assistant in 1994.  Ex. 23 (Dep. of Camille Buras, Mar. 26, 2019) to Monju Decl. at 7:7–9:17.  Mr. Jones believes Judge Buras may instead have been appointed First Assistant in November 1993, when Mr. Bigelow resigned the position after being elected to the Orleans Parish Criminal District Court.  *See supra* note 10.

testimony regarding OPDA's *Brady* policies, practices, and customs during that time period. *See, e.g.*, *id.* at 36:13–16, 48:2–49:15.

5. **Debra Coffee (February 8, 2019):** Detective Coffee investigated the rape of T.P., *see* Compl. ¶ 22, and authored several documents with undisclosed *Brady* information, including handwritten notes and a supplemental report related to the April 6 Crimes, *see Jones v. Cain*, 151 So. 3d 781, 794–97, 801–02 (La. Ct. App. 2014), *writ denied*, 171 So. 3d 270 (La. 2015). During her deposition, Detective Coffee testified regarding her investigation and handling of the undisclosed evidence, as well as New Orleans Police Department policies, practices, and customs regarding the transmission of evidence to OPDA. Ex. 25 (Dep. of Debra Coffee, Feb. 8, 2019) to Monju Decl. at 74:1–75:8, 132:16–135:3.

6. **Harry Connick, Sr. (February 11 and 13, 2019):** Mr. Connick was the District Attorney for Orleans Parish and the sole policymaker at OPDA from April 1974 to January 2003, a period that included Mr. Jones's arrest and trial for the April 6 Crimes. Ex. 15 (Dep. of Harry Connick, Sr., Feb. 11, 2019) to Monju Decl. at 9:3–16. At his deposition, Mr. Connick testified regarding many aspects of OPDA's relevant *Brady* policy, practices, and customs during his tenure. *See, e.g.*, *id.* at 11:12–13:13, 30:15–32:4, 46:23–47:6, 78:23–79:4, 154:24–159:7.

7. **Roger Jordan (January 18, 2019):** Mr. Jordan was the screening assistant district attorney and lead pre-trial prosecutor on the charges against Mr. Jones and Lester Jones for the Crime Spree Crimes. *See* Ex. 7 (Dep. of Roger Jordan, Jan. 18, 2019) to Monju Decl. at 114:8–115:24. He secured the indictment against Mr. Jones for the April 6 Crimes, *see* Compl. ¶ 163, and worked on OPDA's incomplete response to Mr. Jones's 1992 discovery request, *see* Ex. 7 (Dep. of Roger Jordan, Jan. 18, 2019) to Monju Decl. at 138:21–139:19. At his deposition, Mr. Jordan testified regarding his firsthand knowledge of the prosecution of Mr. Jones's case, as well as OPDA's policies, practices, and customs at the time of Mr. Jones's trial. *See, e.g.*, *id.* at 122:7–125:14. Moreover, Mr. Jordan has a history of *Brady* violations committed while working at OPDA, *see* Compl. ¶ 163, and testified regarding his disciplinary history and reprimand from the Louisiana Supreme Court for violating *Brady* in another case, *see, e.g.*, Ex. 7 (Dep. of Roger Jordan, Jan. 18, 2019) to Monju Decl. at 101:7–104:6, 283:15–17.

8. **Timothy McElroy (February 15, 2019):** Mr. McElroy joined OPDA in January 1984 and held a variety of supervisory positions throughout his career, including serving as First Assistant to Mr. Connick from October 1998 to January 2003. Ex. 16 (Dep. of Timothy McElroy, Feb. 15, 2019) to Monju Decl. at 8:25–10:3. Mr. McElroy helped draft OPDA's first policy manual in 1987, which included the written *Brady* policy in effect when Mr. Jones was arrested and tried for the April 6 Crimes, *see, e.g.*, *id.* at 26:21–27:16, and at his deposition, testified regarding the development and implementation of the policy, *see, e.g.*, *id.* at 41:11–42:20. Mr. McElroy also testified about overseeing OPDA's day-to-day operations as First Assistant. *See, e.g.*, *id.* at 184:12–185:25, 220:11–18.

18

9. **Frederick Menner (February 19, 2019):**  Mr. Menner tried Mr. Jones for the April 6 Crimes, in which OPDA violated *Brady*.  Ex. 4 (Dep. of Frederick Menner, Feb. 19, 2019) to Monju Decl. at 48:18–25.  Additionally, Mr. Menner prepared the Menner Memo, which contained critical, undisclosed *Brady* evidence that undermined OPDA's case.  At his deposition, Mr. Menner testified regarding his handling of the trial and subsequent plea bargain for other of the Crime Spree Crimes charges, *see, e.g.*, *id.* at 54:25–56:23, as well as OPDA's *Brady* policies, practices, and customs at the time of Mr. Jones's trial, *see, e.g.*, *id.*

10. **OPDA 30(b)(6) (April 11–12, 2019):**   In their depositions, OPDA's Rule 30(b)(6) designees testified regarding the investigation and prosecution of Mr. Jones for the April 6 Crimes and other Crime Spree Crimes, *see, e.g.*, Ex. 26 (Dep. of David Pipes, Apr. 11, 2019) to Monju Decl. at 169:3–172:4, the investigation and prosecution of Lester Jones for the Crime Spree Crimes, *see, e.g.*, *id.* at 33:7–34:22, past *Brady* violations by OPDA, *see, e.g.*, Ex. 27 (Dep. of Val Solino, Apr. 12, 2019) to Monju Decl. at 263:15–269:4, and OPDA's policies, practices, and customs related to *Brady*, *see, e.g.*, *id.* at 16:3–17:4, 17:25–18:8.

11. **T.P. (May 15, 2019):**  T.P. was one of the victims of the April 6 Crimes and a key witness called by OPDA at Mr. Jones's trial.  In her deposition, T.P. testified regarding her recollection of the police investigation of the April 6 Crimes, as well as the circumstances surrounding her subsequent identification of Mr. Jones as the perpetrator in a pre-trial lineup and at trial.  Ex. 28 (Dep. of T.P., May 15, 2019) to Monju Decl. at 15:1–16:17, 66:6–67:25.  She was also questioned about inconsistencies in her trial testimony that support Mr. Jones's claim that OPDA suppressed favorable evidence. *See, e.g.*, *id.* at 95:1–98:25.

12. **Andrew Pickett (March 29, 2019):**  Mr. Pickett represented OPDA during Mr. Jones's post-conviction proceedings from late 2012 to 2015, a period culminating in the vacatur of Mr. Jones's convictions.  Ex. 29 (Dep. of Andrew Pickett, Mar. 29, 2019) to Monju Decl. at 9:13–16, 151:16–21; *see also Jones*, 151 So. 3d at 801–02.  During this time, Mr. Pickett repeatedly misrepresented to Mr. Jones and to state and federal courts that no undisclosed *Brady* evidence existed in Mr. Jones's case.  *See, e.g.*, Ex. 29 (Dep. of Andrew Pickett, Mar. 29, 2019) to Monju Decl. at 155:8–160:8, 171:25–185:6, 235:9–237:7.  At his deposition, Mr. Pickett testified regarding his handling of Mr. Jones's post-conviction litigation.  *See, e.g.*, *id.* at 128:14–24.

13. **John Rohr (March 22, 2019):**  Mr. Rohr has served as OPDA's Records Manager since May 1989.  Ex. 30 (Dep. of John Rohr, Mar. 22, 2019) to Monju Decl. at 12:25–13:22. In this role, Mr. Rohr responded to several public records requests submitted by Mr. Jones, but never disclosed the Menner Memo—which was in plain sight in one of OPDA's files for Mr. Jones.  In his deposition, Mr. Rohr provided testimony that shed light on how OPDA's policies and practices for responding to public records requests contributed to OPDA's repeated failure to produce this significant piece of *Brady* information.  *See, e.g.*, *id.* at 47:19–49:17, 97:15–101:11.

For a case that spans decades—with a complex factual and procedural history, involving

many key witnesses, information largely in the possession of his adversary, and requiring proof not only of Mr. Jones's own injuries but also of a pattern of unconstitutional conduct at OPDA in other cases—it is reasonable that more than ten depositions are needed by Mr. Jones (who bears the burden of proof on his claim) to adequately develop the evidence in this case.  For all these reasons, Mr. Jones should be granted leave to depose Mr. Daly.

## IV.     Mr. Cannizzaro Has Waived Work Product Protection Over Notes of OPDA's November 5, 2015 Meeting with Frederick Menner (*Requests for Production Nos. 3 and 7*)

On November 5, 2015, OPDA assistant district attorneys David Pipes and Donna Andrieu met with Frederick Menner, the lead trial prosecutor in Mr. Jones's case, concerning the bombshell memorandum Mr. Menner drafted in Mr. Jones's case, reflecting that Lester Jones had "recanted [his] entire statement" implicating Mr. Jones and that OPDA had no evidence to convict Mr. Jones of the murder of Ms. Stott.  *See* Ex. 6 (Mem. from Frederick Menner, Apr. 4, 1996) to Monju Decl. Ms. Andrieu drafted a memorandum of the meeting, reflecting Mr. Menner's alleged interpretation of the Menner Memo—that by writing Lester Jones "recanted [his] entire statement" and "insisted the statement was not made," Mr. Menner meant only that Lester Jones said he would not testify against Mr. Jones without a cooperation agreement.  *See* Ex. 31 (Mem. from Donna Andrieu, Nov. 6, 2015) to Monju Decl.  (Notably, the Menner Memo reflects no request for a cooperation agreement, and Ms. Andrieu's memorandum does not include an explanation from Mr. Menner for this glaring flaw in his alleged account.)  Mr. Cannizzaro produced Ms. Andrieu's memorandum to Mr. Jones in both this litigation and in Mr. Jones's post-conviction litigation.  Nevertheless, Mr. Cannizzaro has refused to produce Mr. Pipes's notes of the meeting, despite the fact that they are responsive to Requests Nos. 3 and 7, citing work product protection.  *See* Doc. No. 52-7 at 8–9; Ex. 9 (Email from Matthew Paul, Sept. 26, 2019) to Monju Decl.

Mr. Cannizzaro's work product claim over Mr. Pipes's notes must fail.  As an initial matter,

Mr. Cannizzaro does not contest the relevance of Mr. Pipes's notes, and rightly so—Mr. Pipes's notes concern the first meeting at which Mr. Menner allegedly shared his interpretation of the Menner Memo with OPDA.  More to the point, Mr. Cannizzaro's assertion of privilege comes far too late to prevent the production of these responsive documents.  Mr. Cannizzaro has repeatedly and intentionally waived any privilege as to the substance of the November 5, 2015 meeting by producing Ms. Andrieu's memorandum to Mr. Jones and by permitting Mr. Pipes and Ms. Andrieu to testify about the meeting on multiple occasions.  *See* Ex. 32 (*State v. Jones*, No. 356-745, Test. of Donna Andrieu (Orleans Crim. Dist. Ct. Dec. 15, 2015)) to Monju Decl. at 24–27; Ex. 33 (*State v. Jones*, No. 356-745, Test. of Donna Andrieu (Orleans Crim. Dist. Ct. Jan. 24, 2017)) to Monju Decl. at 117–23; Ex. 26 (Dep. of David Pipes, Apr. 11, 2019) to Monju Decl. at 288:14–291:4, 295:9–296:3.  Significantly, such intentional disclosures trigger waiver over not only the document or information disclosed, but also "undisclosed . . . information concern[ing] the same subject matter" that "ought in fairness to be considered together" with the produced document. Fed. R. Evid. 502(a).  Because Mr. Cannizzaro's past disclosures regarding the meeting have placed one version of Mr. Menner's explanation in the record, it is only fair that Mr. Jones have access to Mr. Pipes's account of the meeting as well, so that Mr. Jones may ascertain whether Mr. Pipes recorded Mr. Menner's explanation of the Menner Memo differently.  *See Flashmark Techs. LLC v. GTECH Corp.*, No. 06-CV-205, 2007 WL 9724333, at *3 (E.D. Tex. Aug. 1, 2007) (finding the privilege waived as to documents "which might refute" a party's assertions regarding a disputed issue and compelling production of "all other documents relating to the same subject matter").

## V.     Mr. Cannizzaro Must be Compelled to Timely Produce Electronically Stored Information Requested in this Case

Mr. Jones served his First Set of Requests for Production over one year ago, on August 16, 2018.  *See* Doc. No. 52-7.  Mr. Cannizzaro purported to respond completely to these Requests, save

for his objections.  However, it subsequently became clear in Mr. Cannizzaro's and OPDA's Rule 30(b)(6) depositions that Mr. Cannizzaro had not conducted a thorough or systematic search of electronically stored information ("ESI") in order to ensure the completeness of his response.  *See* Ex. 24 (Dep. of Leon Cannizzaro, Jr., Apr. 16, 2019) to Monju Decl. at 17:19–25; Ex. 26 (Dep. of David Pipes, Apr. 11, 2019) to Monju Decl. at 336:16–348:12; Ex. 27 (Dep. of Val Solino, Apr. 12, 2019) to Monju Decl. at 249:13–251:6.  Mr. Jones requested that Mr. Cannizzaro undertake such a search, *see* Ex. 34 (Letter from Erin Monju, June 5, 2019) to Monju Decl. at 1–2, and the parties agreed to criteria for the search approximately three months ago, *see* Monju Decl. at ¶ 46. Mr. Cannizzaro also represented that he would obtain and produce responsive documents from OPDA that are held by the City of New Orleans.  *See* Ex. 10 (Email from Matthew Paul, Sept. 20, 2019) to Monju Decl.

Mr. Cannizzaro did not produce any responsive ESI until September 20, 2019—more than one year after Mr. Jones served the relevant Requests.  *See id.*  Moreover, the production was only partial—covering only a fraction of the relevant Requests (Nos. 1 through 12, and 38), and with the qualified assurance that there are no other documents responsive to those Requests "as far as [counsel] know[s]."  *Id.*  Mr. Cannizzaro provided no estimate for when the remaining ESI will be produced, instead stating only that it will be forthcoming "as soon as [counsel] can get through them," *id.*—an unsatisfactory assurance in light of the many months Mr. Jones has waited for the data.

Federal Rule of Civil Procedure 34(b)(2)(B) provides that productions "must be completed no later than the time for inspection specified in the request or another *reasonable time* specified in the response," but the "reasonable time" for production has long since passed.  In order to ensure that Mr. Jones receives the remaining ESI in time to make use of it, Mr. Jones respectfully requests

that the Court order Mr. Cannizzaro to complete his production of ESI for all outstanding Requests, whether held by OPDA or the City of New Orleans, no later than November 1, 2019.

## **CONCLUSION**

For all of these reasons, Mr. Jones's Second Motion to Compel Discovery from Defendant Leon Cannizzaro, Jr. and Motion for Leave to Depose Kyle Daly, should be granted.

Respectfully submitted,

*/s/ Erin Monju*

Alan Vinegrad* (T.A.) (N.Y. 1967140)
Erin Monju* (N.Y. 5160908)
Benjamin Cain* (C.A. 325122)
Mary Swears* (N.Y. 5677687)
COVINGTON & BURLING LLP
The New York Times Building
620 Eighth Avenue
New York, N.Y. 10018
Phone:  (212) 841-1000
Email: avinegrad@cov.com,
      emonju@cov.com,
      bcain@cov.com,
      mswears@cov.com

*with*

Mark A. Cunningham (La. 24063)
JONES WALKER LLP
201 St. Charles Avenue, Ste. 5100
New Orleans, L.A. 70170
Phone:  (504) 582-8536
Email: mcunningham@joneswalker.com

*and*

Nina Morrison* (N.Y. 3048691)
INNOCENCE PROJECT
40 Worth Street
Suite 701
New York, N.Y.  10013
Phone: (212) 364-5340

Email: nmorrison@innocenceproject.org

*Admitted pro hac vice*

*Attorneys for Plaintiff Robert Jones*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the above and foregoing document has been served upon all

counsel of record by using the CM/ECF system, this 1st day of October, 2019.

*/s/ Erin Monju*